**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Ruben Garza, | No. CV-14-01901-PHX-SRB |
| Petitioner, | **ORDER** |
| v. | DEATH PENALTY CASE |
| David Shinn, et al., | |
| Respondents. | |

Before the Court is the Petition for Writ of Habeas Corpus filed by Ruben Garza, an Arizona death row inmate. (Doc. 27.) Respondents filed a response to the petition and Garza filed a reply. (Docs. 37, 44.) For the reasons set forth herein, the petition is denied.

## BACKGROUND

In 2004, a Maricopa County jury convicted Garza of two counts of first-degree murder for the 1999 shooting deaths of Ellen Franco and Lance Rush. He was sentenced to death for the Rush murder. The Arizona Supreme Court set forth the following facts in its opinion affirming the convictions and sentences. *State v. Garza*, 216 Ariz. 56, 61–63, 163 P.3d 1006, 1011–13 (2007).

Ellen Franco lived in a house in Waddell, Arizona, with Jennifer Farley and Farley's boyfriend, Lance Rush. She had recently separated from her husband, Larry Franco.

At approximately 10:30 p.m. on December 1, 1999, Farley heard a knock at the door. Upon opening the door, she saw a Hispanic male about five feet, nine or ten inches tall, weighing 180 to 200 pounds, with severe acne. He pointed at Ellen, who was standing

behind Farley, and said, "I am here to see her." Ellen identified him as "Ben," whom Farley understood to be a relative of Ellen's.

Ellen went outside. Farley went to her bedroom and told Rush about the visitor. She then heard two gunshots. Rush and Farley scrambled to grab one of the guns they kept in their bedroom, and Farley took a pistol from her nightstand. By the time she removed the gun from its holster, the locked door to the bedroom had been opened.

Rush went into the hallway. Farley heard a gunshot almost immediately thereafter and hid in the bedroom closet. She heard several more shots.

After waiting briefly, Farley came out of the bedroom closet. She saw Ellen lying face down in the living room in a pool of blood. After determining that Ellen was alive, Farley looked for Rush. She found him in the guest bedroom opposite their bedroom. He was conscious but bleeding. Farley dialed 911. Police and paramedics arrived within minutes. Rush was lucid and said, "Someone kicked the door and started shooting." Ellen and Rush later died of their wounds.

Around 12:45 a.m. on December 2, Garza bought bandages, gauze, and hydrogen peroxide from a drugstore in west Phoenix. Later that morning, he was treated at a Phoenix hospital for a gunshot wound to his left arm. The hospital contacted Phoenix police. Garza told the responding officer that he was walking down the street when an unknown assailant drove by and shot him.

Maricopa County Sheriff's Office ("MCSO") detectives questioned Garza the next morning. Garza again claimed that he had been the victim of a drive-by shooting but changed his story when told that he had been identified by Farley as the visitor to the Waddell house. He then stated that he had gone there to persuade Ellen to reconcile with Larry. Ellen came out and talked to him. When their conversation turned into an argument, Garza pulled out his gun and shot her. Garza said he then blacked out and was in a daze. He told the detectives he did not remember seeing a man at the house, but that the woman who had originally answered the door charged at him with a knife and he shot at her. At some point someone shot him and he returned fire.

Garza was arrested. That same day he made two phone calls from jail to his friend Laurel Thompson. In the first conversation, Garza said he was going to be in jail for a couple years and that he had done to somebody else what the two had once discussed doing to a boyfriend who had assaulted Thompson.

In the second conversation, Thompson told Garza that he was on every newscast. Thompson asked Garza how he had gotten caught. He told her he had been shot. Garza asked Thompson about the news coverage and how many victims were being reported, and she said that he had killed two people. Garza told Thompson he didn't remember who he shot. When asked if it was self-defense, Garza said that on one count it was and on the other count it wasn't. He said the guy shot him and then he shot the guy.

Garza's car was searched. Two white cloth gloves were found on the front seat floorboards. One glove was stained with blood, later identified through DNA testing as Garza's. A bloodstained green cloth glove was found under the front seat. DNA testing also identified that blood as Garza's. Garza's blood was also found on the passenger side of the car and in two locations in the hallway of the Waddell house.

A box of 9 mm ammunition was found under the driver's seat. Garza's fingerprints were on the box. The bullets were the same type as those found at the murder scene. A 9 mm pistol was found in Garza's apartment. Testing showed that the pistol had fired the bullets found at the murder scene. No bullets fired by any other gun were discovered at the scene.

Farley identified Garza at trial as the intruder. Eric Rodriguez, a longtime friend of Garza's, testified that before the murders he had rejected Garza's offer to join him in a venture that would require them to "get a little dirty" in order to make some money. Another acquaintance testified that two or three weeks before the murders Garza had asked if he was interested in helping Garza with some "family problems."

Garza was represented at trial by James Cleary and Christopher Dupont of the Office of the Legal Defender. His primary defense was that Larry Franco had committed the

murders. He claimed that law enforcement covered up Franco's involvement because Franco was a police informant.

The jury found Garza guilty of two counts of first degree-murder and one count of first-degree burglary. The State alleged both felony and premeditated murder. The jury made no findings as to the theory or theories upon which the murder verdicts were based.

In the aggravation phase of trial, the jury rejected the A.R.S. § 13-703(F)(5) pecuniary gain aggravating factor, but found that the § 13-703(F)(8) multiple-murders factor had been established as to both murders.[1]

In the penalty or mitigation phase, the jury declined to impose death for Ellen's murder, but authorized the death penalty for the murder of Rush. The court sentenced Garza to death for the Rush murder and life without possibility of parole for Ellen's murder.

The Arizona Supreme Court affirmed the convictions and sentences. *Garza*, 216 Ariz. at 63, 163 P.3d at 1013. Garza filed a petition for post-conviction relief ("PCR"), which the court denied without an evidentiary hearing.[2] The Arizona Supreme Court summarily denied review.

Garza then sought relief in this Court, filing his Petition for Writ of Habeas Corpus on July 31, 2015. (Doc. 27.)

## APPLICABLE LAW

Habeas relief may be granted only on claims that a prisoner "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Federal habeas claims are analyzed under the framework of the Antiterrorism and Effective Death Penalty Act ("AEDPA"). Pursuant to AEDPA, a petitioner is not entitled to habeas relief on any claim adjudicated on the merits in state court unless the state court's

---

[1] At the time of Garza's offense, Arizona's capital sentencing scheme was set forth in A.R.S. §§ 13-703 and 13-703.01 to -703.04. It is presently set forth in A.R.S. §§ 13-751 to -759. The Court refers throughout this order to the statutes in effect at the time of the crimes.

[2] Maricopa County Superior Court Judge Gregory H. Martin presided over Garza's trial and sentencing. Judge Karen L. O'Connor presided over the PCR proceedings.

- 4 -

adjudication (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state court. 28 U.S.C. § 2254(d).

A state court decision is "contrary to" clearly established federal law under § 2254(d)(1) if it applies a rule that contradicts the governing law set forth in Supreme Court precedent, thereby reaching a conclusion opposite to that reached by the Supreme Court on a matter of law, or if it confronts a set of facts that is materially indistinguishable from a decision of the Supreme Court but reaches a different result. *Williams v. Taylor (Terry Williams)*, 529 U.S. 362, 405–06 (2000); *see Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam). Under the "unreasonable application" prong of § 2254(d)(1), relief is available where a state court "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular . . . case" or "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams (Terry)*, 529 U.S. at 407.

"Clearly established federal law" refers to the holdings, as opposed to dicta, of the Supreme Court's decisions at the time of the relevant state court decision. *Id.* at 412. "[C]ircuit precedent does not constitute 'clearly established Federal law'" and "cannot form the basis for habeas relief under AEDPA." *Parker v. Matthews*, 567 U.S. 37, 48–49 (2012); *see Carey v. Musladin*, 549 U.S. 70, 76–77 (2006). A reviewing court may, however, "look to circuit precedent to ascertain whether it has already held that the particular point in issue is clearly established by Supreme Court precedent." *Marshall v. Rodgers*, 569 U.S. 58, 63 (2013).

The Supreme Court has emphasized that under § 2254(d)(1) "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Williams (Terry)*, 529 U.S. at 410, (O'Connor, J., concurring); *see Bell v. Cone*, 535 U.S. 685, 694 (2002). To obtain habeas relief, therefore, "a state prisoner must show that the

state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011); *see Shinn v. Kayer*, 141 S. Ct. 517, 526 (2020) (per curiam); *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The burden is on the petitioner to show "there was no reasonable basis for the state court to deny relief." *Richter*, 562 U.S. at 98. This standard is meant to be "difficult to meet." *Kayer*, 141 S. Ct. at 523 (quoting *Richter*, 562 U.S. at 102).

Under § 2254(d)(2), habeas relief is available if the state court decision was based on an unreasonable determination of the facts. *Miller-El v. Dretke* (*Miller-El II*), 545 U.S. 231, 240 (2005). "[A] decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El v. Cockrell* (*Miller-El I*), 537 U.S. 322, 340 (2003). A state court's factual determination is presumed correct and a petitioner bears the burden of overcoming that presumption with clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El I*, 537 U.S. at 340. A "factual determination is not unreasonable merely because [a] federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010); *see Rice v. Collins*, 546 U.S. 333, 341–42 (2006) ("Reasonable minds reviewing the record might disagree" about a factual finding, but "on habeas review that does not suffice to supersede" the state court's determination."); *see also Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004) (explaining that to satisfy § 2254(d)(2) a federal habeas court "must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record"), *overruled on other grounds by Murray (Robert) v. Schriro*, 745 F.3d 984, 999–1000 (9th Cir. 2014); *McGill v. Shinn*, --- F.4th ----, 2021 WL 4899001, at *11 (9th Cir. 2021) (noting that § 2254(d)(2) standard is met in "relatively few cases") (quoting *Taylor*, 366 F.3d at 1000).

A writ of habeas corpus cannot be granted unless the petitioner has properly exhausted all available state court remedies. 28 U.S.C. § 2254(b)(1); *see also Coleman v. Thompson*, 501 U.S. 722, 731 (1991). To exhaust state remedies, the petitioner must "fairly present[]" his claims to the state's highest court in a procedurally appropriate manner. *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999). Petitioners meet this requirement by describing the operative facts and the federal legal theory on which the claim is based. *Anderson v. Harless*, 459 U.S. 4, 6 (1982).

A claim may also be "technically" exhausted if the petitioner has lost the opportunity to raise the claim on "independent and adequate" state law grounds. *Coleman*, 501 U.S. at 732 ("A habeas petitioner who has defaulted his federal claims in state court meets the technical requirements for exhaustion; there are no state remedies any longer 'available' to him."). Such claims are considered procedurally defaulted and are not subject to habeas relief. *See id.* at 731–32; *Smith v. Baldwin*, 510 F.3d 1127, 1139 (9th Cir. 2007).

In Arizona, there are two avenues for petitioners to present and exhaust federal constitutional claims in state court: direct appeal and PCR proceedings. Rule 32 of the Arizona Rules of Criminal Procedure governs PCR proceedings and provides that a petitioner is procedurally barred from relief on any claim that could have been raised on appeal or in a prior PCR petition. Ariz. R. Crim. P. 32.2(a)(3). If an Arizona court concludes that a claim was waived under this rule, that is an independent and adequate procedural ground precluding federal habeas relief. *See Hurles v. Ryan*, 752 F.3d 768, 780 (9th Cir. 2014).

Procedural default is not an insurmountable bar to relief. A petitioner may raise a defaulted claim if he "can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750.

Generally, "cause" for a procedural default exists if a petitioner can demonstrate that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986); *Coleman*,

1    501 U.S. at 753. "Prejudice" is actual harm resulting from the alleged constitutional error.

2    *Vickers v. Stewart*, 144 F.3d 613, 617 (9th Cir. 1998).

3          Because the acts of a petitioner's counsel are not external to the defense, they are

4    generally attributable to the petitioner, and negligence, ignorance, or inadvertence on

5    counsel's part does not qualify as "cause." *Coleman*, 501 U.S. at 752–54 (citing *Carrier*,

6    477 U.S. at 488). However, where the ineffective assistance of counsel amounts to an

7    independent constitutional violation, it can establish cause. *Id.* at 753–54.

8          Under *Martinez v. Ryan*, 566 U.S. 1, 14 (2012), a petitioner may establish cause for

9    the procedural default of a claim of ineffective assistance of trial counsel "by demonstrating

10   two things: (1) 'counsel in the initial-review collateral proceeding, where the claim should

11   have been raised, was ineffective under the standards of *Strickland v. Washington*, 466 U.S.

12   668 . . . (1984),' and (2) 'the underlying ineffective-assistance-of-trial-counsel claim is a

13   substantial one, which is to say that the prisoner must demonstrate that the claim has some

14   merit.'" *Cook v. Ryan*, 688 F.3d 598, 607 (9th Cir. 2012) (quoting *Martinez*, 566 U.S. at

15   14); *see also Pizzuto v. Ramirez*, 783 F.3d 1171, 1178 (9th Cir. 2015).

16         As explained in more detail below, to prevail under *Strickland*, a petitioner must

17   show that counsel's representation fell below an objective standard of reasonableness and

18   that the deficiency prejudiced the defense. 466 U.S. at 687–88. The inquiry under

19   *Strickland* is highly deferential. *Id.* at 689; *see Hooper v. Shinn*, 985 F.3d 594, 627 (9th

20   Cir. 2021); *Atwood v. Ryan*, 870 F.3d 1033, 1055 (9th Cir. 2017); *Runningeagle v. Ryan*,

21   825 F.3d 970, 982 (9th Cir. 2016).

22         To satisfy *Strickland*'s first prong, a petitioner must overcome "the presumption

23   that, under the circumstances, the challenged action 'might be considered sound trial

24   strategy.'" *Strickland*, 466 U.S. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101

25   (1955)). With respect to *Strickland*'s second prong, a petitioner must affirmatively prove

26   prejudice by "show[ing] that there is a reasonable probability that, but for counsel's

27   unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

28

The *Martinez* exception to procedural default applies only to claims of ineffective assistance of trial counsel. It has not been expanded to other types of claims. *Martinez (Ernesto) v. Ryan*, 926 F.3d 1215, 1225 (9th Cir. 2019) ("[I]neffective assistance of PCR counsel can constitute cause only to overcome procedurally defaulted claims of ineffective assistance of trial counsel."); *Pizzuto*, 783 F.3d at 1177 (explaining that the Ninth Circuit has "not allowed petitioners to substantially expand the scope of *Martinez* beyond the circumstances present in *Martinez*"); *Hunton v. Sinclair*, 732 F.3d 1124, 1126–27 (9th Cir. 2013) (noting that only the Supreme Court can expand the application of *Martinez* to other areas); *see Davila v. Davis*, 137 S. Ct. 2058, 2062–63, 2065–66 (2017) (holding that the *Martinez* exception does not apply to claims of ineffective assistance of appellate counsel).

## DISCUSSION

Garza's habeas petition is more than 400 pages long and raises 37 claims, along with dozens of subclaims. (Doc. 27.)

The Court previously denied Garza's motion for evidentiary development. (Doc. 73.) In doing so the Court denied Claims 18, 19, 25, 27, and 35 on the merits and Claim 37 as non-cognizable. (*Id.* at 34.) The Court also determined that the following claims were procedurally defaulted and barred from federal review: Claims 2(D) and (G), Claims 7(A)(4)(a), (h), (i), (l), (m), and (n), and Claims 23 and Claim 24. (*Id.* at 28–29, 32–33.)

In addressing the remaining claims, the Court will first consider Garza's allegation of intellectual disability. It will then turn to his allegations of trial court error, prosecutorial misconduct, and juror misconduct, followed by a consideration of his challenges to the Arizona Supreme Court's review of his death sentence. Next, the Court will address Garza's claims of ineffective assistance of counsel. Finally, the Court will consider Garza's challenges to the death penalty and to Arizona's death penalty scheme.

## I.     Intellectual Disability

**Claim 1:**

Garza alleges that he is intellectually disabled and therefore ineligible for execution under the Eighth and Fourteenth Amendments. (Doc. 27 at 40.) He raised this claim during

his PCR proceedings. (PCR Pet. at 10–12.)[3] The court denied the claim without a hearing. (PCR Ruling, ME 7/29/13, at 3.)[4] The Arizona Supreme Court denied Garza's petition for review. (Doc. 39, Ex. LLLLLL). Garza contends that the denial of the claim was contrary to or an unreasonable application of clearly established federal law and involved an unreasonable determination of the facts. (Doc. 27 at 40.)

A.    Clearly established federal law

For purposes of 28 U.S.C. § 2254(d)(1), clearly established federal law at the time of the relevant state court decision includes *Atkins v. Virginia*, 536 U.S. 304, 321 (2002), which held that "death is not a suitable punishment for a mentally retarded criminal" and the Eighth Amendment prohibits their execution.[5] The Court explained that "clinical definitions of mental retardation" consist of three prongs: "subaverage intellectual functioning"; "significant limitations in adaptive skills such as communication, self-care, and self-direction"; and the manifestation of those limitations before age 18.[6] *Id.* at 318. The Court reserved for the states, however, "the task of developing appropriate ways to enforce the constitutional restriction" against executing the intellectually disabled. *Id.* at 317 (quoting *Ford v. Wainwright*, 477 U.S. 399, 405 (1986)); *see Bobby v. Bies*, 556 U.S. 825, 831 (2009) (explaining that *Atkins* "did not provide definitive procedural or substantive guides for determining when a person" is intellectually disabled).

Arizona law defines intellectual disability as "a condition based on a mental deficit that involves significantly subaverage general intellectual functioning, existing concurrently with significant impairment in adaptive behavior, where the onset of the foregoing conditions occurred before the defendant reached the age of eighteen." A.R.S. § 13-753(K)(3). "Significantly subaverage general intellectual functioning" means a "full

---

[3] The PCR Pet. can be found at Doc. 37-6, Ex. TTTT.

[4] Doc. 39, Ex. CCCCCC.

[5] The terms "intellectual disability" and "mental retardation" "describe the identical phenomenon." *Hall v. Florida*, 572 U.S. 701, 704 (2014). The Court uses the former.

[6] The Court cited definitions provided by the American Association on Mental Retardation ("AAMR") and the American Psychiatric Association. *Atkins*, 536 U.S. at 308, n.3.

scale intelligence quotient" of 70 or lower. A.R.S. § 13-753(K)(5). The statute directs courts, in determining IQ, to "take into account the margin of error for the test administered." *Id.*

Arizona law defines "adaptive behavior" as "the effectiveness or degree to which the defendant meets the standards of personal independence and social responsibility expected of the defendant's age and cultural group." A.R.S. § 13-753(K)(1). The statute "requires an overall assessment of the defendant's ability to meet society's expectations of him." *State v. Grell*, 212 Ariz. 516, 529, 135 P.3d 696, 709 (2006).

Under Arizona law, a defendant bears the burden of proving intellectual disability by clear and convincing evidence. A.R.S. § 13–753(G).

Twelve years after *Atkins*, in *Hall v. Florida*, 572 U.S. 701, 704 (2014), the Court clarified that "*Atkins* did not give the States unfettered discretion to define the full scope of the constitutional protection" and that "[t]he legal determination of intellectual disability is distinct from a medical diagnosis, but it is informed by the medical community's diagnostic framework." *Id.* at 719, 721. In *Hall* the Court considered a statute which, as interpreted by Florida courts, required a defendant to show an IQ of below 70 before being allowed to present additional evidence of intellectual disability. The Court held that imposing a strict IQ cutoff of 70, without allowing for the standard error of measurement ("SEM") of five points, ran counter to psychiatric and professional studies about the meaning of IQ scores and disregarded medical practice which recognizes the imprecision inherent in such scores and the need to take into account other evidence of intellectual disability. *Id.* at 713. Having reviewed the scientific literature and the practices in other states, the Court concluded that: "For professionals to diagnose—and for the law then to determine—whether an intellectual disability exists once the SEM applies and the individual's IQ score is 75 or below the inquiry would consider factors indicating whether the person had deficits in adaptive functioning." *Id.* at 714. In other words, *Hall* directs that courts "may not cut off the inquiry when a defendant scores between 70 and 75 on an IQ

test." *Pizzuto v. Yordy*, 947 F.3d 510 (9th Cir. 2019) (per curiam), *cert. denied*, 141 S. Ct. 661 (2020) (Mem.); *Hall*, 572 U.S. at 722.

### B.   Background

During the PCR proceedings, Garza supported this claim with the report of psychological consultant Dr. Steven Greenspan, who diagnosed Garza as intellectually disabled. (Doc. 38-4, PCR Pet., Ex. 47.) With respect to the first prong of that diagnosis, subaverage intellectual functioning, Dr. Greenspan noted that Garza had taken three IQ tests—specifically, the WAIS-3 test—in 2003. (*Id.* at 7–8.) The first test, administered by Dr. Ricardo Weinstein in January 2003, resulted in the following scores: verbal IQ, 76; performance IQ, 91; full-scale IQ, 81; with a full-scale score of 79 when adjusted for the "Flynn Effect."[7] (*Id.* at 8.) The second test, administered in August 2003 by Dr. James Thal, produced a verbal IQ score of 89, a performance IQ of 114, a full-scale IQ of 98, and a Flynn-adjusted score of 96.[8] (*Id.*) The final test was administered in November 2003 by Dr. Daniel Blackwood, a neuropsychologist, and resulted in a verbal IQ of 92, a performance IQ of 116, a full-scale IQ of 102, and an adjusted IQ of 100. (*Id.*) As Dr. Greenspan noted, Dr. Blackwood opined that the two previous scores should be adjusted upward due to "minor scoring errors." (*Id.* at 7; Doc. 38-8, PCR Pet., Ex. 154 at 2–3.) Dr. Greenspan, however, "retained the original scores." (*Id.*)

According to Dr. Greenspan, the "Practice Effect," or learning that occurs when the same test is readministered, particularly over a short time period, accounted for Garza's improved scores on the second and third tests. In Dr. Greenspan's view, therefore, only the first test results are valid. (*Id.*) The key result, in that case, is Garza's full-scale IQ score of 81, *see* A.R.S. § 13–753(K)(5), or 79 when adjusted for the Flynn Effect.

---

[7] Adjusting for the Flynn Effect is said to account for test obsolescence through a formula by which IQ points are subtracted for each year between the date the test was normed and the date it was administered. (Doc. 38-4, PCR Pet., Ex. 47 at 8.) *See Smith v. Ryan*, 813 F.3d 1175, 1184–85 (9th Cir. 2016). According to Dr. Greenspan, applying that formula to Garza's 2003 IQ scores results in a reduction of two IQ points.

[8] The full-scale score reported by Dr. Thal in his written report is actually 99, before the Flynn Effect. (Doc. 38-8, PCR Pet., Ex. 155.)

1    Under Arizona law, one more factor must be taken into account—the margin of

2    error, which, in measuring IQ, is approximately five points.[9] This results in a full-scale IQ

3    score ranging from 74 to 84. In other words, even given the advantage of every variable—

4    not accounting for scoring errors identified by Dr. Blackwood, the Flynn Effect, the

5    Practice Effect, and accepting the low end of the margin of error—Garza's IQ score is 74,

6    which does not satisfy the subaverage intellectual functioning prong of Arizona's

7    intellectual disability statute. A.R.S. § 13–753(K)(5).

8    With that record before it, the PCR court denied Garza's claim of intellectual

9    disability. The court found that the IQ scores as reported by Dr. Greenspan, "a full-scale

10   IQ of 74 and verbal IQ of 71," did "not satisfy the statutory definition of 'significantly sub

11   average intellectual functioning,' and therefore cannot establish that he is ineligible for the

12   death penalty." (PCR Ruling, ME 7/29/13, at 3.) The court did not address adaptive

13   behavior or the age of onset.

14   Garza subsequently filed a petition for review ("PR") in the Arizona Supreme Court.

15   (PR, Doc. 39, Ex. HHHHHH.) He then moved to vacate his death sentence pursuant to

16   *Hall*. (*Id.*, Ex. NNNNNN). On August 27, 2014, the Arizona Supreme Court summarily

17   denied the PR and the motion to vacate. (Doc. 39, Ex. LLLLLL). The United States

18   Supreme Court denied Garza's petition for writ of certiorari. *Garza v. Arizona*, 574 U.S.

19   1161 (2015) (Mem).

20   C.    Analysis

21   Garza offers several arguments intended to discount the significance of his full-scale

22   IQ score of 74. For example, he emphasizes his verbal IQ score, which is "as low as 71"

23   (Doc. 27 at 46), and the gap between that score and his performance IQ, citing research

24   suggesting "that a 'part score' . . . may be most reflective of intellectual functioning when

25   the differences between the part scores are both statistically significant and unusual in the

26   population." (*Id.*, n.45.) Whether or not these concerns are valid, Arizona's statute calls for

27   _____

28   [9] American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders
41–42 (4th ed., text rev. 2000); *see Hall*, 572 U.S. at 713.

IQ to be measured based on the full-scale score. A.R.S. § 13–753(K)(5); *see State v. Boyston*, 231 Ariz. 539, 547, 298 P.3d 887, 895 (2013); *Smith v. Ryan*, 813 F.3d 1175, 1180, 1183 (9th Cir. 2016). In any event, none of Garza's subscales is as low as 70.

Garza also argues that the Arizona statute, by using an IQ "cutoff" score of 70, is "constitutionally suspect" and runs counter to the holding in *Hall*. (Doc. 27 at 61.) Respondents counter that *Hall* was not clearly-established federal law at the time this claim was adjudicated in state court. The Court agrees.

Under AEDPA, clearly-established federal law refers to the Supreme Court's holdings "as of the time of the relevant state-court decision." *Williams (Terry)*, 529 U.S. at 412. The relevant state-court decision is the "last reasoned decision" on the merits of a claim. *Barker v. Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005) (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803–04 (1991)); *Thompson v. Runnels*, 705 F.3d 1089, 1096 (9th Cir. 2013) (citing *Greene v. Fisher*, 565 U.S. 34, 38–39 (2011)); *Milke v. Ryan*, 711 F.3d 998, 1005 (9th Cir. 2013) ("In examining the reasonableness of the state courts' decisions, we look to 'the last explained state-court judgment' on this claim.") (quoting *Ylst*, 501 U.S. at 805).

The Ninth Circuit recently addressed this question. In *Kayer v. Ryan*, 923 F.3d 692 (9th Cir. 2019), *cert. granted, judgment vacated sub nom. Shinn v. Kayer*, 141 S. Ct. 517 (2020), the Arizona Supreme Court "denied without explanation Kayer's Petition for Review" from the PCR court's "denial of post-conviction relief." *Id.* at 700. The Ninth Circuit found that "[t]he order of the PCR court was the last reasoned decision of the state court." *Id.* at 714 (citing *Wilson v. Sellers*, 138 S. Ct. 1188, 1194 (2018)). Therefore, the court continued, it "must determine whether the PCR court's decision was 'contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court' as of May 8, 2006, when the state PCR court issued its decision. . . ." *Id.* (quoting 28 U.S.C. § 2254(d)(1)). Subsequently, the United States Supreme Court "assume[d] without deciding that the Arizona Supreme Court's denial of discretionary review was not a merits adjudication." *Kayer*, 141 S. Ct. at 524.

Here, the PCR court's determination that Garza's *Atkins* claim was not colorable was a reasoned decision. The Arizona Supreme Court's summary denial of review was not. *See Kayer*, 923 F.3d at 714; *Milke*, 711 F.3d at 1005 (reviewing "the post-conviction trial court's denial of her claim" not the Arizona Supreme Court's summary denial of review). Therefore *Hall*, decided May 27, 2014, was not clearly established at the time of the relevant—i.e., the last reasoned—state court ruling, which was the PCR court's denial of the claim on the merits in July 2013.

The PCR court's ruling was not contrary to or an unreasonable application of *Atkins*, nor was it based on an unreasonable determination of the facts.[10] In making this determination, the Court finds particularly instructive the Ninth Circuit's recent decision in *Pizzuto v. Yordy*, 947 F.3d 510, which reviewed the Idaho Supreme Court's 2008 denial of an *Atkins* claim. Applying AEDPA standards of review, the Ninth Circuit found that the state court's ruling satisfied neither § 2254(d)(1) nor (2). *Id.* at 523–35.

The Idaho statutory definition of intellectual disability required the defendant to have "an intelligence quotient of seventy (70) or below." *See id.* at 523. In denying Pizzuto's *Atkins* claim, the Idaho Supreme Court noted that the only IQ result he had proffered was a verbal score of 72. *Pizzuto v. State*, 146 Idaho 720, 729, 202 P.3d 642, 651 (2008). The court explained that the statute "did not require that the IQ score be within five points of 70 or below. It required that it be 70 or below." *Id.* The court continued:

> Although Pizzuto argued that the district court should infer that Pizzuto's actual IQ was lower than his test score, the court could just as reasonably have inferred that it was higher. The alleged error in IQ testing is plus or minus five points. The district court was entitled to draw reasonable inferences from the undisputed facts. . . . It would be just as reasonable to infer that Pizzuto's IQ on December 12, 1985, was 77 as it would be to infer that it was 67.

*Id.* (citation omitted).

---

[10] The PCR court did not cite *Atkins*, but its ruling was an adjudication on the merits nonetheless, entitled to deference under § 2254(d). "[A] state court need not cite or even be aware of our cases under § 2254(d)." *Richter*, 562 U.S. at 98 (2011) (citing *Packer*, 537 U.S. at 8 ).

- 15 -

On habeas review, Pizzuto alleged that the Idaho Supreme Court's decision was contrary to and an unreasonable application of *Atkins* and its "progeny," including *Hall* and *Brumfield v. Cain*, 576 U.S. 305 (2015).[11] *Pizzuto*, 947 F.3d at 525. Specifically, he argued that the state court's application of a "hard IQ-70 cutoff" disregarded clinical definitions of intellectual disability by failing to consider other evidence of intellectual capacity, failing to apply the SEM, and failing to apply the Flynn Effect. *Id.* at 524–25.

The Ninth Circuit disagreed. First, it found that only *Atkins*, not *Hall* or *Brumfield*, was clearly established federal law at the time of the state court's ruling, and *Atkins* did not hold that courts were bound to follow clinical standards in defining intellectual disability. *Id.* at 525. Therefore, while the application of a hard IQ-70 cutoff was not in accord with such standards, at the time of the state court's decision in 2008 "it was not yet apparent that states were required to define intellectual disability in accordance with these prevailing clinical definitions." *Id.* at 526. While "*Atkins* had cited these clinical definitions with approval, noting that statutory definitions generally conformed to them and explaining that 'an IQ between 70 and 75 or lower . . . is typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition,'" the Court "did not adopt these definitions or require states to follow them." *Id.* at 526–27 (quoting *Atkins*, 536 U.S. at 308 n.3, 309 n.5).

The Ninth Circuit also noted that the Idaho Supreme Court did not "utterly disregard[] the clinical definitions." *Id.* at 527. For example, it "at least recognized the existence of a standard error of measurement of plus or minus five points." *Id.* at 527.

The Ninth Circuit concluded that "because it was not apparent in 2008 that states were required to adhere closely to the clinical definitions of intellectual disability, the Idaho Supreme Court's application of a 'hard IQ-70 cutoff' was not an 'unreasonable application' of *Atkins*." *Id.*

---

[11] There can be no argument that *Brumfield*, which Garza also cites but which was decided after the Arizona Supreme Court's 2014 denial of Garza's petition for review, is clearly-established federal law for purposes of this claim.

The court next considered the rule, announced in *Hall*, that an individual with an IQ score between 70 and 75 must be allowed to offer evidence of deficits in adaptive functioning. *Id.* at 528. The court again found that while the "Idaho Supreme Court violated this principle by requiring an 'actual' IQ of 70 or below," the issue "was not beyond fairminded disagreement in 2008." *Id.* (citing *Richter*, 562 U.S. at 103).

Finally, the court rejected Pizzuto's argument that the state court's decision was unreasonable because the court did not apply the Flynn Effect. *Id.* at 528–29. The Ninth Circuit explained that because *Atkins* did not discuss the Flynn Effect, the Idaho Supreme Court's decision was not contrary to or an unreasonable application of clearly established federal law. *Id.* at 529 (citing *Hooks v. Workman*, 689 F.3d 1148, 1170 (10th Cir. 2012)).

For the reasons cited in *Pizzuto*, Garza likewise fails to show that the PCR court's denial of his *Atkins* claims satisfies § 2254(d)(1). Indeed, Garza's claim is far weaker than Pizzuto's given that (1) his lowest full-scale IQ score was 79, with the record also revealing two sets of much higher scores and (2) unlike the state supreme court in *Pizzuto*, the PCR court based its ruling on scores to which both the Flynn Effect and, as required by Arizona statute, the five-point margin of error had been applied.

Underlining the reasonableness of the PCR court's application of clearly established federal law as set forth in *Atkins* is the fact that Garza's IQ score of 79 places him outside the range of scores (70 to 75) that triggers the right to produce additional evidence of disability. *See Atkins*, 536 U.S. at 309 n.5; *Hall*, 572 U.S. at 722; *see also Moore v. Texas*, 137 S. Ct. 1039, 1049 (2017). Based on that score, even assuming *Hall* was clearly established federal law, the PCR court's decision was not unreasonable.

"*Hall* instructs that, where an IQ score is close to, but above, 70, courts must account for the test's 'standard error of measurement.'" *Moore*, 137 S. Ct. at 1049. As noted above, the PCR court accounted for the SEM when reviewing Garza's IQ score of 79; applying the SEM resulted in a range of scores from 74 to 84. The lower end of that range, however, remained above 70, and therefore the PCR court was not required, under *Hall*, to consider the additional prongs of intellectual disability. *See Moore*, 137 S. Ct. at 1049 ("Moore's

score of 74, adjusted for the standard error of measurement, yields a range of 69 to 79. . . . Because the *lower end of Moore's score range falls at or below 70*, the [state court] had to move on to consider Moore's adaptive functioning.") (emphasis added). The PCR court's ruling was therefore a reasonable application of *Hall*.

In *Pizzuto*, the Ninth Circuit also denied the petitioner's argument that the state court's ruling and its decision not to hold an evidentiary hearing were based on an unreasonable determination of the facts. 947 F.3d at 530–34. Garza likewise argues that the PCR court unreasonably denied an evidentiary hearing based on its finding that his IQ scores failed to satisfy the statutory definition of significantly subaverage intellectual functioning. This argument is not persuasive. The PCR court's factfinding procedure was reasonable—it accepted as true the IQ scores provided and interpreted by Garza's expert— as was its determination that Garza failed to prove subaverage intellectual functioning based on those scores. As just discussed, the PCR court's assessment of Garza's IQ scores was in accord with *Atkins*.

Garza relies on *Brumfield*, but as already noted that 2015 case does not constitute clearly established federal law for purposes of this claim. *Brumfield* is also distinguishable. A Louisiana trial court denied Brumfield's *Atkins* claim and his request for an evidentiary hearing based on a proffered IQ score of 75, which, according to the court, precluded a finding of intellectual disability. 576 U.S. at 309–310. The Supreme Court found that the state court's decision was based on an unreasonable determination of the facts because an IQ score of 75, when taking into account the SEM, "was squarely in the range of potential intellectual disability," which, in Louisiana, equated to a score of 70 or below. *Id.* at 315. In Garza's case, an IQ score of 79, even when applying the five-point SEM, did not equate to an IQ of 70 or lower as required under Arizona law.

The *Brumfield* Court also noted that there was not "evidence of any higher IQ test score that could render the state court's determination reasonable." *Id.* at 316. Of course, the opposite is the case for Garza, where the record before the PCR court showed two much higher IQ scores—Flynn-adjusted full-scale scores of 96 and 100. The record also

contained information indicating that the first two sets of IQ scores, including the score of 79, should have been adjusted upward due to scoring errors. This information renders all the more reasonable the PCR court's finding that Garza's IQ was too high to satisfy the subaverage intellectual functioning prong of intellectual disability.[12]

### D.   Conclusion

The PCR court's ruling satisfies neither 28 U.S.C. § 2254(d)(1) nor (2). The court's denial of Garza's *Atkins* claim based on full-scale IQ scores ranging from 79 to 100 was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103. Likewise, an appellate panel could reasonably conclude that the PCR court's ruling on Garza's intellectual functioning was supported by the record. *Taylor*, 366 F.3d at 1000; *see Wood*, 558 U.S. at 301.

Claim 1 is denied as meritless.

## II.   Trial Error, Prosecutorial Misconduct, and Juror Misconduct

**Claim 3:**

Gallegos alleges that the trial court violated his Sixth and Fourteenth Amendment rights when it admitted (A) hearsay testimony, (B) unduly prejudicial bad-act evidence, and (C) Garza's involuntary statements to the police. (Doc. 27 at 85.) These allegations are without merit.

### A.   Dr. Keen's testimony

*1. Background*

---

[12] Because the PCR court reasonably found that Garza failed to show "[s]ignificantly subaverage general intellectual functioning," A.R.S. § 13-753(K)(5), this Court need not consider the adaptive-functioning and age-of-onset prongs of intellectual disability. *See Apelt v. Ryan*, 878 F.3d 800, 837 (9th Cir. 2017) ("To prevail on his *Atkins* claim, Apelt must meet all three prongs of the test for intellectual disability.") (citing *State v. Boyston*, 231 Ariz. 539, 543, 298 P.3d 887, 891 (2013)).

1        Garza contends that the medical examiner's testimony violated his Sixth
2   Amendment right to confront witnesses against him. (Doc. 27 at 85.) Dr. Phillip Keen, the
3   Chief Medical Examiner of Maricopa County, testified about the Franco and Rush
4   autopsies. He did not perform or witness the autopsies, however, which were conducted by
5   forensic pathologist Dr. Ann Bucholtz, who also wrote the autopsy reports. The reports
6   were not admitted at trial. Defense counsel objected to Dr. Keen's testimony on
7   Confrontation Clause grounds. (ROA 361; RT 5/18/04 at 3; *see* RT 7/6/04 at 92.) The trial
8   court overruled the objection and allowed the testimony. (RT 5/18/04 at 43; *see* RT 7/6/04
9   at 92–93)

10       Garza failed to raise this claim on direct appeal. He raised the claim during the PCR
11  proceedings (PCR Pet. at 76–79) and the court denied it as waived under Rule 32.2(a)(3).
12  (PCR Ruling, ME 7/29/13, at 2.) Garza argues that the claim's default is excused by the
13  ineffective assistance of appellate counsel. (Doc. 27 at 86.) In his PCR petition, Garza
14  alleged that appellate counsel performed ineffectively by failing to challenge Dr. Keen's
15  testimony on confrontation grounds. (PCR Pet. at 19–20.) The PCR court denied the claim,
16  citing Arizona Supreme Court precedent holding that "allowing a medical examiner who
17  did not conduct the autopsy to testify does not violate a Defendant's confrontation rights if
18  the medical examiner used the report in forming his opinion." (PCR Ruling, ME 7/29/13,
19  at 5.)

20       Ineffective assistance of appellate counsel may serve to excuse a procedural default
21  where the particular ineffective assistance allegation was itself exhausted in state court as
22  an independent constitutional claim. *See Edwards v. Carpenter*, 529 U.S. 446, 453 (2000);
23  *Murray v. Carrier*, 477 U.S. 478, 489–90 (1986). To show cause for the procedural default
24  of a habeas claim, a petitioner must demonstrate that appellate counsel's performance was
25  "constitutionally ineffective." *Carrier*, 477 U.S. at 488; *see Carpenter*, 529 U.S. at 451.
26  Because, as discussed next, the Confrontation Clause claim here is without merit, appellate
27  counsel did not perform at a constitutionally ineffective level in failing to raise it. *See*
28  *Moormann v. Ryan*, 628 F.3d 1102, 1109 (9th Cir. 2010) ("Counsel was not required to

raise a meritless issue on direct appeal, and there is no reasonable probability that had counsel raised this claim, the Arizona Supreme Court would have reversed Moormann's conviction.") (citing *Jones v. Smith*, 231 F.3d 1227, 1239 n.8 (9th Cir. 2000)).

Therefore, the default of Claim 3(A) is not excused and the claim is barred from federal review.[13]

### 2.    Analysis

The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." In *Crawford v. Washington*, 541 U.S. 36 (2004), the Supreme Court held that testimonial out-of-court statements offered against a criminal defendant are inadmissible under the Sixth Amendment unless the witness is unavailable to testify and the defendant had a prior opportunity for cross-examination. *Id.* at 42. Although the Court did not provide a definition of "testimonial," it offered the following "formulations" of the "core class" of testimonial statements: (1) "ex parte in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially;" (2) "extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions;" and (3) "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Id.* at 51–52.

Garza argues that the autopsy reports prepared by Dr. Bucholtz were testimonial in nature and that Dr. Keen did not use them to form his own opinion but simply served as a "conduit" for Dr. Bucholtz's findings. Neither of these arguments is persuasive.

First, it remains an open question whether autopsy reports constitute testimonial out-of-court statements. *See, e.g.*, *Nardi v. Pepe*, 662 F.3d 107, 112 (1st Cir. 2011) ("[I]t is

---

[13] Garza does not allege, with respect to any of his defaulted claims, that a fundamental miscarriage of justice would occur if the claim were not heard on the merits.

uncertain whether . . . the Supreme Court would classify autopsy reports as testimonial."); *Hensley v. Roden*, 755 F.3d 724, 732–35 (1st Cir. 2014) (noting circuit split on whether autopsy reports are testimonial). In *McNeiece v. Lattimore*, 501 F.App'x. 634 (9th Cir. 2012), the trial court admitted into evidence an autopsy report showing a diagram of the victim's body with descriptions of the bullet wounds. *Id.* at 636. The Ninth Circuit found the state court's determination that the excerpts were non-testimonial was not contrary to or an unreasonable application of *Crawford*. *Id.* The trial court also allowed a pathologist who had not conducted the autopsy to testify about the diagrams and to offer his opinions based on the report and other evidence. *Id.* Again, the Ninth Circuit held that the state court did not unreasonably apply *Crawford* when it determined that the testimony did not violate the Confrontation Clause. *Id.* This ruling is consistent with decisions reached by district courts addressing the same confrontation issues. *See, e.g.*, *Dixon v. Ryan*, No. CV-14-258-PHX-DJH, 2016 WL 1045355, at *20 (D. Ariz. Mar. 16, 2016), *aff'd*, 932 F.3d 789 (9th Cir. 2019); *Smith v. Ryan*, No. CV-12-00318-PHX-PGR, 2014 WL 1247828, at *33 (D. Ariz. Mar. 24, 2014), *aff'd*, 823 F.3d 1270 (9th Cir. 2016).

These decisions are also in accord with holdings of the Arizona Supreme Court. In *State v. Medina*, 232 Ariz. 391, 306 P.3d 48 (2013), the court first noted that "[t]he United States Supreme Court has not determined whether an autopsy report is testimonial. . . ." *Id.* at 406, 306 P.3d at 63. The court went on to determine that the autopsy report in that case— coincidentally, authored by Dr. Bucholtz—was nontestimonial in nature. *Id.* at 406–07, 306 P.3d at 63–64. Having concluded that the report was nontestimonial, the court rejected the defendant's argument that his confrontation rights were violated by Dr. Keen's trial testimony. *Id.* at 407, 306 P.3d at 64. The court then explained that "[t]he portions of Dr. Keen's testimony concerning his independent conclusions also did not violate the Confrontation Clause under our prior decisions." *Id.* The court cited *State v. Dixon*, 226 Ariz. 545, 250 P.3d 1174 (2011), which held that "[o]ur cases teach that a testifying medical examiner may, consistent with the Confrontation Clause, rely on information in

1    autopsy reports prepared by others as long as he forms his own conclusions." *Id.* at 553,

2    250 P.3d at 1182.

3           Next, contrary to Garza's argument, Dr. Keen did not merely "parrot" Dr.

4    Bucholtz's reports. Instead, the record shows that he used the report, in particular the

5    photographic evidence, to reach his own conclusions. Based on the autopsy photographs,

6    Dr. Keen testified about the appearance, muzzle distance ("based on your review of the

7    records"), and trajectory of the gunshot wounds. (*See* RT 7/6/04 at 36–40, 46, 48, 71–72,

8    79, 82–83, 100.) He testified about blood drops shown in a photo of Ellen Franco's clothing

9    (*id.* at 58) and the location of a projectile revealed in an x-ray of Lance Rush's abdomen,

10   explaining, for example, that he did not "really see much in the way of bone splintering."

11   (*Id.* at 74–76.) He testified about the relative age of abrasions depicted in photos of Rush's

12   wrist and leg ("they look about the same age"). (*Id.* at 87–88.) Dr. Keen also testified,

13   independently of any information in the autopsy reports, about the effects of the bullet

14   wounds, including the time-periods for which the victims could be expected to maintain

15   consciousness or survive. (*Id.* at 56–58, 77–78, 84–85.)

16          There was no Confrontation Clause violation. Even if there were, Garza would not

17   be entitled to relief. Confrontation Clause violations are subject to harmless error analysis.

18   *See Sully v. Ayers*, 725 F.3d 1057, 1074 (9th Cir. 2013). A violation is harmless unless it

19   had a "substantial and injurious effect or influence in determining the jury's verdict."

20   *Ocampo v. Vail*, 649 F.3d 1098, 1114 (9th Cir. 2011) (quoting *Brecht v. Abrahamson*, 507

21   U.S. 619, 637 (1993)). There must be more than a "reasonable probability" that the

22   confrontation error was harmful. *Davis v. Ayala*, 576 U.S. 257, 268 (2016) (quoting *Brecht*,

23   507 U.S. at 637). Rather, this Court must find that Garza "was actually prejudiced by the

24   error." *Id.* (quoting *Calderon v. Coleman*, 525 U.S. 141, 146 (1998)).

25          Garza argues that he was prejudiced because Dr. Keen's testimony about the

26   location of the wounds, the trajectory of the bullets, and the cause of death was "essential

27   to the State's case." (Doc. 27 at 90.) These were all subjects on which Dr. Keen could have

28   been cross-examined. Garza does not dispute the autopsy findings with respect to any of

1    those elements. In his reply brief, Garza asserts that Dr. Keen's testimony was key because

2    it supported the State's version of how the shootings occurred, which differed from the

3    defense version. (Doc. 44 at 54.) Garza does not argue, however, that Dr. Keen testifying

4    in place of Dr. Bucholtz prevented him from offering his version of the shootings or

5    attacking the State's.

6          Garza was not prejudiced by Dr. Keen's testimony. Any error was harmless.

7          Claim 3(A) is denied as barred from federal review and as meritless.

8          B.    Bad act evidence

9          Garza alleges that the trial court erred in admitting unduly prejudicial "bad act"

10   evidence, depriving him of a fundamentally fair trial and violating his due process rights.

11   (Doc. 27 at 90, 92.)

12         1.    Background

13         The evidence at issue consisted of a phone call Garza made from jail and trial

14   testimony about the incident discussed in the call. (*Id.* at 90–91.) In the call, made

15   December 2, the day after the murders, Garza spoke with his friend Laurel Thompson. He

16   told her: "Well, remember what you wanted me to do when that one guy beat you up? Well,

17   I did it to somebody else." (Doc. 38-8, PCR Pet., Ex. 162 at 3.) A tape-recording of that

18   statement was played at trial. (RT 7/8/04 at 163.)

19         Eric Rodriguez, the boyfriend of Laurel Thompson's mother, testified at trial about

20   the incident Garza mentioned in the phone call. He stated that he and Garza were going to

21   "beat up" the person who assaulted Thompson and "possibly even do as much harm as he

22   could. This guy beat my stepdaughter up." (RT 7/1/04 at 75.) He admitted he and Garza

23   even had plans to shoot the guy. (*Id.*) When asked if they followed through on those plans,

24   Rodriguez responded, "Of course not." (*Id.* at 76.) Laurel Thompson also testified that

25   Rodriguez and Garza were going to "beat up" the person who assaulted her and "kick his

26   ass." (*Id.* at 113.)

27

28

Garza argues that he exhausted this claim by raising it on direct appeal. (Doc. 27 at 90.) Respondents contend that the claim is not exhausted because Garza did not adequately allege the violation of a federal right. (Doc. 37 at 58.)

In his opening brief on appeal to the Arizona Supreme Court, Garza alleged, in the heading to Claim VIII, that the trial court abused its discretion by admitting character evidence "IN VIOLATION OF HIS RIGHT TO DUE PROCESS UNDER THE 14TH AMENDMENT AND ARTICLE 2 § 4 OF THE ARIZONA CONSTITUTION." (Opening Brief at 96.)[14]

The Court agrees with Garza that the citation to "due process under the 14th Amendment" was adequate for exhaustion purposes. This reference to a "specific provision[ ] of the federal constitution" is sufficient to fairly present the claim. *See Lyons v. Crawford*, 232 F.3d 666, 670 (9th Cir. 2000), *as modified by* 247 F.3d 904 (9th Cir. 2001). The claim, however, is meritless.

On direct appeal the Arizona Supreme Court denied Garza's claim that the taped phone conversation was "improper character evidence." *Garza*, 216 Ariz. at 66, 163 P.3d at 1016. The court explained that the statement was "probative of Garza's consciousness of guilt" and "the probative value was not substantially outweighed by any prejudice" because "[b]y its own terms, the statement implies that no previous assault occurred; Garza merely said that Thompson had once suggested some course of action." *Id.* The court also found that the statement was not "offered to show Garza's bad character or propensity for violence," noting that the trial court instructed the jury, under Ariz. R. Evid. 404(b), that "[e]vidence of other acts of the defendant" could be considered "only as it relates to the defendant's intent, plan, knowledge, or identity." *Id.*

2.  *Analysis*

In conducting habeas review, "a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 68 (1991). It is not, therefore, a habeas court's role to review

---

[14] *See* Doc. 37-2, Ex. A.

whether "other crimes" or "bad acts" evidence was properly admitted pursuant to Rule 404(b), which is simply a matter of state evidentiary law. *Id.* at 67–68. Instead, the admission of evidence at a state court trial forms the basis for federal habeas relief only if the evidentiary ruling rendered a petitioner's trial unfair in violation of his due process rights. *See Dowling v. United States*, 493 U.S. 342, 352 (1990) (explaining that due process is violated only when the introduction of evidence "is so extremely unfair that its admission violates fundamental conceptions of justice") (additional quotation omitted); *Jammal v. Van de Kamp*, 926 F.2d 918, 919 (9th Cir. 1991) ("On federal habeas we may only consider whether the petitioner's conviction violated constitutional norms.") (citing *Engle v. Isaac*, 456 U.S. 107, 119 (1982)).

The United States Supreme Court has "very narrowly" defined the category of infractions that violate the due process test of fundamental fairness. *Dowling*, 493 U.S. at 352. Pursuant to that narrow definition, the Court has declined to hold that evidence of other crimes or bad acts violates due process. *Estelle*, 502 U.S. at 75 & n.5 (stating that the Court was expressing no opinion as to whether a state law would violate due process if it permitted the use of prior crimes evidence to show propensity to commit a charged offense). Thus, there is no clearly established Supreme Court precedent holding that a state court violates due process by admitting other acts evidence. *See, e.g.*, *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003) (holding that admission of evidence of petitioner's prior, uncharged acts of child molestation was not contrary to clearly established Supreme Court precedent because there was no such precedent holding that due process is violated by introduction of propensity evidence in the form of other bad acts evidence); *see also Kipp v. Davis*, 971 F.3d 939, 952 n.8 (9th Cir. 2020) (noting petitioner "does not argue for error under section 2254(d)(1) because there is no clearly established law that addresses whether admission of a defendant's criminal history or prior bad acts would violate due process") (citing *Alberni v. McDaniel*, 458 F.3d 860, 864 (9th Cir. 2006)).

Moreover, although "clearly established federal law" under AEDPA refers only to holdings of the United States Supreme Court, the Court notes that even under Ninth Circuit

precedent Garza would not be entitled to relief. The Ninth Circuit has held that the admission of other acts evidence violates due process only when "there are *no* permissible inferences the jury may draw from the evidence." *Jammal*, 926 F.2d at 920; *see Boyde v. Brown*, 404 F.3d 1159, 1172 (9th Cir. 2005); *see also Kealohapauole v. Shimoda*, 800 F.2d 1463, 1465 (9th Cir. 1986) (explaining that whether or not the admission of evidence is contrary to a state rule of evidence, a trial court's ruling does not violate due process unless the admitted evidence is "of such quality as necessarily prevents a fair trial").

There were permissible inferences to be drawn from the evidence at issue here. As the Arizona Supreme Court explained, Garza's statement about his previous plan to attack someone was relevant because it was probative of his consciousness of guilt. *Garza*, 216 Ariz. at 66, 163 P.3d at 1016. Admission of the evidence did not render Garza's trial fundamentally unfair in violation of his due process rights, and he is not entitled to relief on Claim 3(B).

C.    Involuntary statements

Garza alleges that the trial court erred by admitting his statement to the police. (Doc. 27 at 92.) At trial, the court admitted Garza's videotaped confession, made to two MCSO detectives the morning after the murders. Garza contends that the confession was taken in violation of the Fifth, Sixth, and Fourteenth Amendments. (*Id.* at 94.)

1.    *Background*

On the morning of December 2, Detectives Rick Morris and Jim McCarthy contacted Garza at his workplace. The detectives testified at a pretrial evidentiary hearing that Garza agreed to accompany them to the police station. (RT 5/24/04 at 41–46.) He was not handcuffed or told he was under arrest. (*Id.* at 46–47.)

At the station, the detectives first asked, in reference to Garza's injured arm, if he needed anything to make him "more comfortable?" (Doc. 38-7, PCR Pet., Ex. 141 at 1.) After he declined, they administered the *Miranda* advisory, which Garza indicated he understood, answering "Yes, sir" when asked to clarify his initial non-verbal response ("hm-hm"). (*Id.*) The detectives then began questioning him. (*Id.*) He answered their

questions and soon confessed to being involved in the shootings. (*Id.* at 9–23.) He told the detectives that he had just wanted to talk to Ellen but she called him names, yelled at him and pushed him, and then he shot her. (*Id.* at 9–10.) He said that Jennifer Farley then came out of the bedroom and ran after him carrying a knife and he thinks he "shot at her." (*Id.* at 11.) It was at that point that he was shot, and he "just started shooting" back. (*Id.* at 20.) He said he didn't remember when he saw the man in the house and didn't remember whether he, Garza, went to any of the bedrooms. (*Id.* at 14, 20.)

The detectives took a break in the interview after offering Garza something to drink and asking if he needed to use the restroom. (*Id.* at 23.) At that point Garza asked, "Am I gonna see somebody, like a lawyer or whatever it is?" (*Id.* at 24.) The detectives continued to question him. (*Id.*) They asked him how close he was to Ellen when he shot her; he answered that he was a little bit farther away from her than he was from the detective he was speaking to. (*Id.*) He said he didn't remember where or how many times he shot her. (*Id.*) Finally, he said he didn't remember where he had left the gun. (*Id.*) One of the detectives then asked Garza to write out a statement. (*Id.* at 25.) Garza responded, "Are you going to send somebody in here to talk to me?" (*Id.*) After clarifying that Garza was asking for a lawyer, the detectives ended the interview. (*Id.*)

Prior to trial, Garza moved to suppress the confession. (ROA 290.) The court denied the motion after the evidentiary hearing. (ME 5/25/04.) The court ruled that Garza had "voluntarily waived his rights and freely talked to law enforcement." (*Id.* at 1.) The court found that Garza, despite the gunshot wound to his arm, and although "apparently tired," "gave answers that were appropriate to the various questions posed." (*Id.*) He was offered drinks and something to prop up his wounded arm and "did not appear to be in any real discomfort at all." (*Id.*) The court concluded that there was "nothing in the manner of the defendant's questioning by law enforcement or its location that suggests the defendant's will was overborne." (*Id.*) The court also ruled that Garza's "question after the break about whether he was going to see a lawyer was not a sufficiently clear and unambiguous request for counsel so that law enforcement was required to cease interrogation." (*Id.* at 2.)

1   Garza acknowledges that he failed to raise this claim on direct appeal. (Doc. 27 at

2   92.) He argues that the claim's default is excused by the ineffective assistance of appellate

3   counsel. (*Id.*)

4   In his PCR petition, Garza alleged that appellate counsel performed ineffectively by

5   failing "to appeal the admission of Garza's uncounseled statement made during police

6   interrogation." (PCR Pet. at 23.) The PCR court denied the claim, finding that "Defendant's

7   contention that his statements to police were involuntary also would not have prevailed on

8   appeal" and that "Defendant has not shown that the trial court erred in its ruling." (PCR

9   Ruling, ME 7/29/13, at 5.)

10   As previously noted, ineffective assistance of appellate counsel may constitute

11   cause to excuse a procedural default where the particular ineffective assistance allegation

12   was exhausted in state court as an independent claim. *Carpenter*, 529 U.S. at 453; *Carrier*,

13   477 U.S. at 489–90. To show cause, a petitioner must demonstrate that appellate counsel's

14   performance was "constitutionally ineffective." *Carrier*, 477 U.S. at 488. Because the

15   voluntariness claim is without merit, appellate counsel did not perform at a constitutionally

16   ineffective level in failing to raise it. *See Moormann*, 628 F.3d at 1109. Therefore, the

17   default of Claim 3(C) is not excused and the claim is barred from federal review.

18   *2.    Analysis*

19   Garza argues that the detectives violated his rights under *Miranda v. Arizona*, 384

20   U.S. 436 (1966), by continuing to question him after he had invoked his right to counsel.

21   (*Id.* at 93–94.) He also argues that the confession was involuntary due to his "limited

22   intellectual ability, his youth, and the amount of pain he was in." (*Id.* at 94.)

23   To obtain a waiver of *Miranda* rights, the law does not require a police officer to

24   use a waiver form or to ask explicitly whether the defendant intends to waive his rights.

25   *See United States v. Cazares*, 121 F.3d 1241, 1244 (9th Cir. 1997) (citing *North Carolina*

26   *v. Butler*, 441 U.S. 369, 371, 373 (1979)). "[A] defendant's subsequent willingness to

27   answer questions after acknowledging his *Miranda* rights is sufficient to constitute an

28   implied waiver." *Burket v. Angelone*, 208 F.3d 172, 198 (4th Cir.2000) (citation omitted);

*see United States v. Rodriguez-Preciado*, 399 F.3d 1118, 1127 (9th Cir.), *amended*, 416 F.3d 939 (9th Cir. 2005) ("Waivers of *Miranda* rights need not be explicit; a suspect may impliedly waive the rights by answering an officer's questions after receiving *Miranda* warnings."). Garza waived his *Miranda* rights when, after indicating he understood those rights, he answered the detectives' questions.

Next, notwithstanding his wounded arm, age, and purportedly low intelligence, Garza's confession was voluntary. "An involuntary statement by a defendant violates the Due Process Clause of the Fifth Amendment." *United States v. Miller*, 984 F.2d 1028, 1030 (9th Cir. 1993) (citing *Colorado v. Connelly*, 479 U.S. 157, 163 (1986)). The question is whether, under the totality of the circumstances, the defendant's will was overborne when he confessed. *Id.* at 1031; *see Ortiz v. Uribe*, 671 F.3d 863, 869 (9th Cir. 2011). "[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause." *Connelly*, 479 U.S. at 167. To determine whether a confession was voluntary, courts consider length, location, and continuity of the interrogation; the suspect's maturity, education, and physical and mental condition; and whether the suspect was advised of his *Miranda* rights. *Withrow v. Williams*, 507 U.S. 680, 693–94 (1993).

There was no coercive police activity in Garza's case. There were no promises or threats. *Thompson*, 705 F.3d at 1097 (finding no coercion where officers made no implied or express promises of specific benefits if suspect confessed). Garza was not handcuffed or restrained. The *Miranda* warning was provided. The interview was brief: it began at 9:51 a.m. and Garza first acknowledged his involvement in the shooting at 10:20. (*See* RT 5/24/04 at 37.) The detectives offered Garza drinks and a restroom break, which he accepted. Before administering the *Miranda* advisory, they asked Garza if he needed something to make his injured arm more comfortable, and later asked if he wanted something to support his arm. He declined both offers. The trial court found that Garza did not appear to be in any discomfort, and in fact he was at work when the detectives contacted him that morning, suggesting his injury was not debilitating.

1      These circumstances contrast sharply with cases where coercion has been found.

2  *See, e.g.*, *Arizona v. Fulminante*, 499 U.S. 279, 287–88 (1991) (finding that government

3  informant's promise to protect defendant from credible threat of violence rendered

4  confession involuntary); *Mincey v. Arizona*, 437 U.S. 385, 398–99 (1978) (finding

5  confession involuntary where defendant had been seriously wounded a few hours earlier,

6  was "depressed almost to the point of a coma," was in an intensive care unit, complained

7  of "unbearable" pain, gave incoherent answers, declined to answer questions without a

8  lawyer, and was questioned while lying in a hospital bed).

9      A suspect's age or low IQ does not render a confession involuntary absent the

10 predicate of coercive police conduct. *Connelly*, 479 U.S. at 164; *see, e.g.*, *Thompson*, 705

11 F.3d at 1097 ("Although Thompson argues that he was more susceptible to the officers'

12 tactics because he was only eighteen and had a learning disability, the state court

13 reasonably concluded that the record does not reveal such youthfulness and low

14 intelligence that Thompson would have been unusually vulnerable to the inspectors'

15 tactics.") (internal quotations omitted); *see also Clark v. Mitchell*, 425 F.3d 270, 283–84

16 (6th Cir. 2005) (collecting cases where courts have found that defendants, despite their

17 mental retardation or low IQ, voluntarily waived their *Miranda* rights). As noted, there was

18 no coercive police conduct in Garza's case.

19      Garza's confession was voluntary.

20      Finally, Garza's argument that he invoked his right to an attorney before making his

21 confession is meritless. When a suspect invokes his Fifth Amendment right to have counsel

22 present during a custodial interrogation, "the interrogation must cease until an attorney is

23 present." *Miranda*, 384 U.S. at 474. Police may not continue questioning a suspect without

24 counsel present "unless the accused himself initiates further communication." *Edwards v.*

25 *Arizona*, 451 U.S. 477, 484–85 (1981).

26      Only an unambiguous invocation of the right to counsel triggers protection under

27 *Edwards*. An invocation is unambiguous if the accused "articulate[s] his desire to have

28 counsel present sufficiently clearly that a reasonable police officer in the circumstances

would understand the statement to be a request for an attorney." *Davis v. United States*, 512 U.S. 452, 459 (1994) ("If the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him."). "Mere mention of an attorney does not constitute an equivocal [sic] request for counsel, as the word 'attorney' is not talismanic." *Norman v. Ducharme*, 871 F.2d 1483, 1486 (9th Cir. 1989).

Garza did not clearly and unambiguously invoke his right to counsel when he asked, "Am I gonna see somebody, like a lawyer or whatever it is?" In *Davis*, the Supreme Court held that the defendant's statement "maybe I should talk to a lawyer" was not an unambiguous request for counsel. 512 U.S. at 459; *United States v. Younger*, 398 F.3d 1179, 1187 (9th Cir. 2005) (finding defendant's statement "[b]ut, excuse me, if I am right, I can have a lawyer present through all this, right?" did not constitute unambiguous invocation of right to counsel); *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003) (holding that petitioner's statement "I think I would like to talk to a lawyer" was not unequivocal request for counsel), *overruled in part on other grounds by Lockyer v. Andrade*, 538 U.S. 63 (2003). In *Paulino v. Castro*, the Ninth Circuit found that the defendant's statements, "Where's my attorney?" and "You mean it's gonna take him long to come?" did not constitute an unequivocal demand for counsel, even where the defendant also failed to fill in the form indicating he was waiving his right to counsel. 371 F.3d 1083, 1087–88 (9th Cir. 2004). Garza's question to the detectives was more equivocal and ambiguous than any of the statements these court found inadequate to invoke the right to counsel.

Appellate counsel did not perform ineffectively in failing to raise the allegations in Claim 3(C). The claim is barred from federal review and meritless.[15]  Claim 3 is denied.

---

[15] Even if Garza's question about whether he was going to see "like a lawyer or whatever" were a clear and unequivocal invocation of his right to counsel, admission of his statement was harmless, as he had already confessed to shooting Ellen and shooting at Jennifer. *See Ghent v. Woodford*, 279 F.3d 1121, 1126 (9th Cir. 2002), *as amended* (Mar. 11, 2002)

**Claim 4:**

Garza alleges that the court improperly instructed the jury during the guilt phase of trial. (Doc. 27 at 95.) He argues that the court erred when it instructed the jury (A) that it was not required to reach a unanimous finding on the theory of guilt (premeditated and/or felony murder) for first-degree murder, (B) on the absence of another participant, and (C) that proof beyond a reasonable doubt is proof that leaves the jury "firmly convinced." (Doc. 27 at 95–98.)

The parties disagree about the procedural status of these claims. The Court need not resolve that issue, however, because the claims are plainly meritless. *See* 28 U.S.C. § 2254(b)(2) (allowing denial of unexhausted claims on the merits); *Lambrix v. Singletary*, 520 U.S. 518, 524–25 (1997) (explaining that the court may bypass the procedural default question in the interest of judicial economy when the merits are clear but the procedural default issues are not).

### A.    Unanimous finding on theory of guilt

Garza alleges that his rights under the Fifth, Sixth, and Eighth Amendments were violated when the court issued the following instruction:

> In order to find the defendant guilty of first degree murder, it is not necessary that the jury be unanimous with respect to whether the defendant is guilty of first degree premeditated murder or first degree felony murder.
>
> The only requirement is that the jury be unanimous that the defendant is guilty of first degree murder, which can be either first degree premeditated murder or first degree felony murder. By way of example only, the jury can be unanimous as to both theories or one theory or it may be divided.

(RT 8/24/04 at 24–25.)

Garza argues that this instruction, which did not require a unanimous finding on the theory of guilt, conflicted with the court's sentencing-stage *Enmund/Tison* instruction,[16]

---

("The erroneous admission of statements taken in violation of a defendant's Fifth Amendment rights is subject to harmless error analysis.").

[16] A defendant convicted of felony murder may be sentenced to death only if he actually killed, attempted to kill, or intended to kill, or if he was a major participant in the underlying

1   which did require a unanimous finding (*see* RT 8/31/04 at 86–87), and led to a "confused"

2   verdict. (Doc. 27 at 95–96.)

3        On direct appeal, the Arizona Supreme Court denied Garza's claim that "the jury

4   should have been required to make separate findings as to premeditated and/or felony

5   murder." *Garza*, 216 Ariz. at 67 n.11, 163 P.3d at 1017. The court cited *Schad v. Arizona*,

6   501 U.S. 624, 645 (1991), *abrogation on other grounds recognized by Edwards v. Vannoy*,

7   141 S. Ct. 1547 (2021), which rejected the argument that separate findings on the theory

8   of the murder are constitutionally required. *Id.*

9        To successfully challenge a jury instruction, a habeas petitioner must show that "the

10  ailing instruction by itself so infected the entire trial that the resulting conviction violates

11  due process." *Estelle*, 502 U.S. at 72 (citation omitted). To warrant relief, he must make

12  the additional showing that the instruction "had substantial and injurious effect or influence

13  in determining the jury's verdict." *Brecht*, 507 U.S. at 637.

14       Garza fails to show that the instruction was erroneous let alone that it harmed him.

15  His only argument in support of either of these propositions is that the verdict was

16  "confused" because the jury unanimously found that he attempted to kill Ellen Franco but

17  did not find that he killed or intended to kill her. (Doc. 27 at 96.) Garza does not attempt

18  to explain how this confusion or inconsistency—the jury having also found that Ellen had

19  been murdered—had a substantial and injurious effect on the first-degree murder verdict,

20  and the Court can find no grounds for setting aside the verdict. *See Griffin v. United States,*

21  502 U.S. 46, 56–57 (1991) (finding no due process violation if the verdict is legally

22  supportable as to least one theory of liability).

23       The jury's findings satisfied *Enmund/Tison*, and the court's first-degree murder

24  instruction was constitutionally sound under *Schad*. Claim 4(A) is denied.

25       B.    "Absence of another participant" instruction

26       Garza alleges that trial court erred by providing the following jury instruction:

27  ――――――――――――――――

28  felony and acted with reckless indifference to human life. *Tison v. Arizona,* 481 U.S. 137,
    157–58 (1987); *Enmund v. Florida,* 458 U.S. 782, 797 (1982).

1

2   Now, the only matter for you to determine is whether the state has proved
    Ruben Garza guilty beyond a reasonable doubt. *The defendant's guilt or*
3   *innocence is not affected by the fact that another person might have*
    *participated or cooperated in the crime and is not on trial now.* You should
4   not guess about the reason why any other person is absent from the
    courtroom.
5

6
    (RT 8/24/04 at 30–31) (emphasis added).
7
        Garza argues that the instruction prevented him from offering a complete defense—
8
    his defense of third-party complicity—and "should have been amended or clarified to
9
    ensure that jurors recognized that they could still consider the involvement of other
10
    individuals generally when determining whether Garza was guilty." (Doc. 27 at 96.)
11
        On direct appeal, the Arizona Supreme Court held that the instruction was in accord
12
    with the state's standard jury instructions and "was appropriate because Garza's counsel
13
    claimed that Larry [Franco] was involved in the murders." *Garza*, 216 Ariz. at 66, 163 P.3d
14
    at 1016.
15
        Garza asserts that the court failed to address his argument that the jury should also
16
    have been specifically instructed that when assessing Garza's culpability it could consider
17
    Franco's participation in the crimes. (Doc. 27 at 97.) He argues that the instruction as given
18
    had a "substantial and injurious effect" on the verdict because "[i]f the jurors ignored
19
    Franco's participation, then they ignored Garza's entire third-party defense." (*Id.*) This
20
    argument is conclusory, speculative, and unpersuasive.
21
        To be entitled to relief Garza must show that the omitted or unclarified instruction
22
    "by itself so infected the entire trial that the resulting conviction violates due process."
23
    *Estelle*, 502 U.S. at 72. Garza has not met this burden. He fails to demonstrate that he
24
    suffered any prejudice from the trial court's failure to give his requested instruction or
25
    clarification. He fails to show the instruction as given was erroneous or misleading or that
26
    he was harmed by it.
27
        In *Estelle* the Court explained that a challenged jury instruction "must be considered
28
    in the context of the instructions as a whole and the trial record." 502 U.S. at 72. Here, in

1    addition to the challenged instruction, Garza's jury was also informed that his "mere

2    presence . . . at the scene of the crime, together with the knowledge that the crime was

3    being committed, is insufficient to establish guilt." (RT 8/24/04 at 31.) This instruction was

4    congruous with Garza's third-party defense.

5        Garza's bare assertion notwithstanding, nothing in the record shows that the

6    wording of the challenged instruction or the absence of additional instructions prevented

7    the jury from considering his third-party defense. *See Kibbe*, 431 U.S. at 157 (finding

8    "possibility" that jury might have reached a different verdict "too speculative to justify the

9    conclusion that constitutional error was committed"). Throughout the trial, Garza presented

10   evidence and argument in support of his theory that Franco was responsible for the

11   murders.

12       Claim 4(B) is meritless.

13       C.    "Firmly convinced" instruction

14       Garza alleges that the following instruction violated his rights under the Fifth and

15   Fourteenth Amendments:

16       Proof beyond a reasonable doubt is proof that leaves you firmly convinced
17       of the defendant's guilt. There are very few things in this world that we know
         with absolute certainty, and in criminal cases the law does not require proof
18       that overcomes every doubt.

19       If, based on your consideration of the evidence you are firmly convinced that
20       the defendant is guilty of the crime charged, you must find the defendant
         guilty. If, on the other hand, you think there is a real possibility that the
21       defendant is not guilty, you must give the defendant the benefit of the doubt
22       and find the defendant not guilty.

23   (RT 8/24/04 at 22.)

24       The Arizona Supreme Court denied this claim, finding that the instruction was

25   consistent with state law. *Garza*, 216 Ariz. at 66–67, 163 P.3d at 1016–17.

26       This claim is meritless. The instruction at issue is based on the pattern jury

27   instruction on reasonable doubt published by the Federal Judicial Center ("FJC"). *See State

28   v. Van Adams*, 194 Ariz. 408, 417–18, 984 P.2d 16, 25–26 (1999). Garza has presented no

- 36 -

Supreme Court authority in support of his challenge to the instruction. To the contrary, Justice Ginsburg, in a concurring opinion, praised the FJC instruction as "clear, straightforward, and accurate," noting that it "surpasses others I have seen in stating the reasonable doubt standard succinctly and comprehensibly." *Victor v. Nebraska*, 511 U.S. 1, 27 (1994) (Ginsburg, J., concurring). Moreover, the Ninth Circuit has upheld language identical or substantially similar to the FJC's pattern instruction. *See, e.g.*, *United States v. Artero*, 121 F.3d 1256, 1257–59 (9th Cir. 1997); *United States v. Velasquez*, 980 F.2d 1275 (9th Cir. 1992). In rejecting this claim the Arizona Supreme Court did not unreasonably apply clearly established federal law.

Claim 4 is denied as meritless.

**Claim 6:**

Garza alleges that the trial court erred in instructing the jury on the multiple-homicides aggravating circumstance because no "reasonable factfinder" could find that the factor was proved. (Doc. 27 at 115.)

Respondents argue that this claim is unexhausted because Garza failed to raise it as a federal claim on direct appeal. For the reasons forth in its analysis of Claim 3(B), the Court disagrees. However, the claim is without merit.

Under Arizona law, to satisfy the multiple-homicides aggravating circumstance the murders must have a "'temporal, spatial, and motivational relationship' such that they 'were a part of a continuous course of criminal conduct.'" *State v. Ellison*, 213 Ariz. 116, 143, 140 P.3d 899, 926 128 (2006) (quoting *State v. Lavers*, 168 Ariz. 376, 393–94, 814 P.2d 333, 350–51 (1991)).

The trial court in Garza's case provided the following instruction on the factor:

> . . . The fact that the defendant now stands convicted of two homicides is insufficient, standing alone, for you to find that this circumstance exists. In order to find that the homicide was committed during the commission of the homicide to which you are considering the application of this circumstance, you must find that both homicides were temporally, spatially, and motivationally related, and were part of a continuous course of criminal conduct.

> In making that determination, you should consider the time span in which the two homicides were committed, the location of the homicides, and the reason for the homicides, as well as the identity of the victims and the character of the homicides.

(RT 8/31/04 at 84.)

Garza does not allege, and did not argue on appeal (*see* Opening Brief at 48), that the trial court's instruction was incorrect, only that it should not have been given because the aggravating factor was unsupported by the facts—namely, by facts supporting a motivational relationship between the murders.

On direct appeal, the Arizona Supreme Court rejected this argument, holding that the multiple-homicides factor was "correctly found here with respect to Rush's murder." *Garza*, 216 Ariz. at 72, 163 P.3d at 1022. The court noted that Ellen "was in the same house and was shot moments before Rush; the two murders were indisputably temporally and spatially related. The two homicides were also motivationally related." *Id.* The court relied on *State v. Tucker*, 205 Ariz. 157, 169, 68 P.3d 110, 122 (2003), and *State v. Dann*, 206 Ariz. 371, 374 79 P.3d 58, 61 (2003), for its conclusion that the murders were motivationally related. *Garza*, 216 Ariz. at 72, 163 P.3d at 1022. Garza contends that this decision was contrary to or an unreasonable application of clearly established federal law or based on an unreasonable determination of the facts. (Doc. 27 at 115.)

A habeas petitioner is not entitled to relief on a claim challenging a finding that an aggravating factor was proved unless that finding "was not only erroneous, but 'was so arbitrary or capricious as to constitute an independent due process or Eighth Amendment violation.'" *Robinson v. Schriro*, 595 F.3d 1086, 1103 (9th Cir. 2010) (quoting *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990)). In making that determination, the "rational fact-finder" standard applies. *Jeffers*, 497 U.S. at 780 (citing *Jackson v. Virginia*, 443 U.S. 307 (1979)). Under that standard the question is whether, "viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the [aggravating factor] beyond a reasonable doubt." *Id.* (quoting *Jackson*, 443 U.S. at 319). "A state court's finding of an aggravating circumstance in a particular case—

including a de novo finding by an appellate court . . . —is arbitrary or capricious if and only if no reasonable sentencer could have so concluded." *Jeffers*, 497 U.S. at 783; *see Robinson*, 595 F.3d at 1103. The state court findings with respect to the multiple-homicides factor in Garza's case satisfy the rational-factfinder test.

In *Tucker* and *Dann*, the defendant entered an apartment intending to kill one victim, the primary victim, and also killed other, secondary, victims. *Tucker*, 205 Ariz. at 169, 68 P.3d at 122; *Dann*, 206 Ariz. at 374, 79 P.3d at 61. In *Tucker*, the defendant killed his girlfriend, AnnMarie, her brother Roscoe, and Roscoe's girlfriend, Cindy. 205 Ariz. at 160–61, 68 P.3d at 113–14. The prosecution theorized that Roscoe and Cindy were killed to eliminate possible witnesses. *Id.* at 169, 68 P.3d at 122. The court explained, however, that "[w]hile a jury may have found Tucker's motivation was something different, it is difficult to imagine a motive for the killings unrelated to the murder of AnnMarie." *Id.* In *Dann*, the defendant "went to the apartment intending to kill Andrew . . . and killed Shelley and Eddie simply because they were there, and, with respect to Eddie, simply because he was a witness." 206 Ariz. at 374, 79 P.3d at 61 (citation omitted). The court explained that "while a jury may differ as to Dann's precise motive for killing Shelly [sic] and Eddie, no jury would fail to find that his motives were related to the murder of Andrew." *Id.*

A rational factfinder, viewing the evidence in the light most favorable to the prosecution, could have determined that the murders of Ellen Franco and Lance Rush followed the pattern of *Tucker* and *Dann*, and that Rush was killed because he was a witness or simply because he was present in the house when Ellen was killed.

According to Garza, several factors distinguish his case from *Tucker* and *Dann*, including a lack of motive for either murder. (Doc. 27 at 117.) As the Arizona Supreme Court emphasized in those cases, however, a motivational relationship can be established without identifying a precise motive for the killings. Here, as in *Tucker* and *Dann*, it is "difficult to imagine a motive" for Rush's murder that is unrelated to Ellen's murder. *Tucker*, 205 Ariz. at 169, 68 P.3d at 122. A rational factfinder could conclude there was a

1    motivational connection based on Garza's decision to proceed into the house, which he

2    knew to be occupied, instead of leaving the scene after shooting Ellen. [17]

3        Claim 6 is denied as meritless.

4    **Claim 8:**

5        Garza alleges that the trial court committed several errors during the mitigation

6    phase of trial in violation of his constitutional rights. (Doc. 27 at 217.) Specifically, he

7    alleges that the court erred by (A) precluding expert testimony about his mental health, (B)

8    precluding polygraph results, (C) denying his right to allocution, (D) admitting victim

9    impact evidence, and (E) declining to give appropriate jury instructions. He also contends

10   that he was prejudiced by the cumulative effect of these errors. These claims are

11   procedurally defaulted and barred from review and, alternatively, meritless.

12        A.    Mental health testimony

13        Garza alleges that the trial court's preclusion of expert testimony about his mental

14   health violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments. (Doc.

15   27 at 218.)

16        *1.    Background*

17        As the Court will discuss in more detail below, the defense intended to call clinical

18   psychologist Dr. Thomas Reidy as a mitigation witness. In response, the State argued that

19   it should be permitted to have its own expert evaluate Garza's mental health and conduct

20   testing if necessary. (*See* ROA 325; RT 5/18/04 at 43–45.) During Garza's trial, the

21   Arizona Supreme Court held in another case that a defendant who puts his mental health

22   at issue can be compelled to undergo an examination by a State expert, while retaining,

23   however, his privilege against self-incrimination. *Phillips v. Araneta*, 208 Ariz. 280, 283,

24   93 P.3d 480, 483 (2004). Relying on the Arizona Supreme Court's holding in *Phillips*, the

25   trial court ordered Garza to submit to an examination by the State's expert, adding that "if

26   _____

27   [17] As the Arizona Supreme Court noted, "Ellen was shot in the living room and Garza could
     have easily escaped through the door to that room from which he entered the dwelling. He
28   nonetheless went down the hallway to the bedroom, apparently seeking an encounter with
     other residents of the house." *Garza*, 216 Ariz. at 72 n.17, 163 P.3d at 1022.

the defendant were to talk about the crime . . .  his statements could only be used in the penalty phase and could not be used for any other purpose." (RT 7/1/04 at 149.) After further discussions of the issue, defense counsel reiterated that Garza would not submit to testing by the State. (*See* RT 9/2/04 at 20–21.) The court then precluded Garza's mental health evidence. (*Id.* at 21.)

Garza did not raise this claim in state court and Respondents contend it is unexhausted. During the PCR proceedings, Garza alleged that appellate counsel performed ineffectively by failing to raise this issue. (PCR Pet. at 20–22.) The PCR court denied the claim, finding that the "mental health evidence was properly excluded at trial because the Defendant refused to allow the State's expert to examine him." (PCR Ruling, ME 7/29/13, at 5.) Because Garza cannot show that appellate counsel's performance was "constitutionally ineffective," the claim's default is not excused. *Carrier*, 477 U.S. at 488; *see Carpenter*, 529 U.S. at 451. The claim is without merit, so appellate counsel did not perform at a constitutionally ineffective level in failing to raise it. *See Moormann*, 628 F.3d at 1109.

2.     *Analysis*

The Fifth Amendment privilege against self-incrimination applies at the penalty phase of trial. *Estelle v. Smith*, 451 U.S. 454, 465 (1981). However, a defendant may not assert his Fifth Amendment privilege to preclude the prosecution from using material from a defendant's mental health evaluation to rebut psychiatric evidence introduced by the defendant himself. *Buchanan v. Kentucky*, 483 U.S. 402, 422–23 (1987). Accordingly, "[w]hen a defendant presents evidence through a psychological expert who has examined him, the government likewise is permitted to use the only effective means of challenging that evidence: testimony from an expert who has also examined him." *Kansas v. Cheever*, 571 U.S. 87, 94 (2013). As the Ninth Circuit has explained, "a defendant who asserts a mental status defense lacks a Fifth Amendment right to remain silent regarding the mental status that he has placed at issue." *Pawlyk v. Wood*, 248 F.3d 815, 825 (9th Cir. 2001) (citing *Buchanan*, 483 U.S. at 422–23); *see also White v. Mitchell*, 431 F.3d 517, 536–37

(6th Cir. 2005) (holding that a capital defendant's rights were not violated when the prosecution used a pretrial competency report to rebut mitigating evidence offered by defendant's expert); *United States v. Taylor*, 320 F.Supp.2d 790, 793 (N.D.Ind. 2004) (finding that defendant's Fifth and Sixth Amendment rights "are not infringed by this Court's Order directing him to submit to a mental health exam conducted by the Government's mental health expert since he has indicated that he intends to introduce mental health evidence during the penalty phase"). Garza's right against self-incrimination was therefore not violated by the trial court's ruling.

Garza also argues that the trial court's ruling violated the principle that a reliable capital sentencing requires the presentation and consideration of any mitigating aspect of the defendant's character or the circumstances of the crime. (Doc. 27 at 219.) Garza cites *Skipper v. South Carolina*, 476 U.S. 1, 4, 8 (1986), and *Lockett v. Ohio*, 438 U.S. 586, 603–05 (1978).[18] (*Id.* at 219–20.) He offers no authority, however, for the proposition that *Cheever* and *Buchanan* conflict with *Skipper* and *Lockett*. *See Muhammed v. Kelly*, 575 F.3d 359, 374 (4th Cir. 2009) (finding state court properly applied Supreme Court precedent in finding that *Buchanan* rather than *Lockett* governed claim); *see also Newell v. Ryan*, No. CV-12-02038-PHX-JJT, 2019 WL 1280960, at *23–24 (D. Ariz. Mar. 20, 2019); *Hampton v. Ryan*, No. CV-14-02504-PHX-ROS, 2019 WL 979896, at *26 (D. Ariz. Feb. 28, 2019).

In *State v. Naranjo*, the Arizona Supreme Court upheld the trial court's decision precluding the defendant from presenting an expert mitigation witness as a sanction for late disclosure. 234 Ariz. 233, 246, 321 P.3d 398, 411 (2014). The court rejected the defendant's argument under *Lockett* that precluding the expert's testimony prevented the jury from hearing relevant mitigating evidence. *Naranjo*, 234 Ariz. at 245, 321 P.3d at 410. The court explained that, "[a]lthough that general proposition is correct, in exercising the right to

---

[18] *Skipper* and *Lockett* hold that a capital sentencer may not be precluded from considering any aspect of the defendant's character or the circumstances of the offense proffered as a basis for a sentence less than death. *See also Eddings v. Oklahoma*, 455 U.S. 104, 110 (1982).

present witnesses, a defendant must 'comply with established rules of procedure and evidence.'" *Id.* (quoting *Taylor v. Illinois*, 484 U.S. 400, 411 n.15 (1988)).

Claim 8(A) is denied as procedurally defaulted and barred from federal review and meritless.

### B.    Polygraph evidence

Garza alleges that the trial court erred in precluding the results of his polygraph examination during the mitigation phase of his trial. (Doc. 27 at 221.) Before trial, defense counsel had arranged for Garza to take the examination.[19] (ROA 332, Ex. A; Doc. 38-7, PCR Pet., Ex. 140.) The judge granted the State's motion to exclude the evidence (RT 9/2/04 at 20), expressing doubts about its probative value and reliability and concluding that he did not think "polygraph evidence is admissible" (*id.* at 16, 17).

Garza concedes that he "has not previously asserted this claim." (*Id.*) He argues that the claim's default is excused by the ineffective assistance of appellate and PCR counsel. (*Id.*) The Court disagrees.

First, Garza did not exhaust a claim that appellate counsel performed ineffectively by failing to raise the polygraph issue. Therefore, ineffective assistance of appellate counsel cannot serve as cause for the underlying claim's default. *Carpenter*, 529 U.S. at 453; *Carrier*, 477 U.S. 489–90. Second, *Martinez* applies only to claims of ineffective assistance of trial counsel. Therefore, ineffective assistance of PCR counsel cannot serve as cause to excuse the default of this claim of trial court error. *Martinez (Ernesto)*, 926 F.3d at 1225; *Pizzuto*, 783 F.3d at 1177; *Hunton*, 732 F.3d at 1126–27.

In addition to being barred from this Court's review, the claim is meritless. Polygraph evidence is "generally inadmissible" under Arizona law. *State v. Ikirt*, 160 Ariz.

---

[19] The report of the examination highlighted the following questions, to which Garza answered "No": Did you shoot ELLEN? Are you lying when you say you saw LARRY shoot ELLEN? Are you lying when you say LARRY threatened your family? Did you shoot that big guy? Are you lying when you say LARRY shot that big guy? Are you lying when you say LARRY drove you to that house? The examiner found that Gaza's answers were "not indicative of deception." (ROA 332, Ex. A; Doc. 38-7, PCR Pet., Ex. 140.) Defense counsel submitted the report to the trial court. (ROA 332.)

113, 115, 770 P.2d 1159, 1161 (1987); *State v. Rodriguez*, 186 Ariz. 240, 250, 921 P.2d 643, 653 (1996) (explaining that the Arizona Supreme Court has "consistently held, as a matter of law, that polygraph evidence is not reliable"); *see State v. Hoskins*, 199 Ariz. 127, 144, 14 P.3d 997, 1014 (2000) ("Arizona courts, along with the vast majority of jurisdictions, consider polygraph examinations unreliable."). Arizona courts have also found that polygraph evidence does not meet the "reliability" requirement of Rule 26.7(b) of the Arizona Rules of Criminal Procedure. *See State v. Zuck*, 134 Ariz. 509, 514, 658 P.2d 162, 167 (1982) (rejecting claim that trial court erred in refusing to admit polygraph results as mitigating evidence at presentencing hearing).

Clearly-established federal law regarding the admissibility of polygraph evidence includes *United States v. Scheffer*, 523 U.S. 303, 317 (1998), which held that the military's per se rule excluding polygraph evidence does not violate a defendant's rights under the Fifth or Sixth Amendments. The *Scheffer* Court, noting that federal and state courts continued to express doubt about the reliability of polygraph evidence, declared that "there is simply no way to know in a particular case whether a polygraph examiner's conclusion is accurate, because certain doubts and uncertainties plague even the best polygraph exams." *Id.* at 312. The Court explained that "[a] defendant's right to present relevant evidence is not unlimited, but rather is subject to reasonable restrictions," *id.* at 308, and that courts "may legitimately be concerned that juries will give excessive weight to the opinions of a polygrapher, clothed as they are in scientific expertise. . . ." *Id.* at 313–14.

Garza cites *Rupe v. Wood*, 93 F.3d 1434, 1441 (9th Cir. 1996), and *Paxton v. Ward*, 199 F.3d 1197, 1216 (10th Cir. 1999), in support of his argument that the per se exclusion of polygraph results at sentencing violates the requirement that the sentencer must be allowed to consider all relevant mitigating evidence. (Doc. 27 at 222–23.) These circuit court cases do not establish that Garza is entitled to relief.

In *Rupe*, the Ninth Circuit held that a Washington state court erred by excluding polygraph evidence from a capital sentencing. 93 F.3d at 1441. Rupe was convicted and sentenced to death for two murders committed during a bank robbery. At trial, Rupe

- 44 -

1   testified that his accomplice, Monte Yovetich, committed the crimes. The polygraph results

2   at issue showed that Yovetich, the State's key witness, had lied when he denied

3   involvement in the crimes. *Id.* at 1438, 1440. On habeas review, the Ninth Circuit agreed

4   with the district court that the polygraph results were relevant mitigating evidence whose

5   exclusion violated *Lockett*. *Id.* at 1440–41. The evidence was relevant at sentencing to the

6   question of Rupe's relative culpability, to his credibility, and to the State's theory of the

7   case where the prosecutor had argued "there is not one shred of evidence other than Mr.

8   Rupe's statement that Mr. Yovetich did it."[20] *Id.* at 1441.

9       While Garza argues otherwise, courts have held that *Rupe* is "undermined" by the

10  subsequent holding in *Scheffer*. *See Goins v. Angelone*, 52 F. Supp. 2d 638, 675 (E.D. Va.

11  1999). In *Goins*, the defendant argued that the prosecutor violated *Brady*[21] by failing to

12  disclose the results of a polygraph test taken by the individual who, according to Goins,

13  had committed the murders with which Goins was charged. *Id.* at 674–75. Although

14  polygraph evidence was inadmissible under state law, Goins argued, citing *Rupe*, that the

15  results were admissible as mitigating evidence. *Id.* at 675. The district court rejected the

16  argument. *Id.* The court acknowledged that *Scheffer* was a non-capital case, but concluded

17  that the holding, "with its emphasis on the unreliability of polygraph evidence and the

18  interest of courts in excluding such unreliable evidence, certainly suggests that exclusion

19  of polygraph results would pass constitutional muster in [the capital] context, as well." *Id.*

20      The Fourth Circuit Court of Appeals agreed that Goins's rights were not violated by

21  exclusion of the polygraph evidence. *Goins v. Angelone,* 226 F.3d 312 (4th Cir. 2000),

---

22  [20] The court also rejected the State's argument that the polygraph results were inadmissible

23  "residual doubt" evidence, finding instead that they addressed Rupe's relative culpability,

24  which is a circumstance of the crime for mitigation purposes. *Rupe*, 93 F.3d at 1441.
    Respondents likewise argue that Garza's polygraph results constitute inadmissible residual

25  doubt evidence. (Doc. 37 at 86.) Garza cites *Rupe* to the contrary. (*See* Doc. 27 at 206.)
    The Court need not address the residual doubt question as it denies the claim on other

26  grounds.

27  [21] *Brady v. Maryland*, 373 U.S. 83, 87 (1963), holds that a defendant's due process rights

28  are violated if the prosecution fails to disclose evidence that is "material either to guilt or
    to punishment."

*abrogated on other grounds by Bell v. Jarvis,* 236 F.3d 149 (4th Cir. 2000). The court ruled that the evidence was not "material" under *Brady* because polygraph results were inadmissible for any purpose under Virginia law. *Id.* at 326. The court rejected Goins's assertion that the Constitution mandated admission of polygraph results during the sentencing phase of a capital trial. *Id.* The court explained that "under current controlling precedent, the Constitution does not mandate admission of polygraph results in capital sentencing proceedings." *Id.* at 326 n.7 (quoting *Goins*, 52 F.Supp.2d at 675); *see United States v. Fulks*, 454 F.3d 410, 434 (4th Cir. 2006); *see also Irick v. Bell*, No. 3:98-CV-666, 2001 WL 37115951, at *35 (E.D. Tenn. Mar. 30, 2001) (citing *Scheffer*, explaining that *Rupe* is not clearly established federal law, and concluding that "the Court has not found . . . any authority indicating that the Constitution mandates the admission of polygraph evidence in a capital sentencing proceeding"); *Sealey v. Chatman*, No. 1:14-CV-0285-WBH, 2017 WL 11477455, at *26 (N.D. Ga. Nov. 9, 2017), *aff'd sub nom. Sealey v. Warden, Georgia Diagnostic Prison*, 954 F.3d 1338 (11th Cir. 2020) ("Some courts have held that polygraph results can be admitted during the sentencing phase of a death penalty trial, but there is no constitutional mandate requiring courts to allow such evidence.").

In *Paxton*, the Tenth Circuit distinguished *Scheffer* on the grounds that it did not concern a capital defendant's constitutional right to present mitigating evidence at sentencing. 199 F.3d at 1215. *Paxton* itself, however, is readily distinguishable from Garza's case.

After Paxton was convicted of murdering a friend, the prosecution presented evidence during the sentencing stage that he had been charged in the shooting death of his wife years earlier. *Paxton*, 199 F.3d at 1202–03. Paxton offered into evidence a court order stating that the charge against him had been dismissed because he had been cleared by a polygraph examination. The trial court, however, excluded the evidence under a state rule prohibiting the admission of polygraph results for any purpose. *See id.* at 1211. During his "mendacious closing argument," the prosecutor told the jury that Paxton had failed to introduce any evidence countering the State's version of events and that nobody knew why

the previous charges had been dismissed. *Id.* at 1216. On habeas review, the Tenth Circuit ruled that exclusion of the polygraph evidence violated Paxton's right to present mitigating evidence at sentencing, and that Paxton had been denied his due-process right to explain or deny the evidence against him. *Id.* The court explained that, contrary to the Supreme Court's analysis of the polygraph evidence in *Scheffer*, the exclusion of the evidence in Paxton's case implicated a "'significant interest of the accused'" and "significantly impair[ed] the defense." *Id.* at 1215 (citing *Scheffer*, 523 U.S. at 316–17). In effect, the polygraph results were the only grounds on which Paxton could counter the State's evidence concerning the prior charges. The Tenth Circuit further noted that "the reliability of the excluded polygraph test was corroborated by the fact that the state relied upon it in dismissing the earlier charges against Mr. Paxton." *Id.* at 1214.

The issues surrounding the polygraph evidence in *Paxton* distinguish it from Garza's case. As one district court observed, "the *Paxton* case . . . presents the rare scenario where polygraph results, regardless of their accuracy, are necessary to a defendant's mitigation theory." *United States v. Catalan-Roman*, 368 F. Supp.2d 119, 123 (D.P.R. 2005). In Garza's case, by contrast, any relevance his polygraph results had depended on their accuracy, and hence on the reliability of polygraph evidence itself.

Also in contrast to *Paxton*, Garza's polygraph results were not the only basis of his defense. *See id.* (explaining that where "defendant's polygraph score is not the only information which could mitigate his participation in the attempt," exclusion of polygraph evidence was not inconsistent with the result in *Paxton*). The court in *Catalan-Roman* distinguished *Rupe* on the same basis. *Id.* n.7 ("Although *Rupe* predates *Scheffer*, it also falls into the category of cases where exclusion severely undermined defendant's ability to present mitigating information."). Garza presented evidence and argument in support of his third-party defense—that is, Larry Franco's involvement in the murders—during the guilt, penalty, and mitigation phases of his trial. In addition, unlike the defendant in *Rupe*, Garza did not testify at trial, so his credibility was not at issue. The exclusion of the polygraph evidence did not significantly impair his defense.

In sum, the authority on which Garza relies does not establish a constitutional right to the admission of polygraph evidence in the circumstances of Garza's case.

Claim 8(B) is procedurally defaulted and barred from federal review. It is also meritless. The claim is denied.

C.    Allocution

Garza alleges that the trial court denied his "constitutional right to allocution" by stating he would be subjected to cross-examination if he allocuted. (Doc. 27 at 223.) This claim is meritless.

Prior to closing arguments in the mitigation stage of trial, the parties and the court addressed Garza's possible allocution. (*See* RT 9/14/04 at 141–43; RT 9/15/04 at 3–10.) The court suggested that Garza "might be subject to cross-examination" or comment from the prosecution if he went "beyond the parameters" of allocution—such as a plea for mercy, an explanation of his conduct, or an apology—and instead disputed "the facts in evidence." (RT 9/15/04 at 9, 10.) Garza chose not to allocute. (*Id.* at 14.)

On direct appeal, Garza argued that the trial court's ruling amounted to a denial of his right to allocution in violation of the Fifth, Sixth, and Eighth Amendments. (Opening Brief at 57.) The Arizona Supreme Court rejected the claim, holding that "[b]ecause Garza declined to allocute or make a record as to what his allocution would have been, he cannot now claim prejudice from the trial court's tentative comments." *Garza*, 216 Ariz. at 69–70, 163 P.3d at 1019–20. Garza alleges that this ruling was contrary to or an unreasonable application of clearly established federal law or based on an unreasonable determination of the facts. (Doc. 27 at 223.)

Respondents contend that there is no clearly established federal law holding that a defendant has a constitutional right to allocution. (Doc. 37 at 88.) The Court agrees.

"As of this date, the United States Supreme Court has not held that a criminal defendant has a constitutionally protected right to allocution at sentencing." *Rikard v. Harrington*, No. 2:07-CV-01867-JKS, 2009 WL 3367442, at *3 (E.D. Cal. Oct. 19, 2009), *aff'd sub nom. Rikard v. Hedgpeth*, 473 F.App'x 610 (9th Cir. 2012); *see Troy v. Sec'y of*

*Dep't of Corr.*, No. 8:11-CV-796-T30-AEP, 2013 WL 24212, at *25 (M.D. Fla. Jan. 2, 2013), *aff'd sub nom. Troy v. Sec'y, Fla. Dep't of Corr.*, 763 F.3d 1305 (11th Cir. 2014) ("The Supreme Court has not recognized a constitutional right to allocution.").

The district courts in *Rikard* and *Troy* cited *Hill v. United States*, 368 U.S. 424 (1962), and *McGautha v. United States*, 402 U.S. 183 (1971), *judgment vacated on other grounds by Crampton v. Ohio*, 408 U.S. 941 (1972). In *Hill*, the Supreme Court left open the question of whether a defendant has a right to allocution. 368 U.S. at 429. In *McGautha*, the Court noted that it has "not directly determined whether or to what extent the concept of due process of law requires that a criminal defendant wishing to present evidence or argument presumably relevant to the issues involved in sentencing should be permitted to do so." 402 U.S. at 218 n.22.

"Circuit courts that have addressed this particular issue have soundly rejected the notion that a capital defendant has a constitutional right to address the sentencing jury." *Carter v. Chappell*, No. 06CV1343 BEN KSC, 2013 WL 1120657, at *154 (S.D. Cal. Mar. 18, 2013), *aff'd sub nom. Carter v. Davis*, 946 F.3d 489 (9th Cir. 2019). The circuit court cases cited in *Carter* include *United States v. Lighty*, 616 F.3d 321 (4th Cir. 2010), and *United States v. Hall*, 152 F.3d 381 (5th Cir. 1998), *abrogated on other grounds by United States v. Martinez-Salazar*, 528 U.S. 304 (2000). In *Lighty*, the Fourth Circuit noted its "precedent holding that a defendant does not have a constitutional right to allocution before the jury in a capital sentencing hearing." 616 F.3d at 365 (citing *United States v. Barnette*, 211 F.3d 803, 820 (4th Cir. 2000)). In *Hall*, the Fifth Circuit "conclude[d] that a criminal defendant in a capital case does not possess a constitutional right to make an unsworn statement of remorse before the jury that is not subject to cross-examination." 152 F.3d at 396; *see also United States v. Fleming*, 849 F.2d 568, 569 (11th Cir. 1988) (citations omitted) ("[T]he right to allocution is not constitutional."); *Scrivener v. Tansy*, 68 F.3d 1234, 1240 (10th Cir. 1995) ( "A trial court's failure to afford a defendant the right of allocution raises neither a jurisdictional nor a constitutional error cognizable in habeas.").

1    The Ninth Circuit has held, in a pre-AEDPA habeas case, that a trial court's denial

2    of a defendant's request to allocute before sentencing violated due process. *Boardman v.*

3    *Estelle*, 957 F.2d 1523, 1529–30 (9th Cir. 1992); *see United States v. Chong*, 104

4    F.Supp.2d 1232 (D. Haw. 1999) (applying *Boardman* in holding that a defendant has a

5    right to allocute before a sentencing jury in a capital sentencing hearing). As the court in

6    *Rikard* recognized, however, under AEDPA "clearly established federal law" refers to law

7    determined by the United States Supreme Court. 2009 WL 3367442, at *5 (citing

8    *Musladin*, 549 U.S. at 77, and *Holley v. Yarborough*, 568 F.3d 1091, 1097–98 (9th Cir.

9    2009)). *Boardman* is not clearly established federal law.

10   In addition, *Boardman* is distinguishable, because there the defendant was

11   "affirmatively denied an opportunity to speak" to the court prior to sentencing, 957 F.2d at

12   1528, whereas Garza made no such request and the trial court merely outlined the possible

13   consequences if Garza strayed "beyond the parameters" of appropriate allocution.

14    Because there is no Supreme Court precedent establishing a constitutional right to

15   allocution, the Arizona Supreme Court's denial of this claim does not entitle Garza to

16   habeas relief. Claim 8(C) is denied.

17       D.   Victim-impact evidence

18   Garza alleges that the trial court violated his rights under the Fifth, Sixth, Eighth,

19   and Fourteenth Amendments by permitting the introduction of victim-impact evidence.

20   (Doc. 27 at 224.) This claim is divided into three subclaims, in which Garza alleges (1)

21   victim-impact evidence is per se inadmissible, (2) admission of unduly prejudicial

22   statements by the victims' mothers violated his due process and Eighth Amendment rights,

23   and (3) admission of the victim-impact statements violated his rights under the

24   Confrontation Clause. These allegations do not entitle Garza to habeas relief.

25       1.   *Victim-impact is not per se inadmissible.*

26   Garza's first argument is refuted by clearly established federal law. In *Booth v.*

27   *Maryland*, 482 U.S. 496, 509 (1987), the Supreme Court held that the introduction of a

28   victim-impact statement to a capital sentencing jury violated the Eighth Amendment. In

*Payne v. Tennessee*, 501 U.S. 808, 827 (1991), however, the Court overruled *Booth* in relevant part.

The Court in *Payne* explained that the "State has a legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put in, by reminding the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to this family." 501 U.S. at 825 (citation and internal quotation marks omitted). "A State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed." *Id.* at 827. Therefore, the Court concluded, "if the State chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no *per se* bar." *Id.* at 827. The Court left intact *Booth*'s prohibition on the admission of characterizations and opinions about the crime, the defendant, or the appropriate sentence. *Id.* at 830 n.2.

Although Garza acknowledges the case only passingly (Doc. 27 at 227), *Payne* disposes of this argument.

### 2.    Admission of statements from the victims' mothers.

Over Garza's objections (*see* ROA, 270, 276), the trial court allowed Ida LaMere, the mother of Ellen Franco, and Brenda Rush, Lance's mother, to make statements and show the jury family photographs during the mitigation phase of trial. (*See* RT 9/2/04 at 8–12; RT 9/7/04 at 16–23.) With respect to LaMere's statement, Garza focuses on the following passages:

> No time will heal this horrible pain. We carry ourselves through our daily lives crying when we need to cry, yelling when we need to yell, sleeping night and days, not feeling one from the other. Relationships with spouses, they've suffered tremendously, questioning trust, faith, to [sic] longer even wanting to struggle for a relationship. . . . We know death is inevitable, disease, accidents, old age, wars, but not like this.
>
> . . .

> There really aren't words to express the horror and devastation of a 4:00 a.m. phone call telling me my baby has been shot to death along with her friend. The best I can compare this to is what you all might have felt the day of September 11 when the horrible devastating attacks to New York and Washington D.C. happened, and always living in the fear that you just don't know what is going to happen any more.

(*Id.* at 51.)

Garza also cites the following comments made by Brenda Rush: "It has been almost five years in our quest waiting for justice of the senseless murder of our son, our only surviving son, Lance Edward Rush. All we have left of our son is the memories and the pictures to carry us through to our last days on earth." (*Id.* at 52.) "This is a terrible crime that was committed upon Lance. No matter how old you are, we all know right from wrong. Lance paid the ultimate price with his life. That's—that is a real high price to pay in my book." (*Id.* at 55–56.) "[T]here are no words in any language on the face of this earth that can describe the loss of our only surviving son, Lance Edward Rush." (*Id.* at 56.) Both LaMere and Rush also displayed photographs, including a photograph of Rush's grave. (*See id.* at 19–20, 49.)

On direct appeal, the Arizona Supreme Court rejected Garza's argument that the mothers' statements were "unduly prejudicial." As to LaMere's comments, the court explained:

> LaMere drew a comparison between an event universally painful for all Americans and the pain she and her family experienced as a result of Ellen's murder. She did not equate Garza to the 9/11 terrorists; rather, her statement properly "focuse[d] on the effect of the crime on the victim and the victim's family."

*Garza*, 216 Ariz. at 69, 163 P.3d at 1019 (citation omitted).

The court also rejected the argument that the family photographs were unduly prejudicial:

> We have "recognize[d] the danger that photos of victims may be used to generate sympathy for the victim and his or her family," but we have declined to categorically bar their use, relying upon the discretion of the trial court to prevent undue prejudice.  The superior court did not abuse its discretion here.

> The photographs depicted the lives of the murder victims and thus supported the statutory victims' descriptions of their losses.

*Id.* (citation omitted).

The Arizona Supreme Court's rulings were neither contrary to nor an unreasonable application of clearly established federal law, nor were they based on an unreasonable determination of the facts.

Garza asserts that the victim-impact evidence "violated his constitutional rights to a fair trial and a reliable sentence by injecting an irrelevant and highly prejudicial characterization of the crime into his capital sentencing proceedings." (Doc. 27 at 228.) The Court disagrees.

The mothers' statements were permissible "evidence about the victim and about the impact of the murder on the victim's family." *Payne*, 501 U.S. at 827. The statements were not qualitatively different from the evidence found permissible in *Payne*, where, for example, the victim's mother testified about how the murder of her daughter and granddaughter affected the daughter's three-year-old son.[22] *Id.* at 814–15; *see, e.g.*, *Simmons v. Bowersox*, 235 F.3d 1124, 1134 n.4 (8th Cir. 2001) (recounting testimony of victim's husband, daughter, and sister).

The statements did not offer characterizations of the crime, the defendant, or the appropriate sentence. *Payne*, 501 U.S. at 830 n.2. To the extent any of the statements referred to the crime, their admission did not have a "substantial and injurious effect or influence in determining" Garza's sentence. *Brecht*, 507 U.S. at 637; *see Floyd v. Filson*, 949 F.3d 1128, 1149 (9th Cir. 2020) (applying harmless error standard to admission of mother's victim-impact statement); *Hooper v. Mullin*, 314 F.3d 1162, 1174 (10th Cir.

---

[22] She testified that her grandson "cries for his mom. He doesn't seem to understand why she doesn't come home. And he cries for his sister Lacie. He comes to me many times during the week and asks me, Grandmama, do you miss my Lacie. And I tell him yes. He says, I'm worried about my Lacie." *Payne*, 501 U.S. at 814–15.

2002) (applying harmless error standard to admission of improper victim-impact statement).

First, as Respondents note, LaMere and Bush were the only victims to give statements, and their comments were relatively brief. (RT 9/7/04 at 49–57.) Immediately after the statements, Garza began the presentation of his extensive case in mitigation, ultimately calling twenty-seven witnesses, including his parents, four younger sisters, and other relatives, friends, and teachers. (RT 9/7/04–9/9/04; 9/13/04–9/14/04.)

In addition, the trial court provided instructions to guide the jury's consideration of the victim-impact statements. At the outset of the mitigation phase, the court instructed the jury as follows:

> [A]fter any opening statements, each victim's survivors may, if they wish, make a state relating to the personal characteristics of the victim and the impact of the murder on the victim's family.
>
> They are not allowed to offer any opinion or recommendation regarding the sentence to be imposed.
> . . .
> [Y]ou cannot consider any victim's statements or victim impact evidence as a new aggravating circumstance. However, it is evidence you may consider in assessing and evaluating the mitigation presented.

(RT 9/7/04 at 30, 32.) At the close of the mitigation phase, the court again instructed the jury about the role of victim-impact evidence:

> You may not consider any information presented during this phase of the trial as a new aggravating circumstance.
>
> . . .
>
> You cannot be governed or influenced by mere sentiment, passion, prejudice or public feeling or opinion.
>
> Victim impact evidence is not an aggravating circumstance. Victim impact evidence may be considered in assessing and evaluating the mitigation presented.

(RT 9/16/04 at 106, 107.)

Given the trial court's instructions, which jurors are presumed to follow, *Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987), even if the victim-impact evidence had been erroneously admitted, the error was harmless. *See Lockett v. Trammell*, 711 F.3d 1218, 1239–40 (10th Cir. 2013) (finding error harmless where jury was correctly instructed that its sentencing decision was "limited to a moral inquiry into the culpability of the defendant, not an emotional response to the evidence"); *Welch v. Workman*, 630 F.3d 980, 997, 999 (10th Cir. 2011) (admission of unconstitutional victim-impact statements vividly and emotionally describing the crimes was harmless error where jury was properly instructed); *United States v. Bernard*, 299 F.3d 467, 481 (5th Cir. 2002) ("[A]ny prejudice that did result from the statements was mitigated by the district court's instructions to the jurors not to be swayed by passion, prejudice or sympathy.").

### 3.    Confrontation Clause

Garza contends that his Confrontation Clause rights were violated because the victim-impact statements were not subjected to cross-examination. (Doc. 27 at 229.) He acknowledges that he did not raise this claim in state court. (*Id.* at 224.) Contrary to his arguments, the claim's default is not excused by the ineffective performance of appellate or PCR counsel. First, as previously noted, ineffective assistance of appellate counsel may constitute cause to excuse a procedural default only where the particular ineffectiveness allegation was exhausted in state court. *Carpenter*, 529 U.S. at 453; *Carrier*, 477 U.S. at 489–90. Garza did not exhaust such a claim in state court, so ineffective assistance of appellate counsel cannot serve as cause for the underlying claim's default. Second, ineffective assistance of PCR counsel can excuse only claims of ineffective assistance of trial counsel, not claims of trial error. *Martinez (Ernesto)*, 926 F.3d at 1225; *Pizzuto*, 783 F.3d at 1177; *Hunton*, 732 F.3d at 1126–27.

The claim also fails on the merits because Sixth Amendment confrontation rights do not apply in sentencing proceedings. *See United States v. Littlesun*, 444 F.3d 1196, 1199 (9th Cir. 2006) ("*Crawford* does not expressly speak to sentencing. . . . *Crawford* speaks to trial testimony, not sentencing."); *Dixon*, 2016 WL 1045355, at *49 ("There is no clearly

1   established federal law holding that *Crawford* applies at sentencing, and the circuit courts

2   have rejected the argument."); *see also, e.g.*, *United States v. Monteiro*, 417 F.3d 208, 215

3   (1st Cir. 2005); *United States v. Martinez*, 413 F.3d 239, 243 (2d Cir. 2005); *United States*

4   *v. Kirby*, 418 F.3d 621, 627–28 (6th Cir. 2005); *United States v. Fleck*, 413 F.3d 883, 894

5   (8th Cir. 2005); *United States v. Cantellano*, 430 F.3d 1142, 1146 (11th Cir. 2005).

6        Garza's constitutional rights were not violated by the presentation of victim-impact

7   evidence at his sentencing. Accordingly, Claim 8(D) is denied.

8        E.   Jury instructions

9        Garza alleges that the trial court declined to give constitutionally appropriate jury

10   instructions in violation of his rights under the Sixth, Eighth, and Fourteenth Amendments.

11   (Doc. 27 at 230.) He argues that the court erred when it failed to give the following

12   mitigation-phase instructions: (1) residual doubt as a mitigating factor; (2) role of a third-

13   party; (3) an instruction which did not require unanimity for mitigation; and (4) role of

14   sympathy. The Arizona Supreme Court's denial of these claims was neither contrary to nor

15   an unreasonable application of clearly established federal law, nor was it based on an

16   unreasonable determination of the facts.

17        1.   *Residual doubt instruction*

18        The trial court denied Garza's request to provide a residual doubt jury instruction.

19   (RT 9/2/04 at 18.) On direct appeal, the Arizona Supreme Court denied Garza's request for

20   relief, finding there is no constitutional right to such an instruction and that the instruction

21   is not required under Arizona law. *Garza*, 216 Ariz. at 70, 163 P.3d at 1020. The court

22   cited *Oregon v. Guzek*, 546 U.S. 517, 523–25 (2006), which held that a defendant does not

23   have a constitutional right to present such evidence at sentencing. *Id.* In *Abdul-Kabir v.*

24   *Quarterman*, 550 U.S. 233 (2007), the Court noted its prior rejection of an argument that

25   the trial court's instructions "did not allow the jury to give adequate weight to whatever

26   'residual doubts' it may have had concerning the defendant's guilt." *Id.* at 250 (citing

27   *Franklin v. Lynaugh*, 487 U.S. 164, 172, 177 (1988)). The Court explained that its holding

28   in *Franklin* was "unremarkable because we have never held that capital defendants have

1   an Eighth Amendment right to present 'residual doubt' evidence at sentencing." *Id.* at 250–

2   51. This claim is meritless.

3          2.      *Third-party instruction*

4          During the mitigation phase of trial, the court rejected Garza's request to instruct

5   the jury that it could consider "the role of another person" or the "involvement of another

6   person" when evaluating whether Garza was legally accountable for the conduct of another

7   as an accomplice. (RT 9/15/04 at 34; RT 9/16/04 at 104.) In its instructions on the potential

8   mitigating circumstances, the trial court included the following statutory mitigator: "The

9   defendant was legally accountable for the conduct of another as an accomplice but his

10  participation was relatively minor, although not so minor as to constitute a defense to

11  prosecution." (RT 9/16/04 at 104.) The Arizona Supreme Court denied this claim on direct

12  appeal, explaining that the instruction as given tracked the language of the statutory

13  mitigating circumstance, A.R.S. § 13-703(G)(3), and "appropriately allowed the jury to

14  consider Garza's level of culpability as mitigation." *Garza*, 216 Ariz. at 70, 163 P.3d at

15  1020.

16         Garza argues that the instruction's failure to specifically reference the role of a

17  "another person" violated his right to have the jury consider all relevant mitigating

18  evidence. (Doc. 27 at 231.) He asserts that "the absence of this instruction led the jury to

19  believe that it could not meaningfully consider critical mitigation." (Doc. 44 at 124.)

20         The Arizona Supreme Court's denial of this claim was reasonable. As Respondents

21  argue, the requested third-party language is "superfluous" (Doc. 37 at 102), given that the

22  jury was instructed to consider as mitigating evidence "the conduct of another." Garza

23  offers no explanation as to how this instruction, as opposed to an instruction citing "the

24  role of another person," prevented consideration of relevant mitigation. If Garza is arguing

25  that the jury should have been directed to consider another person's involvement apart from

26  that person's role as an accomplice, such an instruction is tantamount to an instruction on

27  residual doubt. As just discussed, a capital defendant does not have "a constitutional right

28

1   to an instruction telling the jury to revisit the question of his identity as the murderer as a

2   basis for mitigation." *Franklin*, 487 U.S. at 172. This claim is meritless.

3          *3.     Unanimity instruction*

4          Garza argues that the trial court improperly instructed the jury about the need for

5   unanimity in considering mitigation. He contends that the instructions were "impermissibly

6   confus[ing]" and "improperly limited the consideration of mitigating evidence" by

7   requiring a potential mitigating circumstance to be found unanimously, in violation of *Mills*

8   *v. Maryland*, 486 U.S. 367 (1988), and *McKoy v. North Carolina*, 494 U.S. 433 (1990)

9   (Doc. 27 at 31–32.)

10         The Arizona Supreme Court denied this claim on direct appeal, citing *Mills* and

11  *Beard v. Banks*, 542 U.S. 406, 408–09 (2004). *Garza*, 216 Ariz. at 71, 163 P.3d at 1021.

12  In doing so the court considered the following instructions provided by the trial court:

13         The determination of what circumstances are mitigating and the weight to be
14         given to any mitigation is for each of you to resolve, individually, based upon
        all the evidence presented during all phases of this trial.
15         . . . .

16         A finding that a particular mitigating circumstance exists need not be
17         unanimous, that is you all need not agree on what particular mitigation exists.

18  (RT 9/16/04 at 105.)

19         If you unanimously find that no mitigation exists then you must return a
20         verdict of death. If you unanimously find that mitigation exists, you should
        weigh the mitigation in light of the aggravating circumstances already found
21         to exist, and if you unanimously find that the mitigation is not sufficiently
        substantial to call for a sentence of imprisonment for life, you must return-
22         you must return a verdict of death.

23         If you unanimously find that mitigation exists and it is sufficiently substantial
24         to call for a sentence of imprisonment for life, you must return a verdict of
        life.
25

26  (*Id.* at 107.)

27         The court concluded that these instructions, "[i]n contrast to the instructions in

28  *Mills*, . . . made clear that, although the jury must unanimously find that the death penalty

1   is not appropriate, it need not unanimously find the existence of any particular mitigator."

2   *Garza*, 216 Ariz. at 71, 163 P.3d at 1021.

3          This was a reasonable application of *Mills*. *Mills* error occurs only where jurors are

4   led to believe that they are "precluded from considering any mitigating evidence unless all

5   12 jurors agreed on the existence *of a particular such circumstance*." *Smith v. Spisak*, 558

6   U.S. 139, 144 (2010) (quoting *Mills*, 486 U.S. at 384). Garza's jury was specifically

7   instructed that "[a] finding that a particular mitigating circumstance exists need not be

8   unanimous, that is you all need not agree on what particular mitigation exists." (RT 9/16/04

9   at 105.) Given the clarity of this instruction, there was not a reasonable probability that the

10  jurors would have believed that each individual mitigating circumstances needed to be

11  found unanimously. *See Spisak*, 558 U.S. at 148 (finding *Mills* not violated where jury

12  instructions did not say "anything about how—or even whether—the jury should make

13  individual determinations that each particular mitigating circumstance existed"). This

14  claim is meritless.

15          4.      *Role of sympathy instruction*

16          Defense counsel requested an instruction that the jury could consider sympathy or

17  mercy in determining whether a mitigating circumstance existed and whether death was

18  the appropriate sentence. (*See* ROA 346 at 8; RT 9/15/04 at 27.) The trial court declined.

19  It instructed the jurors, with respect to weighing aggravating and mitigating circumstances,

20  that "[y]ou are free to assign whatever moral or sympathetic value you deem appropriate

21  to each and all of the various circumstances," and with respect to the ultimate sentencing

22  decision, "you cannot be governed or influenced by mere sentiment, passion, prejudice or

23  public feeling or opinion." (RT 9/16/04 at 106–07.) Garza argues that the instructions

24  violated *Lockett* and *Eddings* by preventing the jury from considering all relevant

25  mitigating evidence. (Doc. 27 at 232.)

26          On direct appeal, the Arizona Supreme Court denied Garza's challenge to these

27  instructions. *Garza*, 216 Ariz. at 70, 163 P.3d at 1020. The court cited *California v. Brown*,

28  479 U.S. 538, 541–43 (1987), and *Saffle v. Parks*, 494 U.S. 484, 487–95 (1990). The

1    court's decision was neither contrary to nor an unreasonable application of those cases,

2    which constitute the clearly-established federal law governing the claim.

3         In *Saffle,* the Supreme Court held that an instruction directing the jury to avoid any

4    influence of sympathy when imposing a sentence did not violate *Lockett* and *Eddings* by

5    barring relevant mitigating evidence from being presented and considered during a capital

6    proceeding. 494 U.S. at 492–93. The Court explained that "[i]t is no doubt constitutionally

7    permissible, if not constitutionally required . . . for the State to insist that 'the individualized

8    assessment of the appropriateness of the death penalty [be] a moral inquiry into the

9    culpability of the defendant, and not an emotional response to the mitigating evidence.'"

10   *Id.* (quoting *Brown*, 479 U.S. at 545). In *Brown*, 479 U.S. at 540, and in *Victor*, 511 U.S.

11   at 13, the Court upheld instructions directing jurors "not to be swayed by mere sentiment,

12   sympathy, passion, prejudice, public opinion or [public] feeling." These instructions are

13   identical to those given in Garza's case. This claim is meritless.

14        F.    Cumulative prejudice

15        Garza asserts that he was prejudiced by the cumulative effect of the trial court errors

16   alleged in Claim 8. (Doc. 27 at 233.) This claim, which Garza did not raise in state court,

17   is procedurally defaulted and barred from federal review. *See Carpenter*, 529 U.S. at 453;

18   *Martinez (Ernesto)*, 926 F.3d at 1225. It is also meritless.

19        The United States Supreme Court has not specifically recognized the doctrine of

20   cumulative error as an independent basis for habeas relief. *See Lorraine v. Coyle*, 291 F.3d

21   416, 447 (6th Cir. 2002) ("The Supreme Court has not held that distinct constitutional

22   claims can be cumulated to grant habeas relief."); *cf. Morris v. Sec'y Dep't of Corr.*, 677

23   F.3d 1117, 1132 n.3 (11th Cir. 2012) (refusing to decide whether "under the current state

24   of Supreme Court precedent, cumulative error claims reviewed through the lens of AEDPA

25   can ever succeed in showing that the state court's decision on the merits was contrary to or

26   an unreasonable application of clearly established law").

27        The Ninth Circuit has held that in some cases, although no single trial error is

28   sufficiently prejudicial to warrant reversal, the cumulative effect of several errors may

1   nonetheless prejudice a defendant to such a degree that his conviction must be overturned.

2   *See Mancuso v. Olivarez*, 292 F.3d 939, 957 (9th Cir. 2002) (citation and internal quotation

3   marks omitted), *overruled on other grounds by Slack v. McDaniel*, 529 U.S. 473 (2000).

4   Here, however, the Court has not identified any constitutional errors arising during the

5   mitigation phase of Garza's trial. Therefore, "[b]ecause there is no single constitutional

6   error in this case, there is nothing to accumulate to the level of a constitutional violation."

7   *Id.*; *see Boyde v. Brown*, 404 F.3d at 1176; *Morris*, 677 F.3d at 1132 & n.3; *see also McGill*,

8   2021 WL 4899001, at *11 ("If there are no errors, there is no need to consider their

9   cumulative effect.") (citing *Williams v. Filson*, 908 F.3d 546, 570 (9th Cir. 2018)).

10           Because Supreme Court precedent does not recognize the doctrine of cumulative

11   error, and because this Court has determined that no prejudice resulted from the errors

12   alleged by Garza, the claim of cumulative prejudice is meritless.

13           Conclusion

14           Garza is not entitled to habeas relief on his claims of mitigation-stage trial court

15   error. Claims 8(A) through 8(F) are procedurally defaulted and barred from federal review,

16   meritless, or both. Claim 8 is denied.

17   **Claim 9:**

18           Garza alleges that the State's misconduct during its mitigation-phase closing

19   argument deprived him of his rights under the Fifth, Sixth, Eighth, and Fourteenth

20   Amendments. (Doc. 27 at 234.) This claim consists of five subclaims, two of which, (A)

21   and (B), were raised, at least in part, on direct appeal and denied by the Arizona Supreme

22   Court. Garza acknowledges that he failed to raise the remaining subclaims, (C), (D), and

23   (E), in state court. (*Id.*) He contends that their default is excused by the ineffective

24   assistance of appellate and PCR counsel. (*Id.*) The Court disagrees. *See Carpenter*, 529

25   U.S. at 453; *Martinez (Ernesto)*, 926 F.3d at 1225. Claims 9(C), (D), and (E) remain

26   defaulted and barred from federal review. They are also, as described below, meritless.

27           "Counsel are given latitude in the presentation of their closing arguments, and courts

28   must allow the prosecution to strike hard blows based on the evidence presented and all

reasonable inferences therefrom." *Ceja v. Stewart*, 97 F.3d 1246, 1253–54 (9th Cir. 1996) (internal quotation marks omitted); *United States v. Tucker*, 641 F.3d 1110, 1120–21 (9th Cir. 2011). A petitioner is entitled to habeas relief on a claim of prosecutorial misconduct only when the misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).

"[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). To establish a due process violation, "it is not enough that the prosecutors' remarks were undesirable or even universally condemned." *Darden*, 477 U.S. at 181 (internal punctuation and citation omitted). "Rather, the court must determine whether remarks rendered a trial fundamentally unfair, looking at the challenged remarks in the context of the entire proceeding to determine whether the argument influenced the jury's decision." *Noguera v. Davis*, 290 F.Supp.3d 974, 1043 (C.D. Cal. 2017) (citing *Boyde v. California*, 494 U.S. 370, 385 (1990)). Finally, a prosecutor's comments constitute grounds for reversal only when they caused actual prejudice. *Shaw v. Terhune*, 380 F.3d 473, 478 (9th Cir. 2004) (citing *Brecht*, 507 U.S. at 637).

A.     Focus on victim-impact evidence

Garza argues that the prosecutor committed misconduct by focusing "excessively" on evidence of the victims' suffering. (Doc. 27 at 236.)

On direct appeal, Garza argued that the prosecutor's comments violated his Sixth and Fourteenth Amendment rights.[23] (Opening Brief at 63.) He cited two passages in

_____

[23] Respondents contend that the Fifth and Eighth Amendment arguments in Claim 9(A) are procedurally defaulted because Garza did not present such allegations in state court. (Doc. 37 at 115.) Garza acknowledges that he did not raise a claim under the Fifth Amendment. (Doc. 44 at 126 n.55.) He argues, however, that by citing *Darden* in his opening brief he exhausted an Eighth Amendment claim. (*Id.*) Even assuming the Eighth Amendment claim is exhausted, Garza is not entitled to relief for the reasons set forth in the Court's analysis of his due process allegations. *See Darden*, 477 U.S. at 179–83; *see also Caldwell v. Mississippi*, 472 U.S. 320 (1985).

support of this claim. (*Id.* at 66.) At the beginning of his mitigation-stage closing argument, the prosecutor stated:

> You know, listening to [counsel for Garza], I want to apologize at the outset, because when he stood up here and tried to in some way insinuate or suggest to you that the suffering of these people over here, the suffering of the victims is somehow comparable to Ruben Garza and the life he's led.
>
> That deserves an apology. I was shocked to hear that this morning. There is no way that Ruben Garza and the opportunities he's had in his life is comparable in any way to what these people have gone through in the last five years to see that justice is done in this case, the loss of their son, the loss of their daughter.
>
> So we want to apologize at the outset. I know [Garza's counsel] really didn't mean to do that.

(RT 9/16/04 at 45–46.)

At the close of his argument, the prosecutor commented:

> And in the defense's opening he suggested that it was unfortunate that the victims were here in the courtroom. The families of these victims were here because of the decisions that Ruben made. They seek  justice for the brutal murders of their son and daughter, and this case cries out for justice and asks that you follow the law and impose the death penalty in this case.

(*Id.* at 92.)

The Arizona Supreme Court found that the comments were "invited" by defense counsel who "had sought to compare the suffering of the murder victims with that of Garza and his loved ones."[24] *Garza*, 216 Ariz. at 69, 163 P.3d at 1019.

---

[24] In his mitigation-phase closing argument, Garza's counsel commented:

> We've heard Ellen suffering, the suffering of her mother, and Lance's suffering, and the suffering of his family, Lance who was a hardworking, respectful, loving son. And during this last phase we've heard the suffering of Ruben's friends and family as well, Ruben Garza is also a hardworking, respectful, loving man.

(RT 9/16/04 at 79.)

1    In his habeas petition, Garza cites half a dozen additional comments in support of

2    his claim that the prosecutor inappropriately focused on the victims. (Doc. 27 at 236–37.)

3    These comments described the victims' young ages, their suffering on the night of the

4    murders and their dying words, and the contents of Jennifer Farley's 911 call. (*See* RT

5    9/16/04 at 53–58.) Respondents contend that these new factual bases render the claim

6    unexhausted. (Doc. 37 at 115.)

7    To the extent this claim is exhausted, the decision of the Arizona Supreme Court

8    denying relief was neither contrary to nor an unreasonable application of clearly

9    established federal law. Moreover, regardless of its procedural status, the claim is meritless

10   even if the new allegations are considered.

11   As noted above, there is no per se bar to the admission of victim-impact evidence

12   or "prosecutorial argument on that subject." *Payne*, 501 U.S. at 827. The *Payne* Court

13   explained, however, that "[i]n the event that evidence is introduced that is so unduly

14   prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the

15   Fourteenth Amendment provides a mechanism for relief." *Id.* at 825.

16   In support of this due process standard, the *Payne* Court cited *Darden*, 477 U.S. at

17   179–183, which in turn relied on *DeChristoforo*, 416 U.S. 637. These cases establish that

18   in analyzing a claim of prosecutorial misconduct, courts consider a number of factors, such

19   as the nature and extent of the misconduct, including whether the prosecutor's comments

20   manipulated or misstated the evidence; the issuance of curative instructions; defense

21   conduct inviting the prosecutorial response; and the weight of the evidence. *Darden*, 477

22   U.S. at 181–82; *DeChristoforo*, 416 U.S. at 645. Applying these factors, it is apparent that

23   Garza's due process rights were not violated by the prosecutor's comments.

24   First, neither the nature nor the extent of the prosecutor's comments support a

25   finding of a due process violation. The comments described the evidence or, as the Arizona

26   Supreme Court found, responded to comments made by defense counsel about the suffering

27   of Garza's friends and family. The objected-to comments are contained in less than seven

28   pages of the prosecutor's forty-six page closing argument. *See Humphries v. Ozmint*, 397

F.3d 206, 220–21 (4th Cir. 2005) (noting that prosecutor's statements about the victim's "unique personal characteristics" was contained in less than four pages of a twenty-eight-page transcript). Taken as a whole, the prosecutor's comments about the victims expressed the State's legitimate interest in counteracting the mitigating evidence Garza presented by introducing evidence of the victim's personal characteristics and the harm caused by Garza's actions. *See Payne*, 501 U.S. at 825. The comments, including those alluding to defense counsel's statements, were not qualitatively different from the argument the Supreme Court found permissible in *Payne*.[25] *Id.* at 814–16.

In addition, the trial court provided appropriate instructions to guide the jury, explaining that "[v]ictim impact evidence is not an aggravating circumstance. Victim impact evidence may be considered in assessing and evaluating the mitigation presented." (RT 9/16/04 at 107.) The court further instructed the jury that it "cannot be governed or influenced by mere sentiment, passion, prejudice, or public feeling or opinion." (*Id.*)

Finally, the weight of the aggravating factor versus the mitigating circumstances supports a finding the Garza's due process rights were not violated by the prosecutor's

---

[25] As noted above, in *Payne* a mother, Charisse Christopher, and her daughter Lacie were murdered. Her three-year-old son, Nicholas, survived. In his penalty-phase closing argument, the prosecutor commented: "But we do know that Nicholas was alive. And Nicholas was in the same room. Nicholas was still conscious. His eyes were open. . . . He was able to hold his intestines in as he was carried to the ambulance. So he knew what happened to his mother and baby sister." *Payne*, 501 U.S. at 815. In his rebuttal closing argument, the prosecutor stated:

> [Petitioner's attorney] wants you to think about a good reputation, people who love the defendant and things about him. He doesn't want you to think about the people who love Charisse Christopher, her mother and daddy who loved her. The people who loved little Lacie Jo, the grandparents who are still here. The brother who mourns for her every single day and wants to know where his best little playmate is. He doesn't have anybody to watch cartoons with him, a little one.

*Id.* at 816.

comments. The multiple-homicides factor is entitled to "extraordinary weight." *Garza*, 216 Ariz. at 72, 163 P.3d at 1022 (citation omitted). By contrast, the mitigating circumstances, including Garza's age, "prior good character," and experience of "some personal setbacks," were of "reduced" weight due to the circumstances of the murders. *Id.* at 72–73, 163 P.3d at 1023.

Garza's due process rights were not violated by the prosecutor's focus on victim-impact evidence during his mitigation-phase closing argument. Claim 9(A) is denied.

B.     Comment on Garza's silence

Garza argues that the prosecutor improperly commented on his silence in violation of his Fifth Amendment rights. (Doc. 27 at 238.)

On direct appeal, Garza cited two instances in which the prosecutor allegedly commented on his silence. (Opening Brief at 60–62.) The first was when the prosecutor pointed out that on the night of the murders Garza did not call 911. (*See* RT 9/16/04 at 58.) The Arizona Supreme Court found that the comment "did not relate to Garza's failure to testify at trial, but rather to the events of December 1, 1999, and Garza's inaction on that date." *Garza*, 216 Ariz. at 68, 163 P.3d at 1018.

The second instance occurred when the prosecutor was discussing the defense theory that Larry Franco committed the murders. The prosecutor argued:

> [Y]ou've listened to the interview of Ruben Garza. We've played that interview for you. If it was Larry Franco, why didn't he tell us that? In fact, he had the opportunity to tell us that back on December 2nd, 1999, while the detectives were investigating this case. . . .
>
> Why didn't the defendant tell us that back in December when at the moment of truth is so critical [sic], when we had the chance to further investigate.

(RT 9/16/04 at 73–74.)

The Arizona Supreme Court found that the prosecutor's comments were "aimed at Garza's statements to the police, not at his failure to testify at trial." *Garza*, 216 Ariz. at 68, 163 P.3d at 1018.

1        In his habeas petition, Garza adds a third instance of alleged misconduct (Doc. 27

2   at 238), citing the prosecutor's comment that "Garza lacks remorse" and "attempts to

3   justify and lie about what he did, even to his closest friend." (*See* RT 9/16/04 at 85.)

4   Respondents argue that this allegation is defaulted. (Doc. 37 at 119, 121.) Whatever its

5   procedural status, that allegation is without merit, as are the allegations that were denied

6   on appeal.

7        The Fifth Amendment prohibits a prosecutor from commenting to the jury about a

8   defendant's failure to testify at trial. *Griffin v. California*, 380 U.S. 609, 615 (1965).

9   "*Griffin* prohibits the judge and prosecutor from suggesting to the jury that it may treat the

10  defendant's silence as substantive evidence of guilt." *United States v. Robinson*, 485 U.S.

11  25, 32 (1988) (quoting *Baxter v. Palmigiano*, 425 U.S. 308, 319 (1976)). A comment

12  violates this rule "if it is manifestly intended to call attention to the defendant's failure to

13  testify, or is of such a character that the jury would naturally and necessarily take it to be a

14  comment on the failure to testify." *Lincoln v. Sunn*, 807 F.2d 805, 809 & n.1 (9th Cir. 1987)

15  (finding comments improper where prosecutor argued, "there's only one person who can

16  tell us" . . .  "there is only one person who can testify" . . . "there is only one person who

17  can tell you"); *see Beardslee v. Woodford*, 358 F.3d 560, 586 (9th Cir. 2004). Relief is to

18  be granted only "where such comment is extensive, where an inference of guilt from silence

19  is stressed to the jury as a basis for the conviction, and where there is evidence that could

20  have supported acquittal." *Lincoln*, 807 F.2d at 809 (quoting *United States v. Kennedy*, 714

21  F.2d 968, 976 (9th Cir. 1983)); *Beardslee*, 358 F.3d at 586.

22       The Arizona Supreme Court reasonably determined that the prosecutor did not

23  impermissibly comment on Garza's failure to testify at trial. The comments were not

24  extensive and, as the court explained, they were not manifestly intended to call attention to

25  the fact that Garza did not testify. *See, e.g.*, *Valot v. Lattimore*, No. SACV 08-

26  1366SJO(FMO), 2010 WL 759158, at *1 (C.D. Cal. Feb. 25, 2010) (finding no *Griffin*

27  violation where the prosecutor's comments were clearly references to "petitioner's silence

28  when she was interviewed by the police," not her failure to testify at trial). The comments

about Garza's failure to call 911 on the night of the murders and his failure, during a taped interview played to the jury, to name Franco as the real killer "back on December 2, 1999," or "back in December," must be viewed in the context of the defense theory that Franco was the shooter and Garza was not involved in the murders. Applying AEDPA deference to the state court's decision, Garza is not entitled to relief. *See Demirdjian v. Gipson*, 832 F.3d 1060, 1069–70 (9th Cir. 2016) (finding a reasonable argument could be made that prosecutor's statements were not comments on defendant's silence but on defense's failure to offer exculpatory evidence).

The comment about Garza's lack of remorse, which was offered in the context of his phone calls with Laurel Thompson and the lies he told during the investigation, was a response to defense attempts to offer mitigating evidence of Garza's good character. (RT 9/16/04 at 81–85.) Even under de novo review the allegation that these comments violated *Griffin* fails. *See United States v. Mikhel*, 889 F.3d 1003, 1060 (9th Cir. 2018) (finding no *Griffin* violation where comments about lack of remorse "clearly referred not to defendants' failure to testify but to their conduct during, and in the months after, the killings"); *Ervin v. Davis*, No. 00-CV-01228-LHK, 2016 WL 3350573, at *9 (N.D. Cal. June 16, 2016) (finding no *Griffin* violation where prosecutor's statements "addressed Petitioner's conduct following the crime, and the lack of remorse demonstrated by that conduct, as well as Petitioner's absence of remorse reflected in Petitioner's witnesses' testimony").

None of the prosecutor's comments, when viewed in context, were "of such a character that the jury would naturally and necessarily take it to be a comment on the failure to testify." *Lincoln*, 807 F.2d at 809.

There was no *Griffin* violation, let alone a harmful one. Claim 9(B) is denied.

C.   Improper nexus argument

In this procedurally defaulted claim, Garza contends that the prosecutor improperly argued that mitigating evidence must have a causal nexus to the crime and that each

mitigating circumstance must be weighed individually against the aggravation. (Doc. 27 at 239.) Regardless of its procedural status, the claim is plainly meritless.

The sentencer in a capital case may "not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Eddings v. Oklahoma*, 455 U.S. 104, 110 (1982) (quoting *Lockett*, 438 U.S. at 604); *see Tennard v. Dretke*, 542 U.S. 274, 283 (2004) (finding unconstitutional a screening test that required a causal nexus between mitigating evidence and the offense).

However, while the sentencer must not be foreclosed from considering relevant mitigation, it "is free to assess how much weight to assign to such evidence." *Ortiz v. Stewart*, 149 F.3d 923, 943 (9th Cir. 1998), *overruling on other grounds recognized by Apelt v. Ryan*, 878 F.3d 800, 827 (9th Cir. 2017); *see also Lopez v. Ryan*, 630 F.3d 1198, 1204 (9th Cir. 2011) (explaining that a sentencer may consider "causal nexus . . . as a factor in determining the weight or significance of mitigating evidence"), *overruled in part on other grounds by McKinney v. Ryan*, 813 F.3d 798 (9th Cir. 2015) (en banc); *State v. Newell*, 212 Ariz. 389, 405, 132 P.3d 833, 849 (2006) (explaining that mitigating evidence must be considered regardless of whether there is a "nexus" between the mitigating circumstance and the crime but the lack of a causal connection may be taken into account in assessing the weight of the evidence). As the *Eddings* court explained: "The sentencer . . . may determine the weight to be given relevant mitigating evidence. But they may not give it no weight by excluding such evidence from their consideration." 455 U.S. at 114–15.

The prosecutor did not improperly argue that a causal nexus must be shown in order for mitigating evidence to be considered. Garza cites two comments from the prosecutor's mitigation-stage closing argument. In the first, the prosecutor discussed testimony that Garza was a good person when the witness knew him in 1994. The prosecutor asked, "What relevance does that have to December of 1999 or, let's say, the last few months before these executions took place?" (RT 9/16/04 at 60.)

In the second passage quoted by Garza (Doc. 27 at 240), the prosecutor stated, in reference to mitigating evidence that Garza suffered from asthma, "We don't contest that he had asthma, but what did the asthma have to do with what he was doing on December 1, 1999? . . . . There is no indication it played any kind of role in this offense." (RT 9/16/04 at 79–80.)

Garza's selective quote here elides a lengthy passage in which the prosecutor discussed the fact that Garza was able to go to work, go hunting, and play sports despite his asthma, and "by the time he left high school the asthma greatly improved." (*Id.* at 79.) The prosecutor continued:

> Is it mitigation? Many children have asthma, and many children have deformities, and many children are deaf and blind. Ruben didn't have those things. He has asthma, but it improved to the point that he felt comfortable, so comfortable that he could carry a gun or carry methamphetamine around with him.
>
> Is it sufficiently substantial to call for lenience? No.

(*Id.* at 79–80.)

The prosecutor's comments, when viewed in full, are a permissible comment on the weight of the proffered mitigating evidence. "Once the jury has heard all of the defendant's mitigation evidence, there is no constitutional prohibition against the State arguing that the evidence is not particularly relevant or that it is entitled to little weight." *State v. Anderson*, 210 Ariz. 327, 350, 111 P.3d 369, 392 (2005). The prosecutor's "various comments and questions here simply went to the weight of [Garza's] mitigation evidence and were not improper." *Id.* The prosecutor was permissibly attempting to discount the mitigating value of Garza's good character evidence and asthma.

Garza also argues that the prosecutor committed misconduct by discussing the individual mitigating circumstances and arguing that each was insufficient to call for leniency. (Doc. 27 at 240–41.) According to Garza, the prosecutor thus "conveyed . . . the wrong legal standard," because mitigating evidence must be considered in its totality. (*Id.* at 241.)

Garza offers no support for this challenge to the prosecutor's argument. In any event, any error was corrected by the trial court's instruction that jury is to weigh the "total or entire mitigation" and consider "the totality of the mitigation." (RT 9/16/04 at 106.) The arguments of counsel do not have the same force as instructions from the court, *see Boyde v. California*, 494 U.S. at 384, and jurors are presumed to follow such instructions, *Greer v. Miller*, 483 U.S. at 766 n.8.

Along with being procedurally defaulted and barred from federal review, Claim 9(C) is meritless.

### D.    Speculation, mischaracterization, and inappropriate argument

In this procedurally defaulted claim, Garza argues that the prosecutor improperly speculated about how the murders occurred, mischaracterized the record, and made inappropriate arguments about mitigation and aggravating factors. (Doc. 27 at 241.) Garza is not entitled to relief.

#### 1.    Speculation

Garza contends that in his mitigation-phase closing argument the prosecutor "concocted a whole scene wherein Garza attempted to shoot Ellen, marched down the hallway in search of Farley, happened upon Rush instead, and killed Rush." (Doc. 27 at 241–42.) Garza also cites as impermissibly speculative the prosecutor's arguments that if Garza hadn't wounded himself in his encounter with Rush, Farley would also have been killed, and that if Larry Franco had been present there would not have been any survivors. (*Id.* at 242.) Respondents contend that these arguments were based on reasonable inferences from the trial evidence. (Doc. 27 at 127–28.) The Court agrees that Garza is not entitled to relief.

As an initial matter, the prosecutor's arguments here responded to the closing comments of Garza's counsel who argued in mitigation that Garza was immature, lacked decision-making skills, and was a person of good character. The prosecutor contended that the facts of the crime, including all of the decisions Garza made in carrying it out, contradicted the proposed mitigating circumstances. His comments were therefore invited,

at least in part, by Garza's arguments. *See Darden*, 477 U.S. at 182. The prosecutor's comments about Larry Franco were also invited by defense counsel's argument that Franco's involvement in the shootings was a mitigating circumstance.

Next, the evidence, including the physical evidence and Jennifer Farley's trial testimony, supported the prosecutor's argument (RT 9/16/04 at 53–57) that Garza pursued Farley down the hall after shooting Ellen Franco, broke open the locked bedroom door, and left the house only after shooting himself in an encounter with Lance Rush. (*See* RT 7/14/04 at 215–34.) That Garza's intent in pursuing Farley was to eliminate her as a witness is a reasonable inference, as no other grounds present themselves for Garza's armed intrusion into the house and then into the bedroom *after* shooting Ellen. Finally, assuming the prosecutor's suggestion that Larry Franco "wouldn't have left any survivors" (RT 9/16/04 at 69) was speculative rather than based on reasonable inferences, Garza was not prejudiced. The prosecutor cited other trial evidence as proof that Franco was not present at the scene or involved in the shootings. The comments about Franco did not have an injurious effect on the sentencing verdict. *Brecht*, 507 U.S. at 637.

### 2.   *Mischaracterization of the record*

Garza alleges that the prosecutor committed misconduct and mischaracterized the evidence when he referred to "the conspiracy to commit murder with Eric Rodriguez" and stated that "[Garza] and Rodriguez conspired about going over and shooting that guy." (RT 9/16/04 at 63.) These comments alluded to the plan Garza and Rodriguez had to "beat up" or otherwise harm the person who had attacked Laurel Thompson. The prosecutor cited this "conspiracy" to counter Garza's mitigation argument that he had no criminal history. (*Id.*)

In *Donnelly*, the Supreme Court observed that "closing arguments . . . are seldom carefully constructed in toto before the event; improvisation frequently results in syntax left imperfect and meaning less than crystal clear." 416 U.S. at 646–47. As a result, "a court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that

meaning from the plethora of less damaging interpretations." *Id.* at 647. With this caveat in mind, the Court agrees with Respondents that the prosecutor used the word "conspiracy" not as an accusation that Garza was legally guilty of conspiracy but simply as a synonym for agreement or plan. In the same context the prosecutor also referred to Garza's other "misconduct," including drug and alcohol use and carrying a gun. (RT 9/16/04 at 16.)

Even assuming the prosecutor erred in using the word "conspiracy," Garza fails to explain how this mischaracterization, in the context of the prosecutor's lengthy argument, had a "substantial and injurious effect" on the verdict. *Brecht*, 507 U.S. at 637. The jury was made aware of the agreement between Garza and Rodriguez from Rodriguez's guilt-phase testimony. (RT 7/1/04 at 75.)

### 3.   Inappropriate arguments

Finally, Garza asserts that the prosecutor made improper arguments about two aggravating factors, "zone of danger"[26] and witness elimination, and made inappropriate comments about remorse as a mitigating circumstance. (Doc. 27 at 243–44.) These claims are meritless.

The record shows that the prosecutor did not inappropriately argue for the aggravating factors. First, in describing the crime, the prosecutor stated, not particularly coherently, that it was Garza's "decision to violate another person's safety and with that three people, their safety, their safety and security that we all entrust in a person's home, you know, the safety and security in the home." (RT 9/16/04 at 55.) He continued, "In our society there is little else that gains greater respect than the safety and security of one's home. . . . We hold the safety and security of our homes in such high esteem and such a requirement [sic]" (*Id.*) These comments suggest, if anything, that Garza somehow violated the victims' house, not that his actions placed Jennifer Farley within the "zone of danger."

---

[26] The "zone of danger" factor exists when "[i]n the commission of the offense the defendant knowingly created a grave risk of death to another person or persons in addition to the person murdered during the commission of the offense." A.R.S. § 13-703(F)(3). The trial court ruled that the State was not permitted to argue as an aggravating factor that Jennifer Farley was in the zone of danger." (RT 9/2/04 at 64–65.)

1    Next, the prosecutor did not improperly argue that witness elimination was an

2  aggravating factor. Garza notes that the prosecutor repeatedly referred to Jennifer as a

3  "witness" (Doc. 27 at 243), but that is nothing more than a statement of fact. The

4  prosecutor's description of Garza searching for Jennifer and pursuing her down the hall

5  with his gun drawn (RT 9/16/04 at 54) is a reasonable inference drawn from the evidence.

6    Finally, the prosecutor did not commit misconduct by referring to Garza's lack of

7  remorse. Those comments, as noted above, were made in rebuttal to the defense's portrayal

8  of Garza as caring person of good character.

9    The trial court also instructed the jury that "What the lawyers say is not evidence."

10  (RT 9/16/02 at 102), thereby reducing any risk of prejudice from the prosecutor's

11  comments. *See Runningeagle v. Ryan*, 686 F.3d 758, 781 (9th Cir. 2012) (citing trial court's

12  instruction that what the attorneys say is not evidence in finding there was no due process

13  violation from prosecutor's comments) (citing *Donnelly*, 416 U.S. at 645; *Allen v.

14  Woodford*, 395 F.3d 979, 988 (9th Cir. 2005)).

15    In addition to being procedurally defaulted and barred from federal review, Claim

16  9(D) is meritless.

17    E.    Inflammatory comments

18    In this procedurally defaulted claim, Garza argues that the prosecutor's comments

19  deprived him of a fair sentencing. (Doc. 27 at 245.) He cites the prosecutor's "apology" on

20  behalf of defense counsel for discussing the suffering of Garza's family and friends,

21  "insults" directed at the defense team and "contempt for the defense's arguments," and his

22  "inflammatory" comments about Garza. (*Id.*)

23    Prosecutors have wide latitude in presenting their closing arguments and are

24  permitted to "strike hard blows based on the evidence presented and all reasonable

25  inferences therefrom." *Ceja*, 97 F.3d at 1253–54. Prosecutors are allowed to raise questions

26  about the credibility of defense witnesses where supported by the record. *See Duckett v.

27  Godinez*, 67 F.3d 734, 742 (9th Cir. 1995) ("The prosecutor's assertions regarding the

28  relative believability of the state and defense witnesses were not representations of his

personal opinion, but inferences drawn from the evidence."). They also may argue about how the jury should interpret evidence in the record. *See Menendez v. Terhune*, 422 F.3d 1012, 1036–37 (9th Cir. 2005).

The prosecutor's comments about the defense case did not constitute misconduct. *See Williams v. Borg*, 139 F.3d 737, 744–45 (9th Cir. 1998) (finding no misconduct when prosecutor referred to defense's closing argument as "trash"); *United States v. Ruiz*, 710 F.3d 1077, 1086 (9th Cir. 2013) (finding that "the prosecutor's characterization of the defense's case as 'smoke and mirrors' was not misconduct").

The prosecutor's comments about Garza, describing him as an "executioner" and a "predator" and arguing that murderers should "be removed from the human family" (RT 9/16/04 at 53, 60, 85, 89), are significantly less egregious than the statements of the prosecutor in *Darden*, which were condemned by every reviewing court but found not to violate due process. *Id.* at 179. In *Darden*, the prosecutor called the defendant an "animal," stated "I wish I could see [the defendant] sitting here with no face, blown away by a shotgun," and told the jury that imposing the death penalty was the only way to protect society from future crimes. *Id.* at 180; *see Runningeagle*, 686 F.3d at 781 (finding no due process violation where prosecutor described crimes as "unspeakable horror" and defendant as "evil").

Finally, the trial court instructed the jury that what the lawyers say is not evidence (RT 9/16/02 at 102), thus reducing any risk of prejudice. *See Runningeagle*, 686 F.3d at 781.

Claim 9(E) is both defaulted and barred from federal review and meritless.

<u>Conclusion</u>

To the extent the allegations in Claims 9(A) and (B) were raised in state court, the decision of the Arizona Supreme Court denying the claims does not entitle Garza habeas relief under 28 U.S.C. § 2254(d). The remaining allegations in Claims 9(A) and (B) are meritless whatever their procedural status. Claims 9(C), (D), and (E) are procedurally defaulted and barred from federal review. The claims are without merit because the

1   prosecutor's comments did not violate Garza's due process rights. To the extent any of the
2   comments constituted improper argument, they did not prejudice Garza. Claim 9 is
3   therefore denied.

4   **Claim 10:**

5   Garza alleges that he was deprived of his "freestanding constitutional right to a
6   reliable sentencing proceeding" in which all mitigation evidence is investigated, presented,
7   and considered. (Doc. 27 at 247.) He raised this claim during the PCR proceedings. (PCR
8   Pet. at 73–74.) The court found the claim waived under Rule 32.2(a) because it could have
9   been raised on appeal but was not. (PCR Ruling, ME 7/29/13 at 2–3.) Garza argues that
10  the PCR court "misapprehended the nature" of the claim and "misapplied" the waiver rule.
11  (*Id.* at 248.) He asserts that the claim could not have been raised on appeal because it is
12  based on evidence developed during the PCR proceedings, namely diagnoses of intellectual
13  disability and Alcohol-Related Neurodevelopmental Disorder. (*Id.*)

14  Respondents counter that there is no "freestanding" right to a reliable capital
15  sentencing. (Doc. 37 at 137.) Having located no authority supporting such a right, the Court
16  agrees. The cases cited by Garza are inapposite. In *Williams (Terry)*, 529 U.S. at 393, the
17  Court discussed the right to present mitigating evidence while addressing a claim of
18  ineffective assistance of counsel. In *Gilmore v. Taylor*, 508 U.S. 333, 342 (1993), the Court
19  referred to jury instructions when it stated that capital cases require "a greater degree of
20  accuracy and factfinding than would be true in a noncapital case."

21  Garza's allegation that he was sentenced to death on an "incomplete mitigation
22  record" (Doc. 27 at 248) is addressed in the Court's consideration of his claim of
23  intellectual disability and in his claims of ineffective assistance of counsel at sentencing.
24  Claim 10 is denied.

25  **Claims 11 and 13:**

26  Garza alleges that his rights were violated by juror misconduct and juror tampering.
27  (Doc. 27 at 248.) In Claim 11(A), he argues that he was deprived of a fair and impartial
28  trial because two jurors provided false answers about their criminal histories on their juror

questionnaires and one of the jurors failed to disclose his previous interaction with the prosecutor. (*Id.* at 250.) In Claim 11(B), he argues that he was deprived of a fair and impartial trial because the jurors engaged in "quid pro quo bargaining." (*Id.* at 254.) In Claim 11(C), he argues that he was deprived of a fair trial because a juror believed he was being intimidated by Garza's family and friends. (*Id.* at 257.) In Claim 11(D), he alleges three additional incidents of juror misconduct. (*Id.* at 261.) Finally, in Claim 13, Garza alleges that the State failed to disclose the prosecutor's prior interactions with a juror. (*Id.* at 270.)

With the exception of Claim 11(D), Garza raised these allegations during the PCR proceedings. (PCR Pet. at 70–73; *see* PR, Doc. 39, Ex. HHHHHH at 36–37.) The PCR court, citing Ariz. R. Crim. P. 32.2(a), found the claims precluded because they could have been raised on appeal. (PCR Ruling, ME 7/29/13, at 2.) However, "[b]ecause defendant appears to raise additional claims of jury misconduct from those raised during trial and/or in the motion for a new trial," the PCR court considered the merits of Claims 11(A), 11(C), and 13, finding the claims "not colorable." (*Id.* at 3 n.1, 9–10.) The court also considered, in the context of a claim of ineffective assistance of counsel, the allegations in Claim 11(B) and determined "there was no misconduct." (*Id.* at 8.)

This Court previously found that the PCR court's procedural ruling was both independent and adequate to preclude federal review of Claims 11(A), (B), and (C) and Claim 13. (Doc. 73 at 17, 20.) The Court also found that Claim 11(B) failed on the merits. (*Id.* at 19.)

With respect to Claim 11(D), the Court finds the allegations procedurally defaulted because they were not raised in state court. Garza alleges that their default is excused by the ineffective assistance of appellate counsel. Contrary to Respondents' argument (Doc. 37 at 140), during the PCR proceedings Garza did raise these allegations of appellate counsel ineffectiveness as independent claims. (PCR Pet. at 22.) Garza has not shown cause for the underlying claims' default, however, because, as discussed below, the allegations of misconduct and bias are meritless and therefore appellate counsel's performance in

1  failing to raise them was not "constitutionally ineffective." *Carrier*, 477 U.S. at 488; *see*

2  *Carpenter*, 529 U.S. at 451; *Moormann*, 628 F.3d at 1109.

3       Garza offers a number arguments as to why the procedural default of Claims 11(A)

4  and (C) and Claim 13 is overcome, including the ambiguity of the PCR court's ruling. (*See*

5  Doc. 44 at 140–45.) Regardless of their procedural status, the Court will now consider these

6  claims on the merits. *See Lambrix*, 520 U.S. at 524–25 (stating that courts may bypass

7  procedural default issues where the merits are clear but the procedural issues are not). The

8  Court will do so applying AEDPA deference to the PCR court's rulings. *See Clabourne v.*

9  *Ryan*, 745 F.3d 362, 383 (9th Cir. 2014) *overruled in part on other grounds by McKinney*,

10  813 F.3d 798 (en banc) (explaining that AEDPA deference applies to PCR court's

11  alternative ruling on the merits).

12       **Claim 11**

13       A.   False responses on juror questionnaire.

14       *1.   Background*

15       In Claim 11(A), Garza alleges that jurors Vic Currier and Geno Chisolm falsely

16  answered "No" to Question 56 of the juror questionnaire, which asked whether the

17  prospective juror had been "arrested for, charged with or convicted of any crime other than

18  a vehicle non-moving violation." (*See* Doc. 38-5, PCR Pet., Ex. 62a at 16; Doc. 38-6, PCR

19  Pet., Ex. 119e at 16.) Garza states that Currier, who was selected jury foreman, had been

20  "charged with and arrested for at least three criminal offenses and one moving violation,"

21  including DWI and bad check charges in Texas, driving on a suspended license, and

22  speeding. (Doc. 27 at 250; *see* Doc. 38-5, PCR Pet., Ex. 62, ¶¶ 2–4, Ex's 62b–62f.)

23       Juror Chisolm had been arrested, charged with, and tried for aggravated assault. (*See*

24  Doc. 38-6, PCR Pet., Ex. 119, ¶¶ 6–9.) The prosecutor in that case, Mark Barry, was also

25  the prosecutor in Garza's trial. (*Id.*, ¶6.) At the outset of Garza's trial, Chisolm indicated

26  that he did not know or recognize the lawyers, although later in the case he recognized

27  Barry. (*Id.*, Ex. 119, ¶ 7, Ex. 119d at 12–13; *see* RT 5/27/04 at 12–13.) Barry never

28  indicated that he knew Chisolm.

During the PCR proceedings, Garza's investigator interviewed Currier and Chisolm. He reported the following exchanges with Currier:

> 9. I asked Mr. Currier why he answered "No" to Q#56 when it appeared he had been charged with a DWI misdemeanor in Texas in 1983. His answers seemed somewhat vague and inconsistent. He said he did not recall whether he was arrested. He said he did not recall much about this case, but that nothing came of it. He said he was never prosecuted and the case was "discharged." He then said this case was dismissed, that there was no evidence. [Texas court records indicate this case was dismissed.] Later, he asserted this charge was a vehicle nonmoving violation. . . . He said there was no vehicle involved at all and had no recollection of a DWI charge.
>
> 10. I asked about the 1984 bad check case in Texas that generated a warrant for his arrest, Travis County case No. C-1-CR-85-246529. He said he did not recall this case. He said he did not know there was such a case. I offered to send a copy of the record to him. He said he was not interested in having it sent.
>
> 11. After my first conversation with Mr. Currier, I learned of the above-referenced the misdemeanor case filed against Ralph Victor Currier, Jr., in East Mesa Justice Court in Mesa, Arizona, in 2004. . . . On or about September 13 and/or 14, 2012, I placed two calls to Mr. Currier asking for follow-up discussion on our first interview, referencing the Arizona Justice Court case. I left two voice mails.
>
> 12. On September 19, 2012, Vic Currier called me back to inquire about the information I had discussed with him concerning his Texas cases during our earlier phone call. At this time, I also asked him about the 2004 Arizona Justice Court case which was filed against him, but dismissed two months later. He said he did not recall being in court in Arizona in 2004. . . .

(Doc. 38-5, PCR Pet., Ex. 62, ¶¶ 9–12.)

Garza's investigator reported the following response from Juror Chisolm:

> I asked why he answered "No" to Q#56 when he clearly had been arrested for, charged with, and tried for felonies. He answered that he had been acquitted. I said that Q#56 did not ask about convictions, it simply asked jurors if they had ever been arrested for or charged with a crime "other than Vehicle Code non-moving violations." Chisolm repeated that he had been found not guilty, indicating to me he felt that the verdict somehow made his arrest and the charges moot.

(Doc. 38-6, PCR Pet., Ex. 119, ¶ 8.)

The investigator reported the following exchange when he asked Chisolm about his prior prosecution by Barry:

> 6. Chisolm spent part of the trial wondering about the identity of one of the prosecutors. He said the prosecutor's face was familiar, but he could not place him in his memory until near the end of the case. He described the prosecutor-whom he later identified as Mark Barry-as sporting a thick, Tom Selleck-style mustache. Sometime near the end of the trial, and Chisolm was not clear exactly when, he remembered that Mark Barry had actually prosecuted him in a prior felony trial. . . . Chisolm had "no doubt" Barry was the same prosecutor in his trial and the Garza trial. Court records indicate Mark L. Barry was, in fact, the deputy county attorney who prosecuted Chisolm in 1990. The . . . Minute Entry and a hand-written witness sheet show that Chisolm testified in his own defense on April 4 and April 5, 1990, indicating that Mark Barry presumably cross-examined him face-to face, before Chisolm was selected as a juror in the Garza trial where Mark Barry was again the prosecutor. . . . Chisolm said he was acquitted. Chisolm said he never informed the court or counsel about this prior case involving Mark Barry.

(*Id.*, ¶ 6.)

The PCR court, in its alternative ruling denying this claim on the merits, found that Garza "has not demonstrated that the individuals [Currier and Chisolm] believed the information provided to be erroneous at the time that the jury was selected" and therefore "has not demonstrated that perjury occurred." (PCR Ruling, ME 7/29/13, at 9.) The court continued:

> [E]ven had disclosure been made, Defendant has not demonstrated either that a correct response would have provided a valid basis for a challenge for cause or prejudice. *See McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 555, 104 S. Ct. 845, 849-50 (1984); *State v. Dann*, 220 Ariz. 351, 371, 207 P.3d 604, 624 (2009); Rule 18.4(b) ("reasonable ground to believe that a juror cannot render a fair and impartial verdict"). Defendant has merely alleged that he was deprived of an opportunity to probe bias; bias has not been established, and speculative bias is not sufficient to support a peremptory challenge. There is no basis to conclude that the juror himself, or the jury in its entirety, was anything other than fair and impartial. Defendant has not demonstrated prejudice.

(*Id.*)

2.    *Analysis*

The Sixth Amendment "guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). Due process requires that the defendant be tried by a "jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." *Id.*

There are three types of jury bias. *See Fields v. Brown*, 503 F.3d 755, 766 (9th Cir. 2007). As the PCR court explained, for Garza to be entitled to relief under the first, he must "demonstrate that a juror failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause." *McDonough*, 464 U.S. at 556. "The Supreme Court has held that an honest yet mistaken answer to a voir dire question rarely amounts to a constitutional violation; even an intentionally dishonest answer is not fatal, so long as the falsehood does not bespeak a lack of impartiality." *Dyer v. Calderon*, 151 F.3d 970, 973 (9th Cir. 1998) (en banc) (citing *McDonough*, 464 U.S. at 555–56).

The other types of juror bias are "actual bias, which stems from a pre-set disposition not to decide an issue impartially," and "implied (or presumptive) bias, which may exist in exceptional circumstances where, for example, a prospective juror has a relationship to the crime itself or to someone involved in a trial, or has repeatedly lied about a material fact to get on the jury." *Fields*, 503 F.3d at 766. Actual bias is not at issue here.

Garza first argues that the PCR court unreasonably determined the facts without holding an evidentiary hearing and unreasonably applied *McDonough* by finding there was no bias or prejudice. (Doc. 27 at 253–54.) However, even if the PCR court unreasonably determined that the jurors were not knowingly untruthful, Garza is not entitled to relief in the absence of a constitutional violation. *See Wilson v. Corcoran*, 562 U.S. 1, 6 (2010) (explaining that a showing that a state court's decision was based on an unreasonable determination of the facts under 28 U.S.C. § 2254(d)(2) "does not repeal the command of § 2254(a) that habeas relief may be afforded to a state prisoner 'only on the ground' that

1   his custody violates federal law"). Garza has shown neither juror bias nor a constitutional

2   violation.

3        Garza contends that bias should be presumed with respect to Juror Currier. For this

4   proposition he cites *Dyer* and *Green v. White*, 232 F.3d 671, 676 (9th Cir. 2000), where the

5   court found implied bias based on the juror's "pattern of lies, inappropriate behavior, and

6   attempts to cover up his behavior." *Dyer* and *Green* are easily distinguishable from Garza's

7   case based on the type and level of juror misconduct involved and the inferences that could

8   be drawn from it.

9        In *Dyer*, a juror's brother had been killed in a manner similar to that with which the

10  defendant was alleged to have killed his victims, but the juror said during voir dire that no

11  family member had ever been the victim of any crime. *Dyer*, 151 F.3d at 972. The Ninth

12  Circuit found that the record "conclusively" showed that the juror lied repeatedly to conceal

13  the nature of her brother's killing, first during voir dire and later when questioned by the

14  state trial judge. *Id.* at 979. The juror also "plainly lied" when she stated during voir dire

15  that none of her relatives had ever been accused of an offense. In fact, her husband had

16  been charged with rape, placed in the same jail as the defendant, and even spoken to the

17  defendant. *Id.* at 973–94. The juror herself had been the victim of several crimes, again

18  contradicting her voir dire responses, and "[n]early every close relative of hers had been

19  arrested" at some point. *Id.* at 980–81. Based on the "magnitude" of her lies, the Ninth

20  Circuit drew the inference that she "lied in order to preserve her status as a juror and to

21  secure the right to pass on Dyer's sentence." *Id.* at 982, 984. These circumstances

22  constituted "that rare case" where juror bias may be presumed. *Id.* at 984.

23       Likewise in *Green* the Ninth Circuit found "extraordinary" circumstances that

24  compelled a finding of implied bias. There, a juror had failed to disclose in his

25  questionnaire a prior felony conviction for passing bad checks, which under California law

26  would have disqualified him from serving as a juror. 232 F.3d at 672. When asked during

27  voir dire to reveal any prior assault charges, the juror failed to disclose a past assault

28  conviction. *Id.* at 673. When called upon at a post-trial evidentiary hearing to explain his

1    behavior he gave contradictory explanations for his omissions, first asserting that his wife

2    had filled out his juror questionnaire by herself and later testifying that she had filled it out

3    pursuant to his directions. *Id.* at 672–73.

4         The juror had also been involved in "several incidents" at trial that suggested he was

5    biased. Other jurors alleged that he said he knew the defendant was guilty the moment he

6    saw him and wished "the judge would let him go back to his place so he could get his

7    piece" and shoot the defendant. *Id.* at 673–74. When questioned about these allegations at

8    the post-trial hearing, the juror offered a variety of contradictory responses. *Id.* at 672–78.

9    For instance, he initially stated he never said "[I] knew [the defendant] was guilty the

10   moment [I] saw him," but later testified that he did in fact make such a statement at the end

11   of the trial. *Id.* at 673–74.

12        The Ninth Circuit concluded that the juror's impartiality was impeached by his

13   statements at trial, the contradictions in his post-trial testimony, and his lies on the juror

14   questionnaire and during voir dire. *Id.* at 673. The court explained that the juror's behavior

15   "provide[d] strong circumstantial evidence of his motive for lying: his stated desire to get

16   a gun and kill Green himself; his statement that he knew Green was guilty from the moment

17   he saw him; his statement to a friend that the wrong people receive too many rights; and

18   his past 'investigation' activities, which, of course, he boasted about to the jury. All of

19   these facts, considered as a whole, create 'destructive uncertainties' regarding [the juror's]

20   ability to render a fair verdict." *Id.* at 678.

21        In Garza's case, by contrast, there are no "destructive uncertainties" about Currier's

22   or Chisolm's ability to render a fair verdict.

23        First, given the explanations they provided to Garza's PCR investigator, which

24   suggest misunderstanding or lack of memory, it is not entirely clear that Currier and

25   Chisolm were intentionally dishonest, as opposed to simply incorrect, in their answers to

26   question 56. This alone distinguishes the case from *Dyer* and *Green. See United States v.*

27   *Olsen*, 704 F.3d 1172, 1195 (9th Cir. 2013) ("Here, we think that one could fairly question

28   the plausibility of [Juror] Leavitt's explanations for the omissions in his juror

1  questionnaire. But these omissions and Leavitt's explanations for them . . . do not even

2  approach the transparent lies of the juror in *Green* or the 'misleading, contradictory, and

3  outright false answers' that the juror later gave to explain those lies.") (quoting *Green*, 232

4  F.3d at 678).

5      Next, there has been no showing that either Currier or Chisolm engaged in any

6  conduct or made any statements during trial suggesting they were biased against Garza.

7  The facts do not support an inference that they lied, as the jurors did in *Dyer* and *Green*,

8  in order to secure their status as jurors so they could pass judgment on Garza.

9      Finally, "[i]n every case where this form of implied bias has been recognized, the

10  juror in question was not entirely forthcoming during voir dire about his or her personal

11  experiences that were similar to the facts involved in the trial." *Olsen*, 704 F.3d at 1192

12  (citing *Fields*, 503 F.3d at 773). The experiences about which Currier and Chisolm were

13  not entirely forthcoming, by contrast, bore no relationship to the crimes for which Garza

14  was being tried.

15      The facts in this case are not sufficiently analogous to *Dyer* or *Green* to support a

16  finding of implied or presumed bias. The case does not reach the level of the "rare" or

17  "extraordinary" circumstances where a finding of implied bias is warranted, and Garza has

18  failed to show that his jury was not impartial. For the reasons cited by the PCR court, Garza

19  has also failed to show bias under *McDonough*.

20      The PCR court's denial of this claim was neither contrary to nor an unreasonable

21  application of clearly established federal law, nor was it based on an unreasonable

22  determination of the facts. Claim 11(A) is denied as meritless.

23      B.    Juror quid pro quo bargaining

24      Garza alleges that he was deprived of a fair and impartial jury when his jurors

25  engaged in "improper bargaining" by which some jurors agreed to a life sentence for Ellen

26  Franco's murder in exchange for a death sentence for Lance Rush's murder. (Doc. 27 at

27  254–55.)

28

The Court previously found the claim meritless (Doc. 73 at 19) because there is no clearly established federal law holding that compromise verdicts or vote trading violate a defendant's constitutional rights. *See Zhuk v. McDonald*, No. CIV S-09-3073 MCE, 2011 WL 3925090, at *9 (E.D. Cal. Sept. 7, 2011), *aff'd*, 584 Fed.Appx. 833 (9th Cir. 2014) ("[T]he United States Supreme Court has never held that a jury violates a criminal defendant's constitutional rights by reaching a compromise verdict that is supported by the evidence, and such a conclusion does not flow from the Court's clearly established law."); *see also United states v. Straach*, 987 F.2d 232, 241 (5th Cir. 1993) ("Even a compromise verdict cannot be challenged later by a juror if a reasonable jury could have found that the conviction was supported by the evidence beyond a reasonable doubt."). The Court reiterates that finding and adds that the claim is based entirely on a juror's account of the jury's deliberative processes (*see* PCR Pet., Ex. 118, ¶¶ 13–20, Ex. 157 at 7, 17), which the Court is not permitted to consider. Fed. R. Evid. 606(b)(1); *see Straach*, 987 at 241–42; *United States v. Camacho*, 865 F.Supp. 1527, 1532–33 (S.D. Fla. 1994) ("At most, the juror statements in this matter indicate that the jury worked through a process of compromise to reach its verdict—a process which constitutes the internal workings of the jury here without any indication of outside influence."). Accordingly, Claim 11(B) is denied.

C.     Jury tampering

In Claim 11(C), Garza alleges that was deprived of his right to a fair and impartial jury because Currier, the jury foreman, believed he was being intimidated by Garza's family and friends. (Doc. 27 at 257.)

1.     Background

Garza raised this claim in his PCR petition. In support of the claim, he relied on an "unsolicited affidavit" Currier sent to the PCR court in 2012. (PCR Pet. at 71.) In the affidavit, Currier indicated he was concerned about the juror questionnaires becoming public after he was contacted by PCR counsel's investigator. (Doc. 38-9, PCR Pet., Ex. 173; Doc. 44-3, Ex. 93, ¶ 19.)

Currier went on to state that during the trial "jurors increasingly became the target of family and friends of the defendant. Some were accosted verbally in the halls and lobby of the Court House and, at one point, jurors felt sufficiently threatened as to request an official (armed) escort to our vehicles." (*Id.*, ¶ 9.) According to Currier, "jurors would often be confronted visually by the Defendant's family or persons known to be friendly to the defense effort. . . ." (*Id.*, ¶ 10.) Currier described an incident when he was leaving the courthouse and a male family member or associate of Garza "stared fiercely" at him and "hollered out" that "'you are not the judge, jury, and executioner here.'" (*Id.*, ¶ 11.) This caused Currier to take a "circuitous" route to his car and to start parking in a remote lot. (*Id.*) Currier stated that he was "intimidated and feared for [his] life and the safety of [his] family" as he continued to see the man among a number of Garza's "groupies." (*Id.*, ¶12.) Although he would not speak for the other jurors, Currier indicated that he "was not the only person who feared for [his] personal safety." (*Id.*, ¶ 13.)

Based on Currier's allegations, Garza argued in his PCR petition that "[b]ecause jurors feared and were intimidated by Garza's friends and/or family, yet remained on the jury, Garza's rights to a fair and impartial jury and due process of law . . . were violated." (PCR Pet. at 72.)

While the State addressed Garza's allegations on the merits in its response (Doc. 39, PCR Response, Ex. PPPPP at 62), Garza in his reply brief admitted that the Currier affidavit was in fact false—"a new set of lies"—and, incredibly, chastised the State for taking Garza's own allegations of jury tampering at face value.[27] (Doc. 39, PCR Reply, Ex. WWWWW at 48–49.) Garza did not withdraw the claim, however.

Not surprisingly, Garza having devoted his entire reply to dismantling the claim's factual basis, the PCR court denied relief on the jury-tampering allegation:

---

[27] Garza explained, with presumably unintentional irony, that the Currier affidavit had been filed under seal because "[w]ere it not, counsel would spread its balderdash hyperbole onto this page." (PCR Reply at 49 n.19.)

> The Court has considered the contents of the allegations (jury tampering – intimidation and safety concerns); *the seriousness of the misconduct* (particularized or generalized); and *the credibility of the concern* (only one of twelve jurors; concern brought to Court's attention twelve [sic] years after trial, in the context of a PCR interview; although having felt intimidated, the juror took steps on his own to ensure his safety). Even if this intimidation had occurred, there is no indication that the impartiality and fairness of the jurors or of the verdict was affected. *See United States v. Jackson*, 209 F.3d 1103, 1109 (9th Cir. 2000).
>
> The Court finds this claim not colorable.

(PCR Ruling, ME 7/29/13, at 9–10) (emphasis added).

In his Petition for Review, Garza offered this remarkable challenge to the court's denial of the claim: "The PCR court's biggest mistake was crediting the [Currier] affidavit in the first place." (PR, Doc. 39, Ex. HHHHHH at 36.)

Garza then recharacterized the claim as being "two-fold, either the jury was intimidated and threatened, as Currier claims, and therefore the convictions must be reversed for jury tampering, or Currier committed perjury. . . ." (*Id.* at 36–37.) Garza did not hesitate, however, to indicate which of the two scenarios was factually supportable:

> Currier's credibility in his affidavit is centrally in doubt. Counsel and his investigators interviewed nearly all of Garza's jurors and alternates. Not one juror (including Currier until after he was confronted with documentation confirming his perjury on the jury questionnaire), ever uttered a word that there were any threats or acts of intimidation committed on the jurors by anyone. . . . So the truth of the sworn affidavit submitted by perjurer Currier is in serious doubt.

(*Id.* at 37.)

In his reply to the State's opposition to the Petition for Review, Garza went even further, describing the Currier affidavit as "an audacious felonious perjury. . . . Of this there can be no doubt."[28] (PR Reply, Doc. 39, Ex. KKKKKK at 27.) Of course the Currier affidavit was—and remains—the only grounds for the jury-tampering allegations.

---

[28] Garza proceeded to attack the State both for its legal argument that Garza was not entitled to relief on his tampering allegations and for its failure to accept the fact that the tampering

1       2.    *Analysis*

Omitting any mention of this colorful background, Garza, in raising Claim 11(C), relies on the disavowed jury-tampering allegations raised in the PCR Petition and asks this Court to take the "unrebutted" Currier affidavit at face value.[29] (Doc. 27 at 260.) Even if Garza himself had not already thoroughly rebutted the affidavit—the "set of lies," "balderdash hyperbole," "audacious felonious perjury"—this claim is without merit.

Jury tampering is "an effort to influence the jury's verdict by threatening or offering inducements to one or more of the jurors." *United States v. Dutkel*, 192 F.3d 893, 897 (9th Cir. 1999), *abrogated on other grounds by Godoy v. Spearman*, 861 F.3d 956, 958 n.6 (9th Cir. 2017). "In a criminal case, any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial." *Remmer v. United States*, 347 U.S. 227, 229 (1954); *see Dutkel*, 192 F.3d at 897 ("[A] presumption of prejudice arises if a juror was subjected to coercion or bribery, and if this intrusion may have affected the juror in the exercise of his judgment."). "Once tampering is established, we presume prejudice and put a heavy burden on the government to rebut the presumption." *Dutkel*, 192 F.3d at 894 (quoting *Remmer*, 347 U.S. at 229). "If the government fails to meet this burden at an evidentiary hearing, the defendant is entitled to have the verdict set aside." *Id.* at 895.

In determining whether tampering has been established, triggering the presumption of prejudice and the necessity for a hearing, courts consider "the content of the allegations, the seriousness of the alleged misconduct or bias, and the *credibility of the source*." *Jackson*, 209 F.3d at 1109 (emphasis added) (quoting *United States v. Angulo*, 4 F.3d 843, 847 (9th Cir. 1993)); *see United States v. Dalton*, 40 F.Appx. 420, 424 (9th Cir. 2002) ("An

---

never occurred, despite "the overwhelming evidence marshaled by Garza to prove [the tampering allegation] false." (PR Reply at 28.)

[29] Garza does acknowledge, with what could charitably be called understatement, that "[t]here is no evidence supporting Currier's perception of intimidation." (Doc. 27 at 258 n.71.)

1  evidentiary hearing was not necessary where no *credible evidence* of jury tampering was
2  presented to the court.") (emphasis added).

3      The PCR court took these factors into account when it denied this claim. (PCR
4  Ruling, ME 7/29/13, at 9–10.) As the court found, the allegations of improper contact were
5  reported years after the trial by a lone juror who conceded he was speaking only for himself.
6  (*Id.* at 9.) Currier's account of the jurors' contact with Garza's family or supporters
7  included vague descriptions of being "confronted visually" and "verbally accosted" in the
8  courthouse. (Doc. 38-9, PCR Pet., Ex. 173; Doc. 44-3, Ex. 93, ¶ 10.) Such occurrences do
9  not meet the definition of "coercion or bribery," *Dutkel*, 192 F.3d at 197, or "private
10 communication, contact, or tampering with a juror" about the case, *Remmer*, 347 U.S. at
11 229. *See United States v. Brown*, 923 F.2d 109, 111–12 (8th Cir. 1991) (finding no
12 presumption of prejudice under *Remmer* where "claims of jury intimidation are based on
13 nothing more than physical closeness [of defendants' supporters], stares, and rebuffed
14 efforts at conversation").

15     Garza argues that the circumstances in *Jackson*, the case cited by the PCR court, are
16 "quite similar" to those of his own case. (Doc. 27 at 261.) In *Jackson*, however, the report
17 of possible improper contact—a threatening phone call—was made by the juror during
18 deliberations. 209 F.3d at 1107. The juror told the court that he believed the call was
19 probably not related to the trial. *Id.* Three years later, a defense investigator reported that
20 the juror told him the call might have been connected to the trial—"a desperate attempt to
21 hang the jury." *Id.* at 1108. The Ninth Circuit held that the district court abused its
22 discretion by failing to hold a hearing to resolve the discrepancy between the juror's two
23 statements, explaining that the lower court could have resolved the issue without a hearing
24 only by finding the investigator's statement "inherently incredible." *Id.* at 1109–10.

25     In Garza's case, by contrast, there was no contemporaneous report about improper
26 contact with jurors. Such information did not come to light until it was disclosed by Currier
27 eight years after the trial. Thus there was no discrepancy between reports whose resolution
28 required an evidentiary hearing. As to the allegations in Currier's affidavit, the PCR court

properly considered, among other factors, their timing and, most significantly, their credibility.

Garza also cites *Caliendo v. Warden, California Men's Colony*, 365 F.3d 691 (9th Cir. 2004). There, the Ninth Circuit granted habeas relief after finding the state court failed to apply the presumption of prejudice when evaluating contact between jurors and a prosecution witness. *Id.* at 698.

In *Caliendo* the defendant was being tried for the second time on auto-burglary charges. The first trial had resulted in a jury hung seven to five in favor of acquittal. *Id.* at 693.

Detective Mundell, who took the defendant's confession—the only evidence against him—sat at the prosecution table throughout the trial. *Id.* At one point during the trial he engaged in a twenty-minute conversation, unrelated to the case, in the courthouse hallway with three of the jurors. *Id.* The defendant was convicted after several days of deliberation. *Id.* at 694. The state appellate court denied the defendant's claim of juror misconduct, finding he had not established prejudice. *Id.* The district court denied his federal habeas petition. *Id.*

In reversing and finding that the state court erred in not applying the presumption of prejudice, the Ninth Circuit listed several factors to consider in "determining whether the communication raised a risk of influencing the verdict." *Id.* at 697. These include the "length and nature of the contact, the identity and role at trial of the parties involved, evidence of actual impact on the juror, and the possibility of eliminating prejudice through a limiting instruction." *Id.* at 697–98. The court determined that the contact was prejudicial because Mundell "was a critical prosecution witness and his interaction with multiple jurors lasted for twenty minutes and therefore 'went beyond 'a mere inadvertent or accidental contact.'" *Id.* (quoting *United States v. Harry Barfield Co.*, 359 F.2d 120, 124 (5th Cir. 1966)). In addition, during the conversation "Detective Mundell discussed his heavy workload with the three jurors and established common ground with them," and after the conversation one of the jurors "expressed a positive view of the detective." *Id.* at 699.

The court also found that government did not make a "strong showing that the contact . . . was harmless." *Id.* at 698. The case was close and it turned on Detective Mundell's credibility. *Id.* "Given the conflicting evidence in Caliendo's case and the centrality of Mundell's testimony to the prosecution, the jurors' claims that the encounter would not influence them did not suffice to meet the government's heavy burden of proving harmlessness." *Id.*

The factors identified in *Caliendo* as suggestive of prejudice do not apply to the alleged contact with the jurors in Garza's case. First, rather than a twenty-minute in-person conversation, the contact in Garza's case included visual confrontations and, at most, brief comments from Garza supporters. The contact, if it occurred, was not with a key witness in the case but with unnamed family members and supporters. *Cf. United States v. Rutherford*, 371 F.3d 634, 643–44 (9th Cir. 2004) (prejudice presumed where jurors reported being glared at by a group of IRS and DOJ agents seated behind the prosecution table, some of whom were trial witnesses). Next, there was no "evidence of actual impact on the juror[s]." *Caliendo*, 365 F.3d at 697–98. The case against Garza was strong, supported by confessions, eyewitness testimony, and physical evidence. In *Caliendo*, by contrast, a guilty verdict in the face of weak evidence and a previous hung jury suggested that the improper conversation might have "bolstered the detective's credibility" or created "juror empathy." *Id.* (additional quotation omitted).

Finally, Garza cites *Dutkel*, which is also inapposite. There, codefendant Washington hired "two henchmen . . . to bribe and/or intimidate" a juror. 192 F.3d at 894. They promised the juror cash, a new job, and a new car if he voted to acquit. *Id.* They also mentioned the juror's baby daughter, suggested they would follow the juror home, and "made it clear that they were monitoring his every move." *Id.* "As a consequence of these importunings, [the juror] 'freely talked about the case' with them" and "made daily reports about the jury's deliberations." *Id.* Nothing approaching that level of inappropriate contact is alleged to have occurred in Garza's case.

Even assuming the Currier affidavit is not the fabrication Garza previously admitted

it to be, he is not entitled to relief on this claim. The decision of the PCR court rejecting the claim was neither contrary to nor an unreasonable application of clearly established federal law, nor was it based on an unreasonable determination of the facts. Claim 11(C) is denied.

### D. Other incidents of misconduct

Garza raises three additional allegations of juror misconduct and bias.[30] (Doc. 27 at 261–65.) They are meritless.

#### 1. Juror Currier's failure to disclose information

Garza alleges that his right to a fair and impartial jury was violated because Currier failed to disclose that he had killed people in Vietnam. (Doc. 27 at 261–62.) The juror questionnaire included Question 32, which asked: "Have you, a family member, or a close friend, ever killed anyone, whether accidentally or otherwise?" Currier answered No. (Doc. 38-5, PCR Pet., Ex 62a.) During jury deliberations, Currier asked whether any of the jurors had caused or been responsible for another person's death. (RT 10/22/04 at 10; RT 11/10/04 at 12, 29.) Currier himself raised his hand. (*Id.*; RT 11/10/04 at 12.) According to Garza, Currier's affirmative response means that his answer on the juror questionnaire was false.

Garza moved for a new trial based on this incident. (ROA 687 at 10.) At the subsequent hearing, Currier testified that he had raised his hand during voir dire because his service in the Air Force during the Vietnam War put him in a "position to have caused death." (RT 11/10/04 at 40.) He indicated that he had answered No to Question 32 because Questions 31 and 33 "dealt specifically with military experience." (*Id.* at 43.) In those questions Currier had answered that he knew someone who had been killed, specifying "In war (Vietnam)," and that he had served in combat. (*Id.*) Finally, Currier testified that he had no direct evidence he had ever killed anyone. (*Id.* at 48.)

The court denied the motion for a new trial, finding there was "no misconduct at all" and that the "jurors did not commit perjury and did not fail to honestly answer the

---

[30] A fourth allegation was withdrawn. (Doc. 44 at 152 n.61.)

questions during voir dire honestly."[31] (*Id.* at 64.) With respect to Currier, the court found that "all his Vietnam experience was out, spread out all over the record during voir dire." (*Id.*) The court concluded that it did not "recognize any prejudice to the defendant." (*Id.*)

This Court agrees with the trial court. First, given Currier's acknowledgement that he had no direct evidence of actually killing anyone, his answer to Question 32 was not a lie. At most, the answer was a "mistaken, though honest response." *McDonough*, 464 U.S. at 556. Even if the answer were false, "the falsehood does not bespeak a lack of impartiality." *Dyer*, 151 F.3d at 973. In addition, Garza cannot show that a Yes answer to Question 32 would have provided a valid basis to challenge Currier for cause, as required under *McDonough*, 464 U.S. at 556, because it would not have reflected bias, prejudice, or partiality against Garza.

Finally, trial counsel were aware, based on Currier's answers to Questions 31 and 33 and his responses to counsel's own questions, that Currier had served in combat in Vietnam. (*See* RT 6/17/04 at 35.) Therefore, notwithstanding his negative response to Question 32, counsel had sufficient information to pursue the issue further with Currier during voir dire.

Garza has not shown juror bias or prejudice resulting from Currier's answer to Question 32.

2.    *Jury's consideration of extraneous evidence about gangs*

After trial, two jurors reported that during jury deliberations, Currier spoke about his experience with gangs and told the jury that Garza's motive for the murders was possibly gang-related. Defense counsel moved for a new trial based on this alleged misconduct. (ROA 687 at 9.) The court denied the motion. (ROA 688, ME 10/22/04.)

Garza alleges that the jury's consideration of this extraneous evidence resulted in a denial of his right to a fair and impartial jury. (Doc. 27 at 264–65.) The Court disagrees. The claim is meritless because Currier's comments during deliberation did not constitute extraneous information.

---

[31] Garza had alleged that two other jurors also falsely answered Question 32.

In *Warger v. Shauers*, The Supreme Court explained that:

Generally speaking, information is deemed 'extraneous' if it derives from a source 'external' to the jury. . . . 'External' matters include publicity and information related specifically to the case the jurors are meant to decide, while 'internal' matters include the general body of experiences that jurors are understood to bring with them to the jury room.

540 U.S. 40, 51 (*citing Tanner v. United States*, 483 U.S. 107, 117 (1987)).

Accordingly, "a juror's past personal experiences may be an appropriate part of the jury's deliberations." *Grotemeyer v. Hickman*, 393 F.3d 871, 879 (9th Cir. 2004) (quoting *United States v. Navarro–Garcia*, 926 F.2d 818, 821 (9th Cir. 1991)); *see United States v. Budziak*, 697 F.3d 1105, 1111 (9th Cir. 2012) (finding juror's past experience with computer program was not extraneous evidence); *Price v. Kramer*, 200 F.3d 1237, 1255–56 (9th Cir. 2000) (finding jurors' comments about "their own experiences with the police" was not extraneous evidence).

"A juror's personal experience may constitute extrinsic evidence only when a juror has personal knowledge regarding the parties or the issues involved in the litigation that might affect the verdict." *Navarro–Garcia*, 926 F.2d at 821 (finding that juror's out-of-court experiment to duplicate the weight of drugs found in defendant's vehicle constituted extraneous evidence). That is not the case here. Currier's comments were based on personal experience unrelated to the Garza case.

Moreover, on habeas review the receipt of extraneous evidence is subject to harmless error analysis under *Brecht*. *Estrada v. Scribner*, 512 F.3d 1227, 1235 (9th Cir. 2008); *Sassounian v. Roe*, 230 F.3d 1097, 1108 (9th Cir. 2000). The Court concludes that even if Currier's comments about gangs constituted extraneous evidence, they did not have a "substantial and injurious effect" on the jury's verdict. *Brecht*, 507 U.S. at 637. The evidence of Garza's guilt was overwhelming, and the jury had no difficulty reaching its verdict, beginning its guilt-phase deliberations on August 25 and delivering a verdict the next day. (*See* RT 8/24/04 at 198; RT 8/26/04.)

This subclaim is without merit.

### 3. Witness's improper contact with juror

During trial, a juror informed the court that Detective McCarthy, a prosecution witness, had asked another juror for a piece of candy during a break in his testimony. (RT 8/17/04 at 24–27.) Detective McCarthy denied that he asked for candy, claiming that he had simply made the observation, "oh, a piece of candy." (*Id.* at 28–29.) The trial court asked the jurors, most of whom witnessed the incident but some of whom had different recollections of what occurred, if the incident would make it difficult for them to be fair and impartial. (*Id.* at 30–32.) None of the jurors responded in the affirmative. (*Id.* at 31–32.) The court denied defense counsel's motion for a mistrial. (*Id.* at 34.)

Garza alleges that this incident violated his right to a fair and impartial jury. (Doc. 27 at 263, 265.) The Court agrees with Respondents (Doc. 37 at that 164–65) that this level of communication between a witness and a juror does not entitle Garza to relief.

The Ninth Circuit has held that "if an unauthorized communication with a juror is *de minimis*, the defendant must show that the communication could have influenced the verdict before the burden of proof shifts to the prosecution." *Caliendo*, 365 F.3d at 696. The contact here was *de minimis*, *see Lee v. Marshall*, 42 F.3d 1296 (9th Cir. 1994); *United States v. Day*, 830 F.2d 1099, 1103–04 (10th Cir. 1987), and Garza has not attempted to meet his burden of showing that the communication could have affected the verdict. The communication was fleeting and did not concern the case. There is no evidence of an actual impact on any juror, and in fact the jurors affirmed that the incident would not affect their fairness and impartiality. Finally, the court instructed the jury to base its verdict only on the trial evidence. (*See* RT 8/24/04 at 19–20.)

Detective McCarthy's contact with the jury did not affect Garza's right to a fair and impartial jury.

Claim 11(D) is denied as both procedurally defaulted and barred from federal review and meritless.

### **Claim 13**

Garza alleges that his right to a fair and impartial jury was violated when prosecutor Barry failed to disclose his prior interactions with juror Chisolm. (Doc. 27 at 270.) Garza raised this claim in his PCR petition. (PCR Pet. at 73.) The PCR court found the claim waived and in an alternative ruling denied the claim on the merits, finding that Garza failed to demonstrate that the prosecutor had committed perjury and that there was no evidence the jury was not fair and impartial. (PCR Ruling, ME 7/29/13, at 9.) The merits ruling was neither contrary to nor an unreasonable application of clearly established federal law, nor was it based on an unreasonable determination of the facts.

Records show that Mark Barry was the prosecutor in Chisolm's trial for aggravated assault which took place over two days in 1990 and resulted in an acquittal. (*See* Doc. 38-6, PCR Pet., Ex. 119, ¶¶ 6–9, Ex. 119c.) Because Chisolm testified at his trial, Garza reasons, Barry must have cross-examined him, and if Barry had cross-examined Chisolm, he would have recognized him as one of the jurors at Garza's trial fourteen years later. (Doc. 27 at 270.)

This speculation about long-ago events and the prosecutor's state of mind is not sufficient to overcome the PCR court's contrary determination that the prosecutor did not knowingly fail to disclose his prior acquaintance with Chisolm. *See* 28 U.S.C. §§ 2254(d)(2) and (e)(1); *see Bragg v. Galaza*, 242 F.3d 1082, 1087 (9th Cir. 2000) (explaining that conclusory allegations will not overcome the presumption that state court's findings are correct).

According to Garza's investigator, Chisolm did not recognize Barry as the prosecutor in his criminal trial until near the end of Garza's trial. (Doc. 38-5, PCR Pet., Ex. 62, ¶ 6.) It is equally plausible that Barry, who undoubtedly prosecuted a number of other defendants between 1990 and 2004, did not recognize Chisolm at all.

Claim 13 is denied.

Conclusion

Garza's allegations that he was denied a fair and impartial jury as a result of jury misconduct, jury tampering, and the prosecutor's failure to disclose his contact with a juror

1    are either procedurally defaulted and barred from review, Claim 11(D), or meritless,

2    Claims 11(A), 11(B), 11(C), and Claim 13. Garza has failed to demonstrate that the PCR

3    court's rejection of the latter claims entitles him to habeas relief. *See Richter*, 562 U.S. at

4    103. Claims 11 and 13 are therefore denied.

5    **Claim 17:**

6         Garza alleges that the trial court violated his due process rights by denying his

7    request for all law enforcement records related to Larry Franco as a confidential informant

8    ("CI"). (Doc. 27 at 322.)

9         A trial, the State called Detective George Inukai, Franco's "handler" with the

10   Department of Public Safety ("DPS"), to testify about Franco's activities as a CI. Detective

11   Inukai testified that Franco worked for him on narcotics cases for about five years between

12   1990 and 1996. (RT 7/12/04 at 70.) Franco was paid approximately $60,000 for his work

13   as a CI over that period. (*Id.* at 73.) Inukai testified that the quality of Franco's work was

14   "a little bit above average." (*Id.*) After Inukai left DPS in 1995 or 1996—possibly as early

15   as 1994—Franco began working with a detective from MCSO. (*Id.* at 76–77.) Inukai did

16   not work with Franco after that. (*Id.* at 77.) No one from MSCO contacted Inukai about

17   Larry Franco after the Lance Rush and Ellen Franco murders. (*Id.* at 80.) Inukai testified

18   that if Franco had contacted him, he would have done nothing on Franco's behalf. (*Id.* at

19   80.)

20        MCSO Detective Daniel Gonzales testified that he began working with Franco as a

21   CI in 1994. (*Id.* at 101–02.) Detective Gonzales was briefly partnered with Detective

22   George Sanchez, the case agent on the Rush and Franco murders, but not while Gonzalez

23   was working with Larry Franco. (*Id.* at 109–10.) Detective Sanchez, then working

24   narcotics, did not deal directly with Franco. (*Id.* at 151–52, 155.)

25        Garza's counsel sought an order directing the State to provide all the records it had

26   on Franco from both MCSO and DPS. (*See* ROA 157 at 2; ROA 239 at 4; RT 7/12/04 at

27   181.) The trial court granted the request as to the MCSO records but denied it with respect

28   to the DPS records. (RT 7/12/04 at 181–82; RT 7/13/04 at 123, 127–29.) The court found

1  that Garza had not made a "threshold showing" of relevance because Franco had been

2  "passed off" from DPS to MCSO in 1994 or 1995. (RT 7/13/04 at 129.) The court also

3  declined to review the records in camera. (*Id.*)

4       On direct appeal, Garza alleged that the State violated *Brady* by unlawfully

5  withholding MCSO's information on Franco.[32] (Opening Brief at 80.) Within that claim,

6  Garza argued that the trial court abused its discretion in failing to order disclosure of the

7  DPS records. (*Id.* at 85, 90.)

8       Respondents contend that this claim is procedurally defaulted because Garza did not

9  allege that the trial court's failure to order disclosure of the DPS records violated his federal

10  constitutional rights. (Doc. 37 at 192.) Garza concedes the claim is defaulted because

11  appellate counsel failed to "federalize" it. (Doc. 44 at 188.) He asserts, however, that the

12  default is excused because of appellate counsel's ineffectiveness. (*Id.*) As previously noted,

13  ineffective assistance of appellate counsel may constitute cause to excuse a procedural

14  default where the particular ineffective assistance allegation was exhausted in state court

15  as an independent claim. *Carpenter*, 529 U.S. at 453; *Carrier*, 477 U.S. at 489–90. Garza

16  did not exhaust such a claim in state court, however, so ineffective assistance of appellate

17  counsel cannot serve as cause for the underlying claim's default. The claim is procedurally

18  defaulted and barred from federal review. It is also without merit.

19       The Arizona Supreme Court denied Garza's claim that the trial court abused its

20  discretion in failing to order disclosure of the DPS records. *Garza*, 216 Ariz. at 65, 163

21  P.3d at 1015. Noting that Franco had served as a CI in undercover drug operations in the

22  early 1990s, the court held that "[Franco's] relationship with DPS had ended years before

23  the murders, and Garza made no showing that DPS was involved in the investigation of the

24  murders." *Id.*

25       Subsequently, during the PCR proceedings, Garza again moved for disclosure of the

26  DPS records. (Doc. 37-5, Ex. UU.) The state court denied disclosure but ordered the

---

[32] This Court previously denied Garza's claim of a *Brady* violation (Claim 18). (Doc. 73 at 22–23.)

1    records produced for its in camera review. (*Id.*, Ex. XX, ME 11/16/11.) After reviewing

2    the records, the court found "no information or material relevant to the case at hand." (*Id.*,

3    Ex. AAA, ME 12/12/11.)

4         Garza alleges that withholding the DPS materials prevented him "from obtaining

5    and presenting relevant and material evidence of his innocence." (Doc. 27 at 325.)

6    Respondents counter that Garza's allegation that he was deprived of exculpatory evidence

7    is speculative and does not set forth a due process violation. (Doc. 37 at 194.) The Court

8    agrees.

9         State court evidentiary rulings cannot serve as a basis for habeas relief unless the

10   alleged error rises to the level of a federal constitutional violation. *See Estelle*, 502 U.S. at

11   67–68. "It is well settled that a state court's evidentiary ruling, even if erroneous, is grounds

12   for federal habeas relief only if it renders the state proceeding so fundamentally unfair as

13   to violate due process." *Spivey v. Rocha*, 194 F.3d 971, 977–78 (9th Cir. 1999); *see*

14   *Jammal*, 926 F.2d at 919–20. As noted above, the Supreme Court has "very narrowly"

15   defined the category of infractions that violate the due process test of fundamental fairness.

16   *Dowling*, 493 U.S. at 352. Accordingly, "[a] habeas petitioner bears a heavy burden in

17   showing a due process violation based on an evidentiary decision." *Boyde v. Brown*, 404

18   F.3d at 1172.

19        Garza cannot meet that heavy burden based on speculation that relevant material

20   was contained in the DPS files regarding Larry Franco's service as a CI. The Ninth Circuit

21   has explained that "[e]vidence of third party culpability is not admissible 'if it simply

22   affords a possible ground of suspicion against such person; rather, *it must be coupled with*

23   *substantial evidence tending to directly connect that person with the actual commission of*

24   *the offense.*'" *People of Territory of Guam v. Ignacio*, 10 F.3d 608, 615 (9th Cir. 1993)

25   (quoting *Perry v. Rushen*, 713 F.2d 1447, 1449 (9th Cir. 1983)); *see Spivey*, 194 F.3d at

26   978 (finding that exclusion of speculative evidence of third-party culpability did not render

27   trial unfair); *see also Holmes v. South Carolina*, 547 U.S. 319, 327 (2006) (noting that rules

28   excluding speculative or remote evidence of third-party culpability are "widely accepted").

1    Garza does not explain how any information contained in the DPS records would

2   have directly connected Larry Franco with the actual commission of the murders. *See*

3   *Ignacio*, 10 F.3d at 615. He contends that the information would have impeached Detective

4   Inukai's testimony (Doc. 27 at 324), but that argument too is speculative and conclusory.

5   Garza notes that contrary to the Arizona Supreme Court's decision, DPS was involved in

6   Garza's case—its criminalists conducted the DNA analysis. (*Id.*) However, Garza draws

7   no connection between that activity and potentially exculpatory information related to

8   Larry Franco's service as a CI.[33] Finally, as already noted, the PCR court reviewed the

9   materials at issue and found nothing relevant (Doc. 37-5, Ex. AAA, ME 12/12/11),

10  reducing any remaining support for Garza's claim that his due process rights were violated

11  by its nondisclosure.

12    Garza has not shown that the trial court's exclusion of the DPS records rendered his

13  trial so fundamentally unfair that his due process rights were violated. The claim is

14  meritless as well and procedurally defaulted and barred from federal review. Claim 17 is

15  therefore denied.

16                **III.    Arizona Supreme Court's Independent Review**

17  **Claim 15:**

18    Garza alleges that the Arizona Supreme Court's decision affirming his death

19  sentence violated his rights under the Sixth, Eighth, and Fourteenth Amendments. (Doc.

20  27 at 299.) Garza contends that he raised this claim during the PCR proceedings. (*Id.*)

21  However, the claim consists of no fewer than ten subclaims, (A)–(J), not all of which were

22  previously raised. As Respondents correctly note, Garza did not raise subclaims (A), (B),

23  and (J) in state court. He did raise subclaims (C) through (I). (*See* PCR Pet. at 23–43.) The

24  PCR denied those claims as precluded under Rule 32.2(a) because they could have been

25  raised previously and because the PCR court "lacks authority to overrule the Arizona

26  Supreme Court's independent review of [Garza's] death sentence." (PCR Ruling, ME

27  7/29/13, at 2.)

28

---

[33] Garza does not allege that any of the DNA results linked Franco to the murders.

Respondents contend that Rule 32.2(a) is an independent and adequate procedural bar. (Doc. 37 at 169 n.30.) Garza disagrees. (Doc. 44 at 173–74.) He also argues that the claims were exhausted by the Arizona Supreme Court's independent review of his sentence. (*Id.* at 171–72.) The Court need not resolve the issue of the claims' procedural status because they are plainly meritless. *See* 28 U.S.C. § 2254(b)(2); *Lambrix*, 520 U.S. at 524–25.

### A.   Facts not found by the jury

Garza alleges that the Arizona Supreme Court infringed on his right to meaningful appellate review by "unconstitutionally relying on facts not found by the jury" in violation of *Apprendi v. New Jersey*, 530 U.S. 466 (2000). (Doc. 27 at 302.) Under *Apprendi*, aggravating factors that render a defendant eligible for the death penalty must be found by a jury beyond a reasonable doubt. 530 U.S. at 490. Garza argues that the court relied on two facts not found by the jury: that Garza "personally killed both victims" and that the "burglary was planned in advance." *Garza*, 216 Ariz. at 72, 163 P.3d at 1022. This argument fails.

First, Garza's jury made the finding that the multiple-homicides aggravating factor had been proved, rendering Garza eligible for the death penalty, so *Apprendi* was not violated.

Next, in the discussion cited by Garza, the Arizona Supreme Court was not making a finding with respect to an aggravating factor. Rather, it was properly assessing the weight of Garza's mitigating evidence. *See, e.g.*, *State v. Wallace*, 229 Ariz. 155, 158, 272 P.3d 1046, 1049 (2012) (explaining that while the State must prove aggravating factors beyond a reasonable doubt, the Arizona Supreme Court does "not defer to the findings or decision of the jury, with respect to aggravation or mitigation, when determining the propriety of the death sentence"); *Newell*, 212 Ariz. at 405, 132 P.3d at 849 ("In conducting our independent review we do not merely consider the quantity of aggravating and mitigating factors which were proven, but we look to the quality and strength of those factors.").

Garza proposed his young age as a mitigating circumstance. Citing its own precedent, the court found that the weight of the circumstance was reduced because Garza was a "major participant in the crime" and because the pre-planned nature of the crime showed that it was "not simply a case of 'juvenile impulsivity.'" *Garza*, 216 Ariz. at 72, 163 P.3d at 1022.

There was no *Apprendi* violation because the Arizona Supreme Court did not find any additional aggravating factors. Claim 15(A) is meritless.

### B.    Exceeding the scope of independent review

Garza alleges that his due process rights were violated when the Arizona Supreme Court exceeded the scope of its independent review by considering "whether Garza killed Ellen Franco and whether the burglary was planned." (Doc. 27 at 303.) As just stated, the court reviewed the circumstances of the crime not as aggravating factors but as considerations to take into account when weighing Garza's young age as a mitigating factor. *Garza*, 216 Ariz. at 72, 163 P.3d at 1022. Claim 15(B) is meritless.

### C.    Failure to consider all mitigation

Garza alleges that the Arizona Supreme Court failed "to consider all of the mitigation in the record." (Doc. 27 at 304.) Specifically, Garza asserts that the court failed to consider Larry Franco's involvement in the crime as a mitigating circumstance and disregarded evidence of Garza's clean criminal record, asthma, and depression. (*Id.* at 304–06.)

As previously discussed, the sentencer in a capital case must be allowed to consider, and may not refuse to consider, any constitutionally relevant mitigating evidence. *Eddings*, 455 U.S. at 113–14. The sentencer is free, however, "to assess how much weight to assign to such evidence." *Ortiz*, 149 F.3d at 943; *see Eddings*, 455 at 114–15. "Once mitigating evidence is allowed in, a finding that there are 'no mitigating circumstances' does not violate the Constitution." *Williams v. Stewart*, 441 F.3d 1030, 1057 (9th Cir. 2006).

A sentencer is "not required to 'itemize and discuss every piece of evidence offered in mitigation.'" *Id.* (quoting *Jeffers v. Lewis*, 38 F.3d 411, 418 (9th Cir. 1994) (en banc)).

"It is sufficient that a sentencing court state that it found no mitigating circumstances that outweigh the aggravating circumstances." *Poland v. Stewart*, 117 F.3d 1094, 1101 (9th Cir. 1997); *see Parker v. Dugger*, 498 U.S. 308, 314 (1991) (holding that a court is deemed to have taken into account all mitigating evidence where the court so states).

In Garza's case, the Arizona Supreme Court stated that it had reviewed the record for possible mitigating circumstances and found three, including two of the circumstances Garza claims the court ignored: Garza's good character and "absence of prior criminal behavior"; "stress" from a series of personal tragedies Garza experienced around the time of the murders, as evidenced by a recent suicide attempt, talk about suicide, and a suicide note; and Garza's young age. *Garza*, 216 Ariz. at 72, 163 P.3d at 1022.

By stating that it had reviewed the record and concluding that the mitigating circumstances did not outweigh the aggravation, the Arizona Supreme Court properly considered Garza's mitigating evidence. *Parker*, 498 U.S. at 314; *Poland*, 117 F.3d at 1101. The court's omission of Larry Franco from its discussion of mitigating circumstances did not violate Garza's constitutional rights. *See Williams*, 441 F.3d at 1058; *Jeffers*, 38 F.3d at 418 ("Nor was Jeffers entitled to a specific listing and discussion of each piece of mitigating evidence under federal constitutional law."). Garza offers no support for his contention that the Arizona Supreme Court, by omitting a discussion of the evidence, failed to consider Franco's alleged role in the murders as a mitigating circumstance. *See Poland*, 117 F.3d at 1101 (explaining that state courts art presumed to follow the law, even when they fail to so indicate); *Williams*, 441 F.3d at 1058.

Claim 15(C) is meritless.

D.   Failure to give effect to mitigating circumstances

Garza alleges that the Arizona Supreme Court "irrationally discount[ed] and fail[ed] to give effect to the mitigating circumstances it acknowledged." (Doc. 27 at 307.) Essentially, he objects to the court's use of the circumstances of the crime to reduce the weight of the mitigating circumstances.

The Constitution mandates "meaningful appellate review of death sentences." *Clemons v. Mississippi*, 494 U.S. 738, 749 (1990). However, this requires only that an appellate court "consider whether the evidence is such that the sentencer could have arrived at the death sentence that was imposed," not whether the appellate court itself would have imposed a death sentence. *Id.*

Garza cites no support for the proposition that the circumstances of the crime cannot be used in assessing mitigating circumstances. *See id.* at 748 ("The primary concern in the Eighth Amendment context has been that the sentencing decision be based on the facts and circumstances of the defendant, his background, and his crime.") Nor does he persuasively argue that the Arizona Supreme Court's consideration of the circumstances of the crime was irrational. In reducing the weight of Garza's age as a mitigating factor, the court reasonably determined that the amount of planning Garza put into the crimes indicated that the murders were "not simply a case of 'juvenile impulsivity.'" *Garza*, 216 Ariz. at 72–73, 163 P.3d at 1022–23. The court also reasonably determined that Garza's murder of a relative—his uncle's wife—reduced the weight of family support as a mitigating circumstance. *Id.* at 73, 163 P.3d at 1023. Finally, the court did not, as Garza asserts, apply an impermissible causal nexus test to preclude consideration of evidence of Garza's "personal setbacks." Instead, the court found that the lack of a connection between Garza's misfortunes and the murders "diminishe[d] the mitigating effect of this evidence." *Id.* The absence of a causal connection is a permissible consideration in weighing a mitigating circumstance. *Lopez*, 630 F.3d at 1204.

The Arizona Supreme Court did not fail to give effect to Garza's mitigating evidence. Claim 15(D) is meritless.

### E.   Interpretation of multiple-homicides factor

Garza alleges that the Arizona Supreme Court's "interpretation of the multiple homicides aggravating circumstance is unconstitutionally vague." (Doc. 27 at 310.)

"[A] statutory aggravating factor is unconstitutionally vague if it fails to furnish principled guidance for the choice between death and a lesser penalty." *Richmond v. Lewis*,

506 U.S. 40, 46 (1992). For example, Arizona's cruel, heinous, or depraved aggravating circumstance was determined to be facially vague until the Arizona Supreme Court provided a narrowing construction which gave "meaningful guidance to the sentencer." *Walton v. Arizona*, 497 U.S. 639, 654 (1990), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).

Under A.R.S. § 13-703(F)(8), the multiple-homicides aggravating factor exists if "[t]he defendant has been convicted of one or more other homicides . . . that were committed during the commission of the offense." Although the Arizona Supreme Court has held that the statute is vague on its face, any vagueness is cured where the jury is instructed that the State must prove that the murders took place during a "continuous course of criminal conduct" and were "temporally, spatially, and motivationally related." *Dann*, 206 Ariz. at 373, 79 P.3d at 60.

Garza argues that within the narrowed definition the phrase "motivationally related" itself is vague. (Doc. 27 at 311.) According to Garza, this vagueness "is evidenced by the fact that the Arizona Supreme Court has not settled on a meaning for it." (*Id.*) There is a settled meaning, however, as the court has consistently found the "motivationally-related" portion of the factor is satisfied where "a jury may differ as to [the defendant's] precise motive for killing [the second victims, but] no jury would fail to find that his motives were related to the murder of [the first victim]." *State v. Armstrong*, 208 Ariz. 360, 365, 93 P.3d 1076, 1081 (2004) (quoting *Dann*, 206 Ariz. at 374, 79 P.3d at 61); *see Tucker*, 205 Ariz. at 169, 68 P.3d at 122.

Because this definition provides meaningful guidance to the sentencer, the multiple-homicides factor is not unconstitutionally vague. Claim 15(E) is denied.

F.    Independent review of multiple-homicides factor

Garza alleges that the Arizona Supreme Court violated his due process interest in the independent review of his sentence by abdicating its review of the multiple-homicides aggravating circumstance. (Doc. 27 at 312.) As grounds for this allegation Garza argues the Arizona Supreme Court failed to "cite any evidence that the homicides were

motivationally related or explain how the homicides were motivationally related." (*Id.* at 314.)

Garza's argument is not well-taken. First, Garza does not identify any law holding that a court's independent review of an aggravating factor is inadequate if the court does not list the facts on which its finding was based. In addition, Garza is incorrect in claiming the Arizona Supreme Court did not provide a basis for its finding.

As already discussed, in concluding that the murders were motivationally related, the court cited its previous holdings in *Dann* and *Tucker* for the proposition that a motivational relationship can be proved in situations where it is "difficult to imagine" that the motives for the killings were unrelated. *Garza*, 216 Ariz. at 72, 163 P.3d at 1022. In *Dann* and *Tucker*, as in Garza's case, there was a primary victim whose murder was followed immediately by the murders of secondary victims who happened to be present in the residence and were killed "simply because they were there" or because they were a witness. *Dann*, 206 Ariz. at 374, 79 P.3d at 61; *see Tucker*, 205 Ariz. at 169, 68 P.3d at 122. By citing these cases, the Arizona Supreme Court identified the basis for its holding that the murders were motivationally related.

The Arizona Supreme Court did not abdicate its responsibility to independently review the multiple-homicides aggravating factor. The court rationally determined that the factor was proved. Claim 15(F) is meritless.

### G.    Standard of proof

Garza alleges that the Arizona Supreme Court "sanctioned a less demanding standard than proof beyond a reasonable doubt" when it found that the multiple-homicides factor was established. (Doc. 27 at 314.) In support of this contention Garza points to the court's citation of the language in *Dann* and *Tucker* that it was "difficult to imagine" a motive for the murder of the secondary victims that was unrelated to the murder of the primary victim. *Garza*, 216 Ariz. at 72, 163 P.3d at 1022.

The court's use of the phrase "difficult to imagine" as shorthand for a finding that a motivational relationship was proved, thereby satisfying the third prong necessary to

1   establish the multiple-homicides factor, is not sufficient to rebut "the presumption that state

2   courts know and follow the law." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002); *see Bell*

3   *v. Cone*, 543 U.S. 447, 455 (2005) (presuming that the state supreme court properly applied

4   the narrowing construction of an aggravating factor even though it did not cite the

5   applicable case).

6       The Arizona Supreme Court's citation to cases using the "difficult to imagine"

7   language is not an "affirmative indication," *Cone*, 543 U.S. at 456, that it abandoned the

8   beyond a reasonable doubt standard in evaluating the aggravating factor. Claim 15(G) is

9   meritless.

10      H.    Motivational relationship finding

11      Garza alleges that the Arizona Supreme Court "arbitrarily found that the murders

12   were motivationally related, when no rational fact finder could have found a motivational

13   relationship beyond a reasonable doubt." (Doc. 27 at 315.)

14      As noted above, "[a] state court's finding of an aggravating circumstance in a

15   particular case—including a de novo finding by an appellate court . . . —is arbitrary or

16   capricious if and only if no reasonable sentencer could have so concluded." *Jeffers*, 497

17   U.S. at 783; *see Robinson*, 595 U.S. at 1103. For the reasons discussed above, viewing the

18   evidence in the light most favorable to the prosecution, a rational factfinder could have

19   determined, as the jury and the Arizona Supreme Court did here, that the murders of Ellen

20   Franco and Lance Rush were motivationally related. As the Arizona Supreme Court

21   pointed out, it is difficult to imagine *unrelated* motives for the two murders. *Garza*, 216

22   Ariz. at 72, 163 P.3d at 1022.

23      Garza further argues (Doc. 44 at 184) that there is no support for the Arizona

24   Supreme Court's determination that Garza, after shooting Ellen, "went down the hallway

25   to the bedroom, apparently seeking an encounter with other residents of the house." *Garza*,

26   216 Ariz. at 72 n.17, 163 P.3d at 1022. The trial evidence showed, however, that Garza,

27   instead of leaving the house after shooting Ellen, did proceed down the hallway to the

28   bedroom, encountering and shooting Rush. (*See* RT 7/1404 at 223–28.)

1       The Arizona Supreme Court's findings with respect to the multiple-homicides factor

2  were not arbitrary and capricious. Claim 15(H) is meritless.

3       I.      Weight of the multiple-homicides factor

4       Garza alleges that he was denied meaningful appellate review because the Arizona

5  Supreme Court "inflat[ed] the weight of the multiple-homicides aggravating

6  circumstance." (Doc. 27 at 316.) This claim is meritless.

7       In its review of Garza's death sentence, the Arizona Supreme Court "start[ed] from

8  the premise that a finding of the (F)(8) factor . . . is entitled to 'extraordinary weight.'"

9  *Garza*, 216 Ariz. at 72, 163 P.3d at 1022 (quoting *State v. Hampton*, 213 Ariz. 167, 185,

10  140 P.3d 950, 968 (2006)). Garza argues that in doing so the court violated his right to an

11  individualized sentencing because it "indiscriminately" assigned extraordinary weight to

12  the multiple-homicides factor without taking into consideration the circumstances of the

13  offense, including the fact that there were only two victims, as opposed to the greater

14  number of victims in other cases where the factor was also described as "extraordinarily

15  weighty." (Doc. 27 at 318.)

16      In *Blystone v. Pennsylvania*, the Supreme Court rejected the petitioner's argument

17  that his death sentence was rendered unreliable because his "jury was precluded from

18  considering whether the severity of his aggravating circumstance warranted the death

19  sentence." 494 U.S. 299, 307 (1990). The Court explained that "[t]he presence of

20  aggravating circumstances serves the purpose of limiting the class of death-eligible

21  defendants, and the Eighth Amendment does not require that these aggravating

22  circumstances be further refined or weighed by a jury." *Id.* (citing *Lowenfield v. Phelps*,

23  484 U.S. 231, 244 (1988)). The Court then reiterated that "[t]he requirement of

24  individualized sentencing in capital cases is satisfied by allowing the jury to consider all

25  relevant mitigating evidence." *Id.* The Court noted that the petitioner's jury "was

26  specifically instructed to consider, as mitigating evidence, any matter concerning the

27  character or record of the defendant, or the circumstances of his offense." *Id.* at 307

28

1    (internal quotation marks omitted). "This was sufficient to satisfy the dictates of the Eighth
2    Amendment." *Id.* at 308.

3        Garza received an individualized sentencing from the Arizona Supreme Court's
4    independent review when the court considered his mitigating evidence and the
5    circumstances of the offense. His rights were not violated by the weight the court assigned
6    to the aggravating factor. Claim 15(I) is meritless.

7            J.    Cumulative error

8        Garza alleges that his constitutional rights were violated by the Arizona Supreme
9    Court's "individual and cumulative errors." (Doc. 27 at 319.)

10        Because United States Supreme Court precedent does not recognize the doctrine of
11   cumulative error, and because this Court has determined that no prejudice resulted from
12   any of the errors alleged here by Garza, the claim of cumulative prejudice is meritless. *See*
13   *Boyde v. Brown*, 404 F.3d at 1176; *Mancuso*, 292 F.3d at 957. Claim 15(J) is denied.

14           Conclusion

15        Garza is not entitled to habeas relief on challenges to the Arizona Supreme Court's
16   independent review of his death sentence. Claims 15(A) through (J) are denied as meritless.

17        **IV.   Ineffective Assistance of Counsel Claims**

18        Garza alleges that defense counsel performed ineffectively at the guilt, aggravation,
19   and mitigation phases of his trial (Claims 2, 5, 7, and 12). He also alleges that appellate
20   counsel performed ineffectively (Claim 14).

21        As noted above, Garza was represented at trial by attorneys James Cleary and
22   Christopher Dupont from the Office of the Legal Defender. Cleary and Dupont were
23   appointed in April 2003. (*See* RT 4/18/04 at 2–3; ROA 206, ME 4/18/03.) Before that,
24   Garza was represented by private attorneys Ulises Farragut and Cynthia Leyh, whom
25   Garza's family had retained in July 2001. (*See* Doc. 38-5, PCR Pet., Ex. 54, ¶ 2; ROA 47.)
26   Before Farragut was retained Garza was represented by attorneys from the Maricopa
27   County Public Defender and another attorney from the Legal Defender's Office.

28

1    Garza's defense team also included Kimberly Dawn Whitt, a capital mitigation
2   specialist with the Legal Defender's Office; Brian Abernathy, a fact investigator; and Rose
3   Rubio, another mitigation specialist. (*See id.*, Ex. 60, ¶¶ 6, 9, 11.) Garza's case was the
4   fourth capital case Cleary and Dupont had tried together, but the first with jury sentencing.
5   (*Id.*, Ex. 52, ¶ 3.)

6    Garza was represented on appeal by Richard Gierloff and during the PCR
7   proceedings by Thomas Phalen along with Eric Sonnenschein and Courtney Forrest of
8   Covington & Burling in Washington, DC.

9    <u>Clearly established federal law</u>

10    Claims of ineffective assistance of counsel are governed by the principles set out in
11   *Strickland*, 466 U.S. 668. "The benchmark for judging any claim of ineffectiveness must
12   be whether counsel's conduct so undermined the proper functioning of the adversarial
13   process that the trial cannot be relied on as having produced a just result." *Id.* at 686. To
14   prevail under *Strickland*, a petitioner must show that counsel's representation fell below an
15   objective standard of reasonableness and that the deficiency prejudiced the defense. *Id.* at
16   687–88. Unless both showings are made, "it cannot be said that the conviction or death
17   sentence resulted from a breakdown in the adversary process that renders the result
18   unreliable." *Id.* at 687.

19    The inquiry under *Strickland* is highly deferential. 466 U.S. at 689. "A fair
20   assessment of attorney performance requires that every effort be made to eliminate the
21   distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged
22   conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689;
23   *see Wong v. Belmontes*, 558 U.S. 15, 16–17 (2009) (per curiam). The "standard is
24   necessarily a general one," *Bobby v. Van Hook*, 558 U.S. 4, 7 (2009), because "[n]o
25   particular set of detailed rules for counsel's conduct can satisfactorily take account of the
26   variety of circumstances faced by defense counsel or the range of legitimate decisions
27   regarding how best to represent a criminal defendant." *Strickland*, 466 U.S. at 688–89.

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Deficient performance, *Strickland*'s first prong, is established by "showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. To make this showing, a petitioner must overcome "the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 689 (quotation omitted). That presumption means that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id.* at 690.

"The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Richter*, 562 U.S. at 105 (quoting *Strickland*, 466 U.S. at 690). "The defendant bears the heavy burden of proving that counsel's assistance was neither reasonable nor the result of sound trial strategy." *Murtishaw v. Woodford*, 255 F.3d 926, 939 (9th Cir. 2001) (citing *Strickland*, 466 U.S. at 689). "[T]he relevant inquiry . . . is not what defense counsel could have pursued, but rather whether the choices made by defense counsel were reasonable." *Murray (Robert)*, 745 F.3d at 1011 (quoting *Babbitt v. Calderon*, 151 F.3d 1170, 1173 (9th Cir. 1998)).

With respect to *Strickland*'s second prong, a petitioner must affirmatively prove prejudice by "show[ing] that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694. "The likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112 (citing *Strickland*, 466 U.S. at 693); *see Hooper v. Shinn*, 985 F.3d at 628; *Apelt v. Ryan*, 878 F.3d at 832. The petitioner "'bears the highly demanding and heavy burden [of] establishing actual prejudice.'" *Allen*, 395 F.3d at 1000 (quoting *Williams (Terry)*, 529 U.S. at 394)).

Because an ineffective assistance of counsel claim must satisfy both prongs of *Strickland*, the reviewing court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged

deficiencies." *Strickland*, 466 U.S. at 697. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." *Id.*

Finally, under AEDPA ineffective assistance of counsel claims are subject to two layers of deference. "Surmounting *Strickland*'s high bar is never an easy task," *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010), and "[e]stablishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult," *Richter*, 562 U.S. at 105. "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Richter*, 562 U.S. at 105; *see Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (discussing "doubly deferential judicial review that applies to a *Strickland* claim under the § 2254(d)(1) standard") (citing *Yarborough v. Gentry*, 540 U.S. 1, 5–6 (2003) (per curiam)). Under this standard of review, the court "gives both the state court and the defense attorney the benefit of the doubt." *Burt v. Titlow*, 571 U.S. 12, 15 (2013).

### Juror affidavits

In support of many of his ineffective assistance of counsel claims, Garza cites information later obtained from the jurors at his trial. For example, in support of his argument that he was prejudiced by counsel's failure to effectively address Garza's jailhouse phone call with Laurel Thompson, Garza relies on an interview defense counsel conducted with a juror who stated that the phone call evidence was "devastating" to Garza's case. (Doc. 27 at 71) (citing Doc. 38-8, PCR Pet., Ex. 157 at 1). In support of the claim that he was prejudiced by counsel's failure to present evidence of Fetal Alcohol Spectrum Disorder ("FASD"), Garza cites declarations from two jurors who stated that their vote for a death sentence may have been affected by evidence of low intelligence or developmental disorders. (Doc. 27 at 172–73) (citing Doc. 38-6, PCR Pet., Ex's 118, 119). There are other examples.

As the Court has previously explained (*see* Doc. 73 at 25–26), it cannot consider this information. Rule 606(b)(1) of the Federal Rules of Evidence prohibits juror testimony

"about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment." Fed. R. Evid. 606(b)(1). Accordingly, court "may not receive a juror's affidavit or evidence of a juror's statement on these matters."[34] *Id.* The juror evidence Garza offers fits squarely into the category of prohibited matters.

The Court also explained that, contrary to Garza's argument, juror affidavits may not be considered under Rule 606(b) in support of claims of ineffective assistance of counsel. (Doc. 73 at 26.) Therefore, in addressing the following claims, the Court does not consider the jurors' affidavits or evidence.

**Claim 2:**

Garza alleges that trial counsel were ineffective during the guilt-phase proceedings. (Doc. 27 at 64.) He raises six specific allegations along with a claim of cumulative prejudice.[35] The Court previously determined that two of the subclaims, 2(D) and 2(G), were barred from federal review because their default was not excused under *Martinez*.[36] (Doc. 73 at 26–29.)

A.   Failure to present expert testimony

In Claim 2(A), Garza alleges that counsel performed ineffectively by failing to present testimony from a crime-scene, forensic, or police-practices expert to challenge the State's physical evidence. (Doc. 27 at 66.) He argues that counsel should have presented expert testimony about his and Lance Rush's gunshot wounds, the blood evidence in Garza's car, and the deficiencies of the police investigation. (*Id.* at 67–68.) The PCR court denied the claim on the merits:

> Defendant next claims that trial counsel should have called his own forensic
> expert at the guilt phase to critique the State's investigation and raise doubts

---

[34] The exceptions to this rule, concerning evidence of "extraneous prejudicial information" and "outside influence," Rule 606(b)(2), are not at issue here.

[35] A seventh, Claim 2(F), has been withdrawn. (Doc. 58.)

[36] In reaching that determination, the Court found that the claims were not "substantial;" that is, they had no merit. (Doc. 73 at 28–29.)

about the Defendant's precise role in the killings. Counsel did retain a crime scene expert, but concluded that his analysis would not have assisted the defense. (Exhibit 53 at #35: Declaration of Christopher DuPont). This tactical decision is within counsel's purview and does not amount to ineffective assistance.

(PCR Ruling, ME 7/29/13, at 3.) This ruling was not contrary to or an unreasonable application of *Strickland*, nor was it based on an unreasonable determination of the facts.

Counsel did retain a crime-scene expert, criminologist Ray Gieszl, but Gieszl did not testify or prepare a report. In an interview with the prosecutors, Gieszl discussed the materials he reviewed and indicated that he had produced 36 pages of notes. (Doc. 38-8, PCR Pet., Ex. 158 at 2–3.) He had no disagreements with the conclusions drawn by the State's firearms expert, Jim Serpa, or with the analysis of the DNA evidence. (*Id.* at 9, 30.) With respect to the processing of the crime scene, Gieszl did state that he would like to have seen additional blood stain analysis, more information about shoeprints, and more information about bullet trajectories. (*Id.* at 29.) At the time of the interview he had spent about 15 hours working on the case. (*Id.* at 36.) Nothing in the interview suggests that Gieszl could have provided testimony about the shootings, including Garza's gunshot wound, that would have assisted the defense. In fact, in an affidavit from 2012, counsel acknowledged that the analysis Gieszl provided "was not very helpful to our case." (Doc. 38-5, PCR Pet., Ex. 53, ¶ 35.)

Based on this record, Garza cannot establish that counsel performed ineffectively by failing to present expert testimony about the physical evidence. Speculation about the results unidentified experts could have obtained is insufficient to establish prejudice. *See Wildman v. Johnson*, 261 F.3d 832, 839 (9th Cir. 2001) (acknowledging that conjecture that a favorable expert might have been found cannot establish prejudice); *Grisby v. Blodgett*, 130 F.3d 365, 373 (9th Cir. 1997) (concluding that speculation about how an expert might have testified is not enough to establish prejudice).

Applying the doubly deferential standard required by AEDPA and *Strickland*, the Court finds that Garza is not entitled to relief on this claim. *See Richter*, 562 U.S. at 105; *Mirzayance*, 556 U.S. at 123. Claim 2(A) is denied.

B.     Failure to address jail phone call

In Claim 2(B), Garza alleges that counsel performed ineffectively by failing to use a jailhouse call to demonstrate that Garza's confession was false.[37] (Doc. 27 at 71.)

As noted above, on the morning after the murders, Garza called Laurel Thompson from jail. During that conversation, the following exchange took place.

> RG: I'll be here for a couple of years.
> LT: Why what did you do?
> RG: Well, remember what you want [sic] me to do when that one guy beat you up?
> LT: Yeah.
> RG: Well I did it to somebody else.
> LT: Shut up. You're lying.
> RG: I fucked (inaudible).

(Doc. 38-8, PCR pet., Ex. 162 at 2–3.)

Garza argues that counsel should have "contextualized" this call by playing portions of a phone conversation on April 22, 2000, between Garza and Karen Thompson, Laurel's mother. (Doc. 44 at 38; *see* Doc. 27 at 72.) In that conversation, Karen asked Garza "why don't you tell the truth about your uncle?" and Garza replied, "Don't say nothing like that into the phone." (Doc. 38-8, PCR Pet., Ex. 163 at 6.)

Garza contends that it was objectively unreasonable for counsel not to play that portion of the Karen Thompson call because the call undermined Garza's confession and supported the defense theory that Larry Franco was involved in the murders. (Doc. 27 at 72.)

Garza raised this claim in his PCR petition. (PCR Pet. at 65–66.) In support of the claim, Garza argued that expert evidence, including the polygraph results and the opinions

---

[37] Garza has withdrawn the portion of the claim alleging that counsel performed ineffectively by failing to play additional portions of the phone call between Garza and Laurel Thompson. (Doc. 44 at 38 n.18.)

of two mental health experts,[38] supported a finding that he had falsely confessed. (*Id.* at 66.)

> The PCR court denied the claim on the merits:
>
> > Defendant next claims that counsel failed to effectively address Defendant's jailhouse telephone conversation with Laurel Thompson in which he admitted his involvement in the crimes. He contends that experts should have been called to testify that he falsely confessed to cover up for Franco and passed a polygraph test to that effect. He fails to explain, however, how any of this evidence would have been admissible. The Court finds that none of this evidence is admissible and trial counsel was not deficient in failing to present it.

(PCR Ruling, ME 7/29/13, at 8.)

The court does not appear to have addressed Garza's argument that counsel should have played portions of the Karen Thompson call. Garza, however, argues that the court incorrectly determined that the conversation was inadmissible and therefore its ruling was unreasonable under both § 2254(d)(1) and (2). (Doc. 27 at 73.) Even assuming Garza is correct and AEDPA deference does not apply, this claim is meritless because Garza cannot establish that he was prejudiced by counsel's performance.

The evidence showing that Garza's confession was not false includes additional portions of his December 2 conversation with Laurel Thompson. These demonstrate that Garza, on the morning after the murders, was aware of the details of the crime and knew of the second, male, victim. Garza told Laurel, for example, that he "got shot in the arm . . . from the dude," so that on "one count it was [self defense] and one count it wasn't." (Doc 38-8, PCR Pet., Ex. 162 at 7.) He continued: "Cuz the guy shot me and then I shot him." (*Id.*)

The exchange with Karen Thompson, several months later, may be suggestive, but its meaning is far less clear than Garza's own descriptions of his involvement in the

---

[38] Dr. Jack Potts, a psychiatrist who, as discussed below, performed a Rule 11 evaluation, and Dr. Thomas Steed, a forensic psychologist. (*See* Doc. 38-7, PCR Pet., Ex. 142 at 2; Doc. 38-8, PCR Pet., Ex. 164 at 2.)

1  murders the day after they occurred. In any event, defense counsel's efforts to persuade the

2  jury of Larry Franco's involvement in the murders, while unsuccessful, were substantial.

3  There was not a reasonable probability of a different verdict if counsel had supplemented

4  those efforts by playing the brief, inconclusive exchange between Garza and Karen

5  Thompson.

6      Counsel did not perform ineffectively by failing to introduce that portion of the

7  taped call between Garza and Karen Thompson. Claim 2(B) is denied.

8      C.      Failure to call Larry Franco

9      In Claim 2(C), Garza alleges that counsel performed ineffectively by failing to call

10  Larry Franco as a witness. (Doc. 27 at 74.) Garza made this argument in a footnote in his

11  PCR petition. (PCR Pet. at 49 n.40.) This Court previously found the claim unexhausted

12  because Garza did not include it in his petition for review. (Doc. 73 at 25.) Garza does not

13  attempt to excuse the default. Claim 2(C) therefore remains defaulted and is barred from

14  federal review.

15      The claim is also meritless. "[C]omplaints of uncalled witnesses are not favored in

16  federal habeas corpus review because allegations of what the witness would have testified

17  are largely speculative." *Evans v. Cockrell*, 285 F.3d 370, 377 (5th Cir. 2002). To establish

18  prejudice from counsel's failure to call a witness, a petitioner must show that the witness

19  would likely have been available and would have given testimony that created a reasonable

20  probability of a different verdict. *Alcala v. Woodford*, 334 F.3d 862, 872–73 (9th Cir.

21  2003). Garza acknowledges that Franco, if called to testify, intended to invoke his Fifth

22  Amendment right against self-incrimination. (Doc. 27 at 74–75.) At most, therefore,

23  counsel could have questioned him about his role as an informant.[39] (*Id.*) Because the jury

24  heard extensive testimony from other witnesses about Franco's work as a CI, Garza was

25

26

27

28

[39] The trial court ruled that notwithstanding Franco's invocation of his Fifth Amendment
rights, he could be questioned about "his career as an informant" and "his status as a CI."
(RT 7/12/04 at 179; RT 8/16/04 at 78.)

not prejudiced by counsel's failure to call Franco as a witness and attempt to elicit additional information on the same subject.

Garza has failed to show that Franco's testimony "would have been favorable," *Evans*, 285 F.3d at 377, let alone that it would have affected the verdict. *See Dows v. Wood*, 211 F.3d 480, 486 (9th Cir. 2000) (rejecting ineffective assistance claim based on trial counsel's failure to call an alibi witness when there was no evidence in the record that the witness would have testified favorably for the defense); *United States v. Berry*, 814 F.2d 1406, 1409 (9th Cir. 1987) (explaining that prejudice is not shown where petitioner offers no indication of what the witness would have testified to and how the testimony would have affected the outcome).

Claim 2(C) is therefore denied.

> ### D.      Failure to present readily available evidence

The Court previously found that this claim was not "substantial" under *Martinez* and therefore its default was not excused. (Doc. 73 at 29.) The claim is denied as procedurally defaulted and barred from federal review.

> ### E.      Failure to object to jury instruction

In Claim 2(E), Garza alleges that counsel performed ineffectively by failing to object to the jury instruction barring consideration of third-party involvement. (Doc. 27 at 79.) The PCR court denied the claim, noting that the Arizona Supreme Court had upheld the instructions as given. (PCR Ruling, ME 7/29/13, at 8.)

As discussed above in the Court's analysis of Claim 4(B), Garza has not shown that the instruction was improper or that he was harmed by it. Because the instruction was proper, objection would have been futile. *See Juan H. v. Allen*, 408 F.3d 1262, 1273 (9th Cir. 2005) ("[T]rial counsel cannot have been ineffective for failing to raise a meritless objection."); *Rupe*, 93 F.3d at 1445 (explaining that "the failure to take a futile action can never be deficient performance"); *see also Simpson v. Carpenter*, 912 F.3d 542, 600 (10th Cir. 2018) ("[B]ecause the . . . instruction was a correct statement of law, trial counsel did not perform deficiently in failing to object to it."); *Johnson v. Moore*, 113 F.Appx. 249,

250 (9th Cir. 2004) (mem.) ("There can be no viable ineffective assistance of counsel claim for failure to object to a proper jury instruction.").

Claim 2(E) is denied.

F.    Failure to obtain records

Garza has withdrawn this claim, (Doc. 58.)

G.    Failure to challenge firearms expert

The Court previously found that this claim was not "substantial" under *Martinez* because there was not a reasonable probability that a challenge to the ballistics evidence would have resulted in a different verdict given the evidence that Garza was the shooter, and therefore the claim's default was not excused. (Doc. 73 at 29.) The claim is denied as procedurally defaulted and barred from federal review.

H.    Cumulative prejudice

Garza alleges that he is entitled to relief because of the cumulative effect of trial counsel's ineffectiveness during the guilt phase of trial. (Doc. 27 at 84.) The parties disagree about whether the claim is exhausted. Regardless of its procedural status, the claim is meritless and will be denied on that ground.

Because the Supreme Court has not recognized the doctrine of cumulative error, and because this Court has determined that no prejudice resulted from the individual errors alleged by Garza, the claim of cumulative prejudice is meritless. *See Boyde v. Brown*, 404 F.3d at 1176; *Mancuso*, 292 F.3d at 957; *McGill*, 2021 WL 4899001, at *11. Claim 4(H) is denied.

Conclusion

Garza's allegations of ineffective assistance of counsel at the guilt phase of trial are without merit, procedurally defaulted and barred from federal review, or both. Claim 2 is therefore denied.

**Claim 5:**

Garza alleges that trial counsel performed ineffectively during the aggravation phase of sentencing by failing to seek a proper jury instruction on the multiple homicides-

aggravating factor and failing to argue that the factor was not supported by the evidence. (Doc. 27 at 98–99, 107.) This claim is without merit.

As described above, the trial court instructed the jury that:

. . . you must find that both homicides were temporally, spatially, and motivationally related, and were part of a continuous course of criminal conduct.

In making that determination, you should consider the time span in which the two homicides were committed, the location of the homicides, and the reason for the homicides, as well as the identity of the victims and the character of the homicides.

(RT 8/31/04 at 84.)

During deliberations, the jurors sent a note to the court seeking clarification of the words "temporally and spatially and motivationally." (*Id.* at 140.) The court, without objection from defense counsel, responded by referring the jury back to the instruction as provided. (*Id.* at 140–41.)

The court also instructed the jury that its finding with respect to an aggravating factor must be unanimous and beyond a reasonable doubt. (*Id.* at 82.)

On direct appeal, the Arizona Supreme Court found that the multiple-homicides factor had been established and that the Ellen Franco and Lance Rush murders were motivationally related because it was "difficult to imagine" a motive for Lance's killing that was not related to the motive for Ellen's killing. *Garza*, 216 Ariz. at 72, 163 P.3d at 1022.

In his PCR petition, Garza alleged that trial counsel performed ineffectively by failing to secure an instruction that defined "motivational relationship" and explained that each subpart of the factor must be proved beyond a reasonable doubt. (PCR Pet. at 46–47.) He also alleged that counsel erred by failing to argue that the weight of the factor could be reduced based on the circumstances of the offense. (*Id.* at 47.) Finally, he alleged that counsel should have argued that no motivational relationship between the murders existed. (*Id.* at 49.)

1    The PCR court denied this claim on the merits, finding that the instructions provided

2    by the trial court "adequately defined the aggravator for the jury and the State's burden of

3    proof. They also cured any alleged constitutional vagueness." (PCR Ruling, ME 7/29/13,

4    at 6.) The court then noted that "in its independent review of the evidence, the Arizona

5    Supreme Court held the (F)(8) aggravator was correctly found." (*Id.*). Finally, the PCR

6    court rejected Garza's argument that counsel should have moved to dismiss the (F)(8)

7    aggravating factor due to the absence of a "motivational relationship." (*Id.* at 7.) The court

8    explained that the Arizona Supreme Court "found sufficient evidence that the murders were

9    'motivationally related.' Had counsel moved to dismiss, the motion would have been

10   denied." (*Id.*)

11   Garza has not met his burden under the "doubly deferential" standard that applies

12   to claims of ineffective assistance under AEDPA. *See Richter*, 562 U.S. at 105. The trial

13   court provided the proper jury instruction on the (F)(8) multiple-homicides factor and the

14   Arizona Supreme Court found that the factor had been proved. Any objection made by

15   counsel, therefore, would have been futile. *See Juan H.*, 408 F.3d at 1273; *Rupe*, 93 F.3d

16   at 1445; *see also Johnson*, 113 F.Appx. at 250. The PCR court reasonably determined that

17   Garza was not prejudiced by trial counsel's handling of the multiple-homicides factor. *See*

18   *Boggs v. Shinn*, No. CV-14-02165-PHX-GMS, 2020 WL 1494491, at *39 (D. Ariz. Mar.

19   27, 2020) ("Boggs cannot demonstrate prejudice because the Arizona Supreme Court

20   found that the multiple-homicides aggravating factor was established beyond a reasonable

21   doubt.").

22   Citing *Johnson v. Williams*, 568 U.S. 289, 303 (2013), Garza contends that the PCR

23   court did not specifically address several of his arguments, which, he asserts, are now

24   entitled to de novo review. (Doc. 27 at 113.) The Court does not agree that "the evidence

25   leads very clearly to the conclusion" that the PCR court "inadvertently overlooked" a

26   federal claim. *Johnson*, 568 U.S. at 303. As the Supreme Court noted, there are many

27   reasons a state court might not "discuss separately every single claim to which a defendant

28

makes even a passing reference," including "instances in which a state court may simply regard a claim as too insubstantial to merit discussion." *Id.* at 298, 299.

Garza contends that counsel performed ineffectively by failing to argue that there was insufficient evidence to support the multiple-homicides factor, particularly with respect to a motivational relationship, and that the jury was entitled to give the factor little weight. (Doc. 27 at 113.) Even under de novo review, however, these arguments do not entitle Garza to relief. *Strickland* still places the burden on Garza to demonstrate deficient performance and prejudice. He has not satisfied that burden.

First, Garza's counsel did attack the multiple-homicides factor. At the aggravation phase of trial, counsel challenged the factor by presenting evidence and argument that Larry Franco, not Garza, was responsible for the murders. (RT 8/31/04 at 27–73, 101–12.) That strategic choice, which was the product of the same theory of the crime Garza continues to espouse, is entitled to deference. *See Strickland*, 466 U.S. at 690; *Richter*, 562 U.S. at 109 ("There is a 'strong presumption' that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than 'sheer neglect.'") (quoting *Gentry*, 540 U.S. at 8). In addition, the Arizona Supreme Court having held that the factor was proved beyond a reasonable doubt, Garza cannot demonstrate that he was prejudiced by any failure to argue there was a lack of evidence supporting the factor.

Finally, the jury was directed to take the weight of the aggravating factor into account. The trial court instructed the jury that:

> . . . the weighing of the aggravating circumstance already found to exist and any mitigating circumstances found to exist does not mean a mere mechanical counting of factors on each side of an imaginary scale, or the arbitrary assignment of weight to any of them. You are free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various circumstances you are permitted to consider.
>
> In weighing the various circumstances, you determine, under the relevant evidence, which sentence is justified and appropriate by considering the one aggravating circumstance with the totality of the mitigation

(RT 9/16/04 at 106.)

1          Counsel did not perform ineffectively in their handling of the multiple-homicides

2    aggravating factor. The PCR court's denial of this claim satisfied nether § 2254(d)(1) nor

3    (d)(2). Claim 5 is denied as meritless.

4    **Claim 7:**

5          Garza alleges that trial counsel performed ineffectively at sentencing by failing to

6    investigate and present mitigating evidence and making other mitigation-phase errors.

7    (Doc. 27 at 118.)

8          As explained above, to establish deficient performance under *Strickland*, a

9    petitioner must show that "counsel's representation fell below an objective standard of

10   reasonableness." *Strickland*, 466 U.S. at 688. While trial counsel has "a duty to make

11   reasonable investigations or to make a reasonable decision that makes particular

12   investigations unnecessary, . . . a particular decision not to investigate must be directly

13   assessed for reasonableness in all the circumstances, applying a heavy measure of

14   deference to counsel's judgments." *Id*. at 691. In assessing counsel's investigation, courts

15   "must conduct an objective review of [counsel's] performance, measured for

16   reasonableness under prevailing professional norms, which includes a context-dependent

17   consideration of the challenged conduct as seen from counsel's perspective at the time."

18   *Wiggins v. Smith*, 539 U.S. 510, 523 (2003) (citation and quotation marks omitted); *see*

19   *Rompilla v. Beard*, 545 U.S. 374, 381 (2005). "As long as a reasonable investigation was

20   conducted, we must defer to counsel's strategic choices." *Cox v. Ayers*, 613 F.3d 883, 899

21   (9th Cir. 2010); *see Babbitt*, 151 F.3d at 1173; *Williams v. Woodford*, 384 F.3d 567, 616

22   (9th Cir. 2004).

23         In the context of a capital sentencing, prejudice is assessed by "reweigh[ing] the

24   evidence in aggravation against the totality of available mitigating evidence." *Wiggins*, 539

25   U.S. at 534. The "totality of the evidence" includes "both that adduced at trial, and the

26   evidence adduced" in subsequent proceedings. *Id.* at 536 (quoting *Williams (Terry)*, 529

27   U.S. at 397–98). "If the difference between the evidence that could have been presented

28   and that which actually was presented is sufficient to 'undermine confidence in the

outcome' of the proceeding, the prejudice prong is satisfied." *Duncan v. Ornoski*, 528 F.3d 1222, 1240 (9th Cir. 2008) (quoting *Strickland*, 466 U.S. at 694). The burden of showing actual prejudice is "highly demanding and heavy." *Allen*, 395 F.3d at 1000 (quoting *Williams (Terry)*, 529 U.S. at 394)).

A.    Mitigating evidence

Garza alleges that trial counsel performed ineffectively by failing to investigate, develop, and present mitigation evidence at sentencing. This claim consists of 15 separate allegations of ineffective assistance, designated Claims 7(A)(4)(a) through (o). Garza raised claims (b) through (g) during the PCR proceedings and the court rejected them on the merits. (PCR Ruling, ME 7/29/13, at 5–9.) Garza asserts that under *Martinez* the ineffective assistance of PCR counsel excuses the default of the remaining claims. The Court previously rejected that argument with respect to claims (a), (h), (i), (l), (m), and (n), and concluded that the claims were barred from federal review.[40] (Doc. 73 at 29–32.) Garza has withdrawn claim (j) and (k). (Doc. 44 at 101.)

---

[40] In the defaulted claims, Garza alleges that trial counsel performed ineffectively by failing to (a) provide an adequate social history to any expert (Doc. 27 at 163); (h) present evidence about the adolescent brain (*id.* at 194); (i) present evidence of Garza's deficits in executive-function skills (*id.*); (l) make clear that Larry Franco had never been charged with a crime related to the murders (*id.* at 198); (m) present evidence that Garza felt threatened on the night of the murders (*id.* at 200); and (n) prepare mitigation witnesses (*id.*). To excuse the default of these claims, Garza must demonstrate that PCR counsel's failure to raise them amounted to ineffective assistance under *Strickland*'s two-prong standard. *Martinez*, 566 U.S. at 16. The Court reiterates its finding (Doc. 73 at 30–32) that PCR counsel's failure to include these claims in his petition does not satisfy *Strickland*'s deficient-performance prong which requires the court to take a "highly deferential" view of counsel's performance and to presume it fell within the "wide range of reasonable professional assistance." *Runningeagle*, 825 F.3d at 982 (quoting *Strickland*, 466 U.S. at 689). Given the range of challenges PCR counsel did raise to trial counsel's presentation of mitigating evidence, Garza "simply does not carry his burden to show that [PCR counsel] 'made errors so serious that [he] was not functioning as . . . counsel.' " *Id.* (quoting *Strickland*, 466 U.S. at 687).

To evaluate the remaining allegations, the Court must undertake an objective consideration of trial counsel's performance and assess the mitigating evidence counsel did present at sentencing and the evidence that could have been presented.

### 1.   Background

Co-counsel Dupont was primarily responsible for the penalty-phase of Garza's trial. (*See* Doc. 38-5, PCR Pet., Ex. 60, ¶ 26.) Dawn Whitt, the capital mitigation specialist, was appointed to the case in July 2003. (*Id.*, ¶ 6.) Whitt was preceded as mitigation specialist by Pam Siller and Marcella Gonzales, who had worked under attorney Farragut, and Missy Kupferberg of the Legal Defender's Office, who had been working on Garza's case for a month or two prior to Whitt's appointment and helped Whitt "get up to speed" on the case. (*Id.*, ¶¶ 12–15.) Siller's file contained some "mitigation-related documents," including "mitigation interview memos, different kinds of charts, etc." (*Id.*, ¶ 15.) By the time of Whitt's appointment, Kupferberg "had already talked to some family members and done some interviews." (*Id.*, ¶ 14.)

### a.   Sentencing proceedings

As Cleary explained in a declaration prepared during the PCR proceedings, counsel's mitigation theme was that Garza "was a young, immature, easily influenced and naïve individual who ultimately was manipulated and controlled by Larry Franco." (Doc. 38-5, PCR Pet., Ex. 52, ¶ 15.) Counsel also wanted to show that Garza "had to endure some difficult family issues and struggled with substance abuse, but . . . was still well-respected by his friends." (*Id.*)

In his opening statement, Dupont told the jury he was going to present evidence about Garza "as a human being . . . before December 2, 1999." (RT 9/7/04 at 34.) Dupont outlined various mitigating factors, including Garza's age, lack of prior arrests, the role of another person in the crimes, impairment, and close ties with family and friends. (*Id.* at 39–40.) He told the jury that "Ruben is a person who deeply loves others and is deeply loved in return. He has a loving heart." (*Id.* at 40.) He described Garza's positive qualities but noted that he suffered from low self-esteem because of his physical appearance and the

difficulties caused by his severe asthma. (*Id.* at 43.) He described Garza as a hard worker who struggled in high school "because he is not the brightest guy in the world" but got extra help and was able to graduate. (*Id.* at 42.) He emphasized Garza's generosity, telling the jury that Garza was "generous to a fault" and tried to win friends by giving people gifts or money. (*Id.* at 43.) He described Garza's failed attempts to please his father, and the father's physical abuse of Garza. (*Id.* at 43–45.) He explained that Garza was easily taken advantage of and manipulated. (*Id.* at 44.)

Dupont then detailed the "terrible things" that had happened in Garza's life leading up to the time of the crimes, including the divorce of Garza's parents; the loss of his apartment and vehicle, when he was cheated out of rent money and repairs costs; and the deaths of his godchild and his friend Alexa Andrea. (*Id.* at 45.) In addition, Dupont told the jury, by this point in Garza's life he had "developed full-blown alcoholism" and "there is evidence of drug usage." (*Id.*)

Finally, Dupont discussed Larry Franco, Garza's uncle and godfather, whom Garza grew up "respecting and idolizing." (*Id.* at 46–47.) Dupont suggested that Franco supplied the methamphetamine found in Garza's pocket after his arrest, described Franco's threats to harm Ellen, and concluded that "[t]he crime itself did not begin in Ruben's heart." (*Id.* at 49.)

Counsel them presented twenty-seven lay witnesses whose testimony over five days supported these mitigating circumstances. The witnesses included teachers, employers, and other adults who knew Garza; high school friends and peers; and various family members, including his parents and all of his siblings.

The first witness was Kathy Coogle, a youth minister. (*Id.* at 61.) Garza was in her group and she "bonded with him real quick" and "fell in love with him." (*Id.* at 62.) He was a "good kid" who "would do anything for [her]." (*Id.*) He was "always there, always helpful, always volunteering" for fundraising events. (*Id.*) He was a "really hard worker" who "wanted to please you and go the extra mile." (*Id.* at 65.) Garza had a girlfriend whom he was "real respectful" toward and "treated like a queen." (*Id.* at 66.) He was "sensitive,"

"tender," and "eager to please." (*Id.* at 67.) Coogle could not believe that Garza committed the crimes because he was the "nicest, kindest kid." (*Id.* at 68.)

Garza's next witness was David Walton, a high school teacher who taught disabled students. (*Id.* at 82.) Garza worked with Walton as a teacher's assistant for a year. (*Id.*) He was "very polite, very responsive, helpful when asked, cordial, just all that you would want a student to be." (*Id.* at 83–84.) Walton testified that Garza had an asthma problem that "he fought to overcome." (*Id.* at 84.) Garza was employed part-time outside of school in addition to being a teacher's aide. (*Id.*) He was goal-oriented, polite, and followed the rules. (*Id.* at 85.) Walton was shocked to learn of the crimes because Garza was "a gentleman growing up, and it was just the last thing I would have thought of." (*Id.* at 86.)

The next witness was Doug Lingner, a friend of Garza's family. (*Id.* at 88.) He described Garza as "very respectful of his parents" and other adults and "very supportive" of his family. (*Id.* at 90.) He "never heard a bad thing about Ruben from anybody at any time." (*Id.*) Garza was very well behaved and eager to please others. (*Id.* at 91.) Lingner too was "shocked" at Garza's arrest. (*Id.*)

Next, Raymond Jacobs testified that he knew Garza as Garza's high school teacher and coach. (*Id.* at 95.) He testified that Garza wasn't a good football player because he didn't like to hit people—his personality wasn't aggressive. (*Id.*) Garza also suffered from asthma. (*Id.* at 96–97.) He "struggled academically" and "had a hard time comprehending some of the material." (*Id.* at 97–98.) He always gave a good effort, however, and was never a problem in the classroom. (*Id.* at 98.) Jacobs described Garza as "one of the better kids that I worked with . . . from a personality standpoint, from a standpoint of a person." (*Id.* at 99.)

Cheryl Marzella testified that Garza and her daughter, Alexa Andrea, were "close friends." (*Id.* at 104–05.) Alexa died of leukemia. (*Id.* at 107.) When Garza learned of her death in late November 1999, he "just fell apart. He was totally upset. He was crying. He just couldn't believe it." (*Id.* at 108.)

The next mitigation witness was Elizabeth Martinez, an elementary school teacher and PTA member who was friends with Garza's mother, Sally. (RT 9/8/04 at 19–21.) She described Garza as helpful and involved in PTA activities. (*Id.* at 24–25.) Garza was "very much of a people pleaser." (*Id.* at 25.) He was shy, reserved, and polite, and would "do anything for you." (*Id.*) Garza worked two jobs when he was in high school. (*Id.* at 27.) Martinez was "very shocked" to learn of Garza's arrest. (*Id.* at 28.) She figured he must have been with a group of kids "that got themselves into mischief" and "he happened to be in the wrong place at the wrong time." (*Id.*) However, Garza was quiet, shy, sweet, and kind, and not the type to attract that kind of group. (*Id.*) On cross-examination, Martinez testified that Garza came from a "totally supportive family background." (*Id.* 32.)

Francis Thurman testified that she knew Garza as a friend of her son, James Duenas. (*Id.* at 36.) She loved Garza like a son. (*Id.*) Garza was respectful, trustworthy, and dependable, and always welcome to stay at her house. (*Id.* at 37.) He called her "mom," and was like a brother to Thurman's daughters. (*Id.*) He would counsel them and give them advice. (*Id.* at 38.) He was generous, and one Christmas when family funds were low he bought Christmas gifts for everyone in the house. (*Id.*) Garza was "respectful, very caring, and loving with all of us." (*Id.* at 40.)

James Duenas testified that he had been friends with Garza since they were sophomores in high school. (*Id.* at 46.) Garza told Duenas that his father was not there for him and did not support and accept him. (*Id.* at 51.) Garza tried to please his father but it didn't work—he was never good enough. (*Id.*) Garza wanted to be the man of the house and take care of his four younger sisters. (*Id.* at 53.) Duenas testified that Garza was not aggressive, and the girls at school thought of him as a "big teddy bear." (*Id.* at 57.) Garza was self-conscious about his weight and acne, and he lacked confidence. (*Id.* at 60.) He was quiet and shy around girls. (*Id.*) Duenas never knew Garza to be violent or to carry a gun. (*Id.* at 61.) On cross-examination, Duenas testified that he had no knowledge that Garza was a drinker or had a drinking problem. (*Id.* at 65.)

The defense next called Sally Gerberich, Larry Franco's ex-wife. (*Id.* at 67.) She testified that she was on probation after being arrested for manufacturing methamphetamine. (*Id.* at 68, 85.) She believed Franco was responsible for her arrest. (*Id.* at 68–69, 85.)

Gerberich described Garza as a "good" and "reliable" kid who "idolized" Larry Franco. (*Id.* at 71–72.) Gerberich testified that on the night of the murders Franco was with her at her residence. She testified that Garza called that night and spoke with Franco, after which Franco asked her if she had any meth. (*Id.* at 82.) She told him she didn't and he got back on the phone and told Garza "She don't have any." (*Id.*) Gerberich testified that Franco left her residence at about 9:30 or 9:45 p.m. (*Id.*) Garza arrived in his vehicle, got out of the car and spoke briefly with Franco, and then drove away, with Franco following in his truck. (*Id.* at 83.) Gerberich testified that Franco used methamphetamine. (*Id.* at 85–86.)

On cross-examination, Gerberich acknowledged that during previous interviews she did not tell the detective she had seen Garza with Franco on the night of the murders. (*Id.* at 87.) She also admitted that she told the detective Franco had left her residence at around 10:30, not 9:30 or 9:45, and she did not tell the detective that Franco had made phone calls from her residence and asked her for meth. (*Id.* at 93–94.)

The next mitigation witness was Laura Withey, who lived with Laurel Thompson, Laurel's mom, Karen, and Karen's parents. (*Id.* at 121.) She got to know Garza when he came by to visit Karen and Laurel. (*Id.* at 122.) Garza would bring food and help pay the vet bill for Karen's dog. (*Id.* at 123.) Withey described Garza as "quiet" and "nice" and "kind of a dork" who wanted people to like him. (*Id.* at 123–24.) She was surprised to hear of his arrest because she thought of him as a "wussie" who would be too scared to commit a crime. (*Id.* at 128.) On cross-examination, Withey testified that she did not believe Garza had a problem with alcohol. (*Id.* at 135.)

Karen Thompson testified next. She knew Garza through her ex-boyfriend Eric Rodriguez. (*Id.* at 143.) She described Garza as a good kid, "clean cut," and "quiet." (*Id.*

at 145.) Garza was protective of Karen and Laurel, because Rodriguez would sometimes steal their stuff. (*Id.* at 145.) Garza would bring the girls food. (*Id.* at 146.) Karen never knew Garza to be violent or to carry a gun. (*Id.*) She testified that Garza did not drink or use drugs when he visited her. (*Id.* at 147.) She testified about an incident in 1998 or 1999 when Garza tried to cut his wrists while at her apartment. (*Id.* at 147–48.) Karen testified that Garza was going to be her newborn son Salvador's godfather. (*Id.* at 148–50.) He brought Salvador clothes and toys. (*Id.* at 150.) When Salvador died Garza was "devastated." (*Id.*) Karen was "shocked" when she heard about Garza's arrest because it was "not like him to do anything like that." (*Id.*) On cross-examination she admitted that Garza told her he had a gun. (*Id.* at 156.)

The next witness was Ed Lukasik, a criminalist with the DPS. (*Id.* at 170.) He testified that he had examined a baggie containing a white, powdery substance that he determined to be .27 gram of methamphetamine, a "usable quantity." (*Id.* at 173.)

Counsel then called Detective Sanchez, the case agent, who testified that the baggie containing methamphetamine had been taken from Garza's person. (*Id.* at 177–78.) He also testified that a criminal background check revealed that Garza had no prior arrests as a juvenile or an adult. (*Id.* at 179–80.)

Counsel then called Marina Hernandez. She testified that Garza was her best friend and the godfather of her daughter, Jasmine. (RT 9/9/04 at 18.) He was with her at the hospital when Jasmine was born and brought Marina food from her favorite restaurant. (*Id.* at 21.) When Marina couldn't afford formula or diapers, Garza would leave cash in her purse. (*Id.* at 22.) He wouldn't let her pay him back. (*Id.*) He bought gifts for Jasmine, including a goldfish in a bowl. When the goldfish died, Garza rushed to replace it before Jasmine found out. (*Id.* at 22–23.) Marina testified that Jasmine "misses [Garza] a lot, very much." (*Id.* at 23.) Garza was like a big brother to Marina and her friends. (*Id.*) He watched out for them and gave them money and rides. (*Id.* at 25.) When one of her friends was locked out of her house, she called Garza in the middle of the night and he came over and unlocked the door with a hanger. (*Id.* at 24.) Garza was "very respectful" of adults. (*Id.*)

Marina testified that Garza was "caring, loving, very supportive, gentle, incredibly gentle with my daughter." (*Id.* at 25.) Marina also testified about "some problems that [Garza] was going through." (*Id.* at 26.) He drank a lot and didn't take care of himself. (*Id.* at 26–27.) He was hospitalized with pneumonia caused by overwork and lack of sleep. (*Id.* at 27.) Marina testified that Garza looked up to his father but felt that "he couldn't live up to" him. (*Id.* at 28.)

Marina also testified that people took advantage of Garza "all the time," borrowing money from him and never paying it back or asking for rides without offering anything in return. (*Id.* at 27–28.) Garza had a girlfriend who was mean to him, belittled him and even hit him, but he "didn't do anything" in response and was never violent towards women. (*Id.* at 28.) Garza's generosity left him short of money, so when he wrecked his vehicle he couldn't afford to have it repaired. (*Id.* at 28–29.) Garza lost his apartment when his roommate left without paying his share of the rent and utilities. (*Id.* at 29.)

Marina believed Garza was an alcoholic. (*Id.* at 29.) He would come over to her apartment "really, really drunk." (*Id.*) On one occasion he got "real sick" and started coughing up blood. (*Id.*) Garza would drink tequila alone in his apartment. (*Id.* at 30.) Garza told Marina that he had tried drugs a couple of times, but he did not want her or her friends to use them. (*Id.* at 31.)

Marina testified that Garza suffered from depression and "was down on himself a lot." (*Id.* at 32.) He didn't think he was good looking or smart enough to get a girlfriend. (*Id.*) He had problems feeling good about himself and lacked confidence. (*Id.*) Marina testified that Garza's sisters didn't treat him well. (*Id.*) She testified that Garza wasn't himself due to the drinking and depression. (*Id.*) He tried to hide the fact that he was hurting. (*Id.*) Toward the time of the crime, Garza had begun "pulling away from" Marina and her friends. (*Id.*) On cross-examination Marina testified that Garza told her he carried a gun. (*Id.* at 38.)

The next mitigation witness was Gloria Tocker, Garza's paternal aunt. (*Id.* at 63.) She testified that Garza had severe asthma, diagnosed at age two or three. (*Id.* at 79.) She described Garza as "quiet, reserved," helpful, and hard working. (*Id.* at 82.)

Counsel then called Michelle Alvarez, a "very, very close friend" who knew Garza from high school. (*Id.* at 87.) She testified that she and Garza were both "role models" who offered counsel and advice to friends. (*Id.*) She testified that she didn't know of any problems Garza had with schoolwork, and described him as "always really bright, really smart." (*Id.* at 88.) She testified that Garza had problems with alcohol and would come to school drunk. (*Id.*) He was also "very depressed just with life, . . . family, friends, always worried about everybody else. Everybody's problems were his problems." (*Id.* at 89.) Garza drank because he was so emotional and the alcohol helped "ease his problems." (*Id.*) Garza treated Alvarez and her girlfriends "[l]ike they were the world" and "meant everything to him." (*Id.*) He was always there if anybody needed anything, including money. (*Id.* at 90.) He comforted Alvarez when her father died unexpectedly. (*Id.* at 91.) She described Garza as "[l]oving, caring, warm hearted, tender, somebody you always wanted to be with." (*Id.*) Alvarez saw Garza with a gun. He told her it was for protection because he had "broken up a fight and he was sticking up for the girl, and the guys told him that they were going to come after him." (*Id.* at 92.) She testified that it was in Garza's character to be protective of women. (*Id.*)

The next witness was another friend of Garza's, Angela Marks, who had known him since the summer after their senior year. (*Id.* at 117.) She testified that Garza was very fond of her daughter and her daughter loved Garza. (*Id.* at 119.) Garza would come over after work, tutor Marks in math, and cook dinner. (*Id.* at 119, 124.) Garza would counsel her and her friends and help them work through their problems. (*Id.* at 120.) Marks described Garza as "very kind," "very giving," "very understanding," and nonjudgmental. (*Id.*) She was "crushed" when she learned he had been arrested for murder and didn't think it could be true. (*Id.* at 124.) On cross-examination Marks testified that she knew Garza drank but

not that he was an alcoholic. (*Id.* at 126.) She was not aware of any suicide attempts. (*Id.*) She knew that Garza carried a gun but he left it in the car when he visited her. (*Id.*)

The next witness was another paternal aunt, Olivia Garza Williams. (*Id.* at 129.) She was shocked to learn of Garza's arrest, explaining that he had been at her house two or three weeks before and everything had seemed normal. (*Id.* at 142–43.) She recounted an incident where she sold a car to Garza and he was prompt in all his payments until the car was paid off. (*Id.* at 143–44.) She described Garza as "very honest" and "punctual." (*Id.* at 144.) On cross-examination Williams testified that Garza had a good relationship with his father, that she knew nothing about Garza having a drinking problem or being involved in drugs, and had heard nothing about any suicide attempts. (*Id.* at 146–47.)

Sally Garza, Garza's mother, testified next. She explained that Garza was "very sickly" as a child. (*Id.* at 156.) He had "bad asthma," was frequently hospitalized—four or five times a year—and missed a lot of school. (*Id.* at 156–57.) Garza took as many as 25 pills per day and underwent breathing treatments "morning, noon, and night." (*Id.* at 163.)

Sally testified that the asthma, medications, and frequent hospitalizations caused problems in school and affected Garza's comprehension. (*Id.* at 165.) "He tried, and he had a hard time with comprehension." (*Id.* at 165–66.) He would become frustrated and upset that he couldn't figure things out. (*Id.* at 166.) Sally testified that Garza "struggled" with his grades in high school. (*Id.* at 172.) He graduated but "didn't have real high grades." (*Id.*)

Sally testified that her marriage to Ruben Garza Sr. was turbulent. He was verbally abusive to both her and Garza. (*Id.* at 169.) He was "[v]ery controlling, belittling" toward Garza, who tried "to do good and please" but "[s]ometimes felt like he couldn't." (*Id.* at 169.)

Sally testified that doctors told her Garza's asthma medication would make his face break out and cause moodiness and depression. (*Id.* at 170.) Sally took Garza to counseling because he was "having a hard time with school and stuff and seemed to be a little bit behind." (*Id.*)

Sally described an incident of physical abuse, where Garza Sr. "was punching and kicking" Garza and Garza said "Just kill me. Why don't you just kill me." (*Id.* at 171.) Following the incident, Sally got an order of protection against Garza Sr. (*Id.*)

Sally testified that she once walked into Garza's room and he told her he was going to hang himself. (*Id.* at 172.) He was a junior or senior in high school and was upset about the ending of a relationship. (*Id.* at 173.) On another occasion Sally got a call saying Garza had slit his wrist. (*Id.*) She picked him up and took him to a friend who was nurse and she bandaged the wound. (*Id.*) Garza told Sally that there were "a lot of things going on in his mind and happening and he was depressed." (*Id.* at 174.)

Sally testified that Larry Franco was her older brother and Garza's godfather. (RT 9/13/04 at 4.) She believed Garza and Franco had a close relationship. (*Id.*) Since the murders Sally and Franco no longer had "close ties." (*Id.* at 4–5.)

Sally testified about problems she had had with Franco. He had killed two of her dogs—one on her birthday—and had set fire to her car. (*Id.* at 6.) He had killed other animals as well. (*Id.*)

Finally, Sally testified about a series of family photos depicting Garza's childhood and youth. (*Id.* at 12–34.)

On cross-examination, Sally testified that she found marijuana in Garza's room when he was in seventh or eighth grade. (*Id.* at 64.) He told her he could make money and help the family by selling the drug. (*Id.* at 64–65.) She testified that prior to Garza's arrest, she was not aware of the extent of his drinking, but knew he drank socially. (*Id.* at 67.) On redirect examination, she testified that she had once found a suicide note in Garza's room. (*Id.* at 135.)

The next witness was Freddie Franco, Sally and Larry's brother and Garza's maternal uncle. (*Id.* at 36–37.) Freddie testified that Larry Franco was smart and popular in high school but made bad choices and ended up dealing drugs. (*Id.* at 37–40.) Larry stole from Freddie and made violent threats against Freddie and his family. (*Id.* at 43.)

Freddie testified that Garza was a "good kid," "quiet and nice," "polite," "real helpful," and respectful. (*Id.* at 45.) Toward the time of his arrest, however, Garza had "seemed a little withdrawn and talking slow and just kind of quiet." (*Id.* at 47.) Freddie suspected Garza might have been using drugs. (*Id.*)

Freddie testified that he "couldn't believe it" when he found out Garza had been arrested for murder. (*Id.* at 48.) He didn't think Garza "was capable of that." (*Id.*) Freddie wouldn't have been surprised to learn that Larry Franco had been involved in Ellen's murder because Larry "is capable of anything." (*Id.* at 49.)

The next mitigation witness was Cassie Hayes, who owned a business, Premier Fundraising, that worked with schools. (*Id.* at 84.) She got to know the Garza family through Sally's involvement with the PTA. (*Id.*) Garza worked for Premier for five or six years. (*Id.* at 85.) Hayes described him as "a very family-oriented and friend-oriented type individual, and everybody is his cousin and his friend and his best buddy. He's always trying to help people." (*Id.*) He was "one of the very best" employees she ever had. (*Id.*) He cared about what he was doing, cared about the people around him, never uttered a curse word or belittled his sisters, and was never negative towards anyone. (*Id.* at 87.) He was protective of Hayes and her elderly parents, even accompanying them to a pizza restaurant one Saturday night after Hayes's mother had been attacked there the previous week. (*Id.* at 87–88.) He was trustworthy and generous to the point of being taking advantage of, volunteering to do other employees' work and doing jobs for other people without being paid. (*Id.* at 88.) Although Garza developed a system to track stock and was well organized, Hayes believed he had problems reading, concentrating, and "staying with" the book. (*Id.* at 90.) Hayes also described an incident in Bagdad, Arizona, where Garza was beaten with a baseball bat while trying to protect other kids. (*Id.* at 91.)

Peggy Moodey, an employee of Premier Fundraising, testified that Garza was helpful and kind to coworkers and an "admirable employee" who represented the company well. (*Id.* at 104.) She testified that Sally Garza had related to her the story of Garza Sr. beating Garza up and Garza telling his dad to go ahead and kill him. (*Id.* at 104.) Moodey

testified that Ruben Sr. had difficulty accepting that Garza's severe asthma "curtailed his activities," and believed the condition made Garza "weak in some respects." (*Id.* at 106.) She testified that with respect to his family Garza was "an extremely loving, giving individual," always asking how he could help. (*Id.*) On cross-examination she testified that Garza never exhibited any signs of alcoholism. (*Id.* at 113–14.)

Ruben Garza Sr. was the next mitigation witness. (RT 9/14/04 at 5.) He testified that Garza's severe asthma, and the treatments and hospitalizations, took a toll on Garza's school performance. (*Id.* at 8.) He believed Garza faced certain challenges and obstacles growing up and "was going to have a difficult time trying to survive. He was just a simple big-hearted kid, and I knew it was going to be tough on him." (*Id.* at 12.) Garza "just believed everybody was his friend, and . . . I could see that he was an easy target for somebody to use." (*Id.*) Garza Sr. worried that Garza would be taken advantage of. (*Id.* at 18.) He warned Garza to stay away from Larry Franco, who would call and page Garza, and told Garza that Franco "was not any good." (*Id.*) He thought that Franco might be trying to get money out of Garza. (*Id.*) Garza Sr. testified that Garza was generous and "would give the shirt off his back." (*Id.* at 19.) Garza was a hard worker, always ready to help out. (*Id.*) Garza Sr. testified that Garza was "scammed out" of a lot of money when he tried to get his vehicle repaired. (*Id.* at 20.)

Garza Sr. testified that he did not suspect Garza had an alcohol problem and was not aware of any family history of alcohol abuse. (*Id.* at 20–21.)

Garza Sr. also testified that he sometimes disciplined Garza by "whipping" him. (*Id.* at 21–22.) He acknowledged that he and Garza had gotten into a physical altercation when Garza was 16. (*Id.* at 23.) Garza Sr. knocked Garza down and put his foot on Garza's chest, telling him not to get up. Garza "said something to the effect of, why don't you just kill me or leave me alone." (*Id.*)

Garza Sr. testified that in the year leading up to the murders Garza lived with friends and stayed with his grandmother a couple of times while Larry Franco was also living there. (*Id.* at 24.) He testified that there "was a conflict between Larry and Ellen all the

time" and "they would be fighting." (*Id.* at 25.) "Larry was always calling Ruben . . . asking him to help him get back to her." (*Id.*)

Garza's four younger sisters testified. They all described the problems Garza experienced due to his asthma. They all testified that Garza had had one girlfriend and was upset when the relationship ended.

Angela, the oldest sister, testified that after their parents separated Garza "would just try to help out a lot and asked us if we needed anything, like try to give use money if we needed it." (*Id.* at 55.) She testified that Garza was a caring and helpful person. (*Id.* at 55–56.) He was also overly generous, and would always give rides to people even if they weren't his friends. (*Id.* at 57.) Angela knew that Garza drank alcohol, and recounted an incident where he was so drunk when he came home that he had to be helped to bed. (*Id.* at 59.) She also heard Garza talk about drinking alone. (*Id.* at 59–60.) Angela described an occasion when she was at a friend's house with some other girls and Garza came to pick her up. The girls would not let him inside until they learned that he had brought pizzas. (*Id.* at 73.) Angela observed him being taken advantage of on other occasions as well. (*Id.* at 73–74.)

Sarah, the second oldest daughter, had also worked at Premier Funding and testified that Garza was regarded as a model employee. (*Id.* at 79.) She knew Garza drank and she saw him drunk on occasion. (*Id.* at 79, 94.) She testified that Garza did not have a lot of close friends in high school and was self-conscious because of his acne. (*Id.* at 79–80.) She described Garza as "caring, generous, loving," and not a violent person. (*Id.* at 82.)

Finally, Amanda and Jessica, the younger daughters, testified. Amanda described Garza as being "very nice" to other people. (*Id.* at 98.) "He would . . . give anybody anything." (*Id.*) She testified that their parents' divorce was hard on Garza. (*Id.* at 99.) He became more protective of his sisters and tried to be "the man of the house." (*Id.*) Amanda observed Garza drink alcohol while he was in high school and saw him when he was under the influence. (*Id.* at 102.) He would come home and pass out in the living room. (*Id.*) She testified about the incident when Garza had cut himself, stating it "looked pretty bad." (*Id.*

at 103.) He was drunk and passed out after his mom brought him home. (*Id.*) Amanda testified that Garza had difficulty being accepted by people because of his low self-esteem and had a hard time making friends because of his braces, big glasses, and acne. (*Id.* at 104.) He tried to make friends by giving people rides or money. (*Id.* at 105.) People took advantage of him. (*Id.*) Amanda recalled that Garza and Ellen Franco were nice to each other and "really enjoyed each other's company." (*Id.* at 107.)

Jessica, the final mitigation witness, testified that she saw Garza under the influence of alcohol a "couple times" but didn't believe he had a problem. (*Id.* at 126.) However, she described seeing empty bottles in his room, beer bottles and maybe a tequila bottle. (*Id.* at 127.) She never saw Garza act violently or even "come close" to hitting anybody. (*Id.*)

The State called no witnesses. Dupont then delivered his closing argument, which the Court will discuss below.

As discussed previously, defense counsel decided to forego the presentation of expert mental health testimony in order to avoid having Garza examined by an expert for the State. Before counsel made that decision, Garza had been evaluated by five experts: Dr. Jack Potts, a forensic psychiatrist; Drs. Weinstein, Thal, and Blackwood, who, as previously noted, administered IQ tests and other instruments; and Dr. Thomas Reidy, a clinical psychologist.

The trial court granted Garza's motion for a competency screening under Rule 11 of the Arizona Rules of Criminal Procedure and appointed Dr. Potts to conduct the evaluation. (ROA 62, 73.) In his report, dated January 28, 2002, Dr. Potts determined that Garza was competent and that while "[h]e may have some symptoms of a Depressive Disorder, . . . they are not to an extent, at the present time, that will impair his effectively assisting his attorney in his defense." (Doc. 38-2, PCR Pet., Ex. 142 at 3.) Dr. Potts also opined that a more extensive evaluation was not warranted. (*Id.*)

Dr. Weinstein administered tests in January 2003 showing Garza had a full-scale IQ of 81. (Docs. 38-4, 38-5, PCR Pet., Ex. 48.) In a letter dated January 27, 2003, Dr. Weinstein recommended additional testing due to the disparity between Garza's verbal and

nonverbal skills. (Doc. 38-7, PCR Pet., Ex. 152.) He also recommended, based on Garza's "reported psychotic symptoms, suicidal ideation and a history of alcohol intoxication and blackouts," that Garza be evaluated by a psychiatrist. (*Id.*)

Dr. Thal administered an IQ test in August 2003, which resulted in a full-scale score of 99. (Doc. 38-8, PCR Pet., Ex. 155.)

In November 2003, Dr. Blackwood conducted a neuropsychological examination, which included a review of previous test scores, a review of Garza's school records, an interview with Garza, and the administration of an IQ test. (Doc. 38-8, PCR Pet., Ex. 154.) Dr. Blackwood determined that Garza's full scale score was 102. (*Id.*; Doc. 38-6, PCR Pet., Ex 64, ¶ 9.) The results of Dr. Blackwood's exam were "generally negative from the standpoint of any significant psychological impairment." (*Id.* at 6.)

Dr. Blackwood also administered the Millon Clinical Multiaxial Inventory ("MCMI-III"), a personality questionnaire, which resulted in showings of significant elevations on scales related to anxiety and dysthymia; paranoid delusions; avoidant, depressive, and passive-aggressive characteristics; and schizotypal, borderline, and paranoid tendencies. (Doc. 38-8, PCR Pet., Ex. 154 at 3–4.) Dr. Blackwood opined that Garza's responses "certainly suggest the need for additional psychiatric investigation." (*Id.* at 4.)

Finally, Dr. Reidy, who was retained to "conduct a development assessment to determine themes that might have been helpful during the mitigation phase," interviewed Garza, reviewed background information and previous evaluations, and produced a report dated April 12, 2004.[41] (*See* Doc. 38-5, PCR Pet., Ex. 67, ¶¶ 2, 6.) The report included an "assessment of adverse experiences that Ruben experienced," such as "drug and alcohol abuse from an early age" and "other parent, family, and community corruptive influences." (*Id.*, ¶¶ 5, 6.)

  b.    PCR proceedings

---

[41] Dr. Reidy's report is contained in a letter to counsel dated April 12, 2004, which summarizes his findings and proposed mitigation-phase testimony. (ROA 382, Ex. B.)

During the PCR proceedings, Garza was evaluated by a new set of experts. As discussed above, Dr. Greenspan, in a report dated October 13, 2012, diagnosed Garza as intellectually disabled. (Doc. 38-5, PCR Pet., Ex. 47.)

PCR counsel retained also Dr. Julian Davies, a pediatrician and expert in Fetal Alcohol Syndrome. In a declaration dated October 18, 2012, Dr. Davies diagnosed Garza with Neurobehavioral Disorder (Alcohol-Exposed), or Alcohol Related Neurodevelopmental Disorder ("ARND"), which is one of the FASD disorders. (Doc. 38-5, PCR Pet., Ex. 51 at 7–8.)

Dr. Davies explained that the diagnosis was supported by three factors. First, there was a "history of prenatal alcohol exposure in pregnancy." (*Id.*) This history consisted of "maternal report and observer corroboration of prenatal alcohol exposure on at least 2–3 occasions during pregnancy," the occasions being the date of conception, the wedding day (during the second trimester), and New Year's (third trimester). (*Id.* at 2.)

The second factor was "notable impairments in three domains of brain function." (*Id.* at 7.) In Garza's case, these impairments included a verbal IQ in the 70s, borderline working memory scores, a statistically significant split between verbal and non-verbal intelligence, relative weakness in mental "switching" tasks, and a history of academic difficulties. (*Id.*)

The third factor was "a pattern of social, adaptive, gullibility, and judgment difficulties with associated secondary disabilities and a notable discrepancy between testing scores, grades, and life trajectory." (*Id.* at 8.)

Also during the PCR proceedings, Dr. Barry Morenz performed a psychiatric examination of Garza. In his report, dated October 13, 2012, Dr. Morenz diagnosed Garza with depressive disorder not otherwise specified ("NOS"), alcohol abuse in a controlled environment, and reading disorder, along with personality disorder NOS with schizotypal and borderline features. (Doc. 38-5, PCR Pet., Ex. 49 at 19.) Dr. Morenz explained that "[p]eople with personality disorders have enduring patterns of maladaptive and self-defeating behaviors usually first evident in adolescence. They have a narrow range of

1    coping strategies . . . [a]nd they use the limited strategies they do have in an inflexible

2    maladaptive fashion." (*Id.* at 21.) Dr. Morenz opined that although Garza "does not meet

3    the full criteria for a borderline personality disorder diagnosis," he has "characteristics

4    typical of people with the diagnosis," including his "desperate efforts to have others

5    approve of him," "recurrent suicidal thoughts and some attempts," and "his alcohol abuse

6    and excessive spending to secure interpersonal relationships." (*Id.* at 21–22.)

7        Finally, Roger Nelson, a substance abuse counselor, prepared an evaluation dated

8    May 21, 2012. (Doc. 38-5, PCR Pet., Ex. 50.) Garza's scores on the instruments Nelson

9    used indicated "hazardous drinking or alcohol dependence" and a fifty percent probability

10   of alcoholism. (*Id.* at 6.) Nelson opined that Garza was "genetically predisposed to

11   alcoholism as evidenced by the history of his extended family and that he crossed the line

12   into active alcoholism within a very short time after starting to drink." (*Id.* at 7.) According

13   to Nelson, Garza's alcoholism fit the "Stress Model," where a genetic predisposition is

14   "coupled with significant life stressors that trigger the onset of the active disease." (*Id.* at

15   6.) In Garza's case, these stressors included severe asthma, physical and emotional abuse

16   by his father, emotional abuse from peers, and severe acne. (*Id.*) Nelson also described the

17   "pathological pattern" of Garza's alcohol use, which consisted of increasing tolerance,

18   drinking in the morning, drinking alone, and drinking to cope with life. (*Id.*)

19       2.    *PCR court's decision*

20       In his PCR petition, Garza alleged that trial counsel failed to develop and present

21   all relevant mitigation evidence. (PCR Pet. at 49.) Specifically, he claimed that counsel

22   failed to develop and present evidence of Garza's intellectual disability and low IQ; failed

23   to investigate evidence of FASD; failed to develop evidence of Garza's gullibility; failed

24   to secure an expert and present evidence of Garza's alcoholism and drug abuse; and failed

25   to investigate, develop, and present mitigating mental health evidence. (*Id.* at 49–61.)

26       The PCR court denied the claims without a hearing. The court ruled as follows:

27       Defendant next claims that counsel failed to develop all relevant mitigation
28       evidence. Defendant presented mitigation evidence over the course of seven

full days of trial. . . . He called 27 witnesses, whose testimony was uncontroverted by the State, other than in cross-examination. The testimony included evidence about the Defendant's age, maturity and judgment, his lack of a criminal record or a violent history, his being under unusual and substantial stress, his mental state at the time of the offense, his minor participation in the offense, his positive relationships with family, friends and the community, his physical health, and his good character up to the time of the offense. As Defendant concedes in his Petition, "[t]here was substantial mitigation evidence in the trial record." Petition, p. 16.

Defendant further alleges that counsel failed to investigate and present evidence of his mental retardation, low intelligence, fetal alcohol spectrum disorder ("FASD"), gullibility, alcoholism and substance abuse, and other mental health evidence. As noted, the record shows most of this evidence was presented through various witnesses. Evidence of Defendant's low functioning was presented in mitigation, as was his gullibility and susceptibility to being manipulated. A number of witnesses also testified about Defendant's heavy drinking and drug use. As shown by their affidavits, counsel were hampered in further developing Defendant's alcohol and drug use, and mental health evidence, by Defendant's reluctance to acknowledge his heavy drinking and drug use, and his refusal to submit to an examination by a State's expert. . . . Given these circumstances, Defendant has failed to state a colorable claim that his counsel's performance was deficient, and also has not demonstrated prejudice.

(PCR Ruling, ME 7/29/13, at 7–8.)

The PCR court also noted that "counsel's efforts resulted in the judge dismissing the (F)(6) heinous/cruel/depraved aggravator, . . . the jury rejecting the (F)(5) pecuniary gain factor," and the jury declining "to impose death as to one of the victims." (*Id.* at 5.) The court concluded that "a review of the record reveals defense counsel's aggressive efforts . . . to identify and disclose mitigation." (*Id.*)

### 3.   *Garza's arguments*

Garza claims that the PCR court's decision satisfies § 2254(d)(1) and (2) and therefore this Court's review of Claim 7(A) is de novo. (Doc. 27 at 149–50.) He contends that the PCR court's analysis of both the deficient performance and prejudice prongs of *Strickland* "rested on unreasonable determinations of fact" that were "derived from a defective fact-finding process" and unsupported by the record. (*Id.* at 151–52.) He argues

1    that the PCR court mischaracterized the record by minimizing the discrepancy between the
2    evidence developed during the PCR proceedings, including evidence of intellectual
3    disability and FASD and the extent of Garza's alcohol abuse, and the evidence presented
4    at trial. (*Id.* at 153–55.) Garza alleges that three factual findings by the PCR court were
5    unsupported by substantial evidence and therefore unreasonable: that Garza's IQ scores
6    prohibited a finding of intellectual disability; that Garza refused to submit to a mental
7    health examination by a State expert; and that Garza was reluctant to acknowledge the
8    extent of his alcohol and drug abuse. (*Id.* at 156–58.)

9        Garza further argues that the PCR court's determination that he had not established
10   deficient performance or prejudice was contrary to or an unreasonable application of
11   *Strickland*. (*Id.* at 159–62.) He contends that the PCR court failed to properly evaluate the
12   reasonableness of counsel's decisions and did not engage in the appropriate weighing
13   process when determining prejudice. (*Id.*)

14       *4.    Analysis*

15       Because the following claims were denied on the merits by the PCR court, the
16   Court's analysis takes place under the "doubly deferential" standard required by *Strickland*
17   and AEDPA. *Richter*, 562 U.S. at 105; *Mirzayance*, 556 U.S. at 123.

18       a.    FASD

19       In Claim 7(A)(4)(b), Garza alleges that counsel provided ineffective assistance by
20   failing to investigate, develop, and present evidence of his FASD. (Doc. 27 at 166.) As
21   noted, in 2012 Dr. Davies diagnosed Garza with ARND, an FASD disorder.

22       Garza first asserts that "[t]rial counsel never followed up on Garza's mother's
23   noncommittal response when first asked whether she drank alcohol during her pregnancy."
24   (Doc. 27 at 167.) For this proposition he cites Dr. Davies's 2012 report. Garza does not
25   explain how trial counsel could have "followed up on" information offered eight years after
26   Garza's trial. In his reply brief, Garza cites a declaration from Debbie Robles, a friend of
27   Sally Franco, who states that she and Sally partied together and got drunk "about four

28

times" during the summer of 1979, presumably while Sally was pregnant with Garza. (Doc. 38-6, PCR Pet., Ex. 114, ¶ 5.) This declaration, however, also dates from 2012.

Garza next argues counsel were not only obligated to "investigate Garza's life from the time of conception," but were "in fact on notice that Garza quite likely had FASD." (Doc. 27 at 169.) Garza asserts that his "social deficits," including gullibility and difficulty reading social cues, were "strongly suggestive of FASD," as was the discrepancy between his verbal and performance IQ scores and the "secondary difficulties" he experienced, including early alcohol abuse and mental health issues. (*Id.* at 169–71.)

In arguing that trial counsel were not ineffective for failing to investigate FASD, Respondents cite Garza's concession that "FASD may not have been immediately discernible for counsel." (Doc. 37 at 251) (quoting Doc. 27 at 171). They also note Dr. Davies's observation that Garza does not have the "face of FAS." (*Id.*) (citing Doc. 38-5, PCR Pet., Ex 51 at 8.) While those points are relevant, more significant is the fact that none of the five mental health professionals retained by trial counsel suggested that Garza suffered from FASD. In 2003, Garza was evaluated by a psychiatrist (Dr. Potts), two neuropsychologists (Drs. Weinstein and Blackwood), and two psychologists (Drs. Thal and Reidy). While neuropsychologists Weinstein and Blackwood recommended further psychiatric testing, they did not flag FASD as an issue to be investigated, even though both were aware of the discrepancy in Garza's verbal and performance IQ scores and both had noted Garza's alcohol abuse and depression. Garza has not suggested that any of these experts was unqualified.

Where counsel have retained qualified mental health experts, they are "entitled to rely on the opinions of [those] experts" in deciding what defense to pursue. *Williams*, 384 F.3d at 610 (quoting *Hendricks v. Calderon*, 70 F.3d 1032, 1038 (9th Cir. 1995)); *Crittenden v. Ayers*, 624 F.3d 943, 966 (9th Cir. 2010) ("That none of [his mitigation experts] happened to unearth the particular line of mitigating evidence Crittenden now presents does not compel the conclusion that the investigation was deficient."). "It is certainly within the 'wide range of professionally competent assistance' for an attorney to

1    rely on properly selected experts." *Harris v. Vasquez*, 949 F.2d 1497, 1525 (9th Cir. 1990)

2    (quoting *Strickland*, 466 U.S. at 690). Because Dupont and Cleary reasonably relied on the

3    information obtained from their experts, they did not perform ineffectively in failing to

4    pursue a diagnosis those experts did not provide.

5          In addition, as the PCR court noted, trial counsel did present mitigating evidence of

6    Garza's gullibility, social awkwardness, academic struggles, alcohol abuse, and

7    depression. This presentation of evidence consistent with the effects of FASD reduced any

8    potential prejudice from the omission of the FASD diagnosis itself. *See Williams v.*

9    *Calderon*, 52 F.3d 1465, 1471 (9th Cir. 1995) (finding no prejudice where counsel did not

10    offer any mitigating evidence in penalty phase and did not present evidence of petitioner's

11    fetal alcohol syndrome where sufficient mitigating evidence was presented in guilt phase).

12          Under these circumstances, counsel did not perform ineffectively by failing to

13    investigate and present evidence of FASD. *See Garza v. Stephens*, 738 F.3d 669, 681 (5th

14    Cir. 2013) (finding counsel did not perform ineffectively in failing to investigate and

15    present evidence of possible fetal alcohol syndrome where family members did not

16    mention mother's alcohol abuse and previous psychological evaluations did not note the

17    issue). The PCR court's denial of the claim was not contrary to or an unreasonable

18    application of *Strickland*, nor was it based on an unreasonable determination of the facts.

19    Applying the doubly deferential standard required by AEDPA and *Strickland*, the Court

20    finds that Garza is not entitled to relief on this claim. *See Richter*, 562 U.S. at 105;

21    *Mirzayance*, 556 U.S. at 123. Claim 7(A)(4)(b) is denied.

22                 b.    Intellectual disability

23          In Claim 7(A)(4)(c), Garza alleges that counsel performed ineffectively by failing

24    to investigate, develop, and present evidence of his intellectual disability and low

25    intelligence. (Doc. 27 at 173.)

26          This claim is meritless. Counsel cannot be said to have failed to investigate Garza's

27    low intelligence when they retained three experts who administered IQ tests to assess

28

precisely that issue. As discussed above, and as the PCR court correctly found, the results of those tests did not support a finding that Garza was intellectually disabled.

In addition, during the mitigation hearing counsel did present evidence of Garza's slowness and academic struggles. Witnesses, including Garza's mother, testified that he had trouble with reading, concentration, and comprehension and that he struggled with his grades in high school and required additional help. (*See, e.g.*, RT 9/9/04 165, 172; RT 09/13/04 at 90.) In his opening statement, counsel described Garza as "not the brightest guy in the world" and noted that he needed extra help to graduate from high school. (RT 9/7/04 at 42.)

Counsel's handling of this issue was neither deficient nor prejudicial. The PCR court's denial of the claim was not contrary to or an unreasonable application of *Strickland*, nor was it based on an unreasonable determination of the facts. *See Richter*, 562 U.S. at 105; *Mirzayance*, 556 U.S. at 123. Claim 7(A)(4)(b) is denied.

### c.     Mental health evidence and examination by State's expert

In Claim 7(A)(4)(d), Garza alleges that counsel performed ineffectively by failing to investigate, develop, and present mental health evidence at sentencing. (Doc. 27 at 180.) In Claim 7(A)(4)(e), he alleges that counsel performed ineffectively by refusing to permit the State's expert to examine him, which resulted in the preclusion of expert testimony on his behalf. (*Id.* at 184.)

These claims, which the PCR court denied on the merits, do not entitle Garza to relief. The record shows that counsel's decisions with respect to expert testimony were strategic, and Garza has not overcome the "strong presumption" that such decisions represented "sound trial strategy." *Strickland*, 466 U.S. at 689; *see id.* at 690 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.").

As outlined above, before trial the State argued that if the defense planned to present mental-health evidence in mitigation, an expert for the State should be allowed to examine Garza as well. (*See* RT 5/18/04 at 43–45.) The defense countered that their expert, Dr.

Reidy, had conducted no testing and therefore the State's expert should be also precluded from performing any tests. The defense also asserted that Garza's Fifth Amendment privilege against self-incrimination applied during any examination by the State. (*Id.* at 46–48.) The Court granted the State's motion to examine Garza and denied Garza the right to assert his privilege against self-incrimination. (ROA 377 at 3.) The defense objected to the court's ruling on Fifth Amendment grounds. (RT 5/26/04 at 31; *see* ROA 382 at 2.)

While Garza's trial was proceeding, the Arizona Supreme Court issued its decision in *Phillips v. Araneta*, 208 Ariz. at 283, 93 P.3d at 483, holding that a defendant who puts his mental health at issue could be compelled to undergo an examination by an expert for the State but would retain his privilege against self-incrimination. After discussing the issue with the parties, the trial court ordered Garza to submit to an examination by the State's expert, adding that "if the defendant were to talk about the crime with the State's . . . expert, . . . his statements could only be used in the penalty phase and could not be used for any other purpose." (RT 7/1/04 at 149.) The defense maintained its position that Garza would not subject himself to an evaluation by the State's expert, again arguing that Dr. Reidy himself had conducted no diagnostic or other testing and also citing the State's previous "bad faith" and "disingenuous" use of information Garza had provided in a "free talk" with the prosecution.[42] (*Id.* at 142–43; *see* RT 9/2/04 at 20–21.) The Court ultimately precluded Garza's mental health evidence, including the testimony of Dr. Reidy. (RT 9/2/04 at 21.)

Garza was examined by several mental health professionals before counsel made their decision to rely on Dr. Reidy as a "global mental health expert" for purposes of mitigation. (Doc. 38-5, PCR Pet., Ex. 60, ¶ 42.) Dr. Reidy was asked to evaluate Garza by reviewing records and prior evaluations and to assess Garza's "protective factors and risk factors," overall functioning and mood, vulnerability, and susceptibility to influence. (*Id.*,

---

[42] Counsel told the court that immediately after the free talk, agents for the State contacted people disclosed by Garza and obtained information that could be used against Garza if he testified and as "rebuttal to mitigation." (RT 7/1/04 at 142–43.)

¶ 43.) Counsel decided to develop the mitigation themes presented in Dr. Reidy's report.[43] (*Id.*, Ex. 52, ¶ 7.)

Counsel told Dr. Reidy not to do any independent testing, in particular not to perform personality assessments such as the MMPI and PCL-R.[44] (*Id.*, Ex., 60, ¶ 44.) Counsel likewise had not asked Dr. Blackwood to do any personality testing, and therefore were surprised to learn that he had administered the MCMI. (*Id.*, ¶ 46.) Dr. Blackwood's recommendation for additional psychiatric testing was based on the results of the MCMI. (*Id.*)

Citing Dr. Blackwood's report, Cleary "believe[d] that we talked at some point about the issue of having a psychiatrist examine Ruben." (Doc. 38-5, PCR Pet., Ex. 52, ¶ 7.) Dupont remembered "speaking generally with [mitigation specialist] Dawn Whitt . . . about avoidant personality disorder and whether it might be applicable to Ruben" but did not remember if they discussed the issue with Drs. Reidy or Blackwood. (*Id.*, Ex. 53, ¶ 12.)

Dupont did "not remember that there was anything striking about the evaluations produced by Drs Weinstein, Thal, and Blackwood" and "[a]t some point decided to address the issues raised in their evaluations through lay witnesses as opposed to introducing [their] results or having them testify as expert witnesses." (*Id.*, ¶ 11; *see id.*, Ex. 52, ¶ 7.)

---

[43] In his report, Dr. Reidy detailed the following "adverse developmental experiences" in Garza's life: disturbed parenting and impaired attachments; child maltreatment; disturbed identity; body image challenges, limited vitality, and chronic illness; school instability; corruptive family and community influences; childhood onset alcohol and drug abuse; association between intoxication and maladjustment; other developmental disruptions; and the impact of youthfulness on behavior and judgment. (ROA 382, Ex. B at 2–5.) Dr. Reidy then described Garza's "positive character evidence and attributes," including positive social bonding to family; generosity; respectfulness of adults; never being a troublemaker at school; empathy and supportiveness of others; work ethic and work record; financial responsibility; loyalty; and lack of criminal record or history of delinquency or violence. (*Id.* at 5–6.)

[44] "Minnesota Multiphasic Personality Inventory" and "Psychopathy Checklist–Revised."

Counsel argued to the trial court that the report written by Dr. Reidy "could not fairly be characterized as a psychological evaluation." (*Id.*, Ex. 53, ¶ 10; *see* RT 7/1/04 at 141.) Dupont explained that "[w]ith respect to not having Reidy testify and not making Garza available to be interviewed by the State's mental health expert, [counsel] were focused on how helpful Reidy would be as a [sic] and other factors." (*Id.*, ¶ 10.)

Counsel chose not to pursue additional psychiatric evaluations or to investigate the issue of possible personality disorders, despite recommendations from Drs. Weinstein and Blackwell. Counsel also chose not to present expert testimony during their mitigation case. The record reveals that these decisions were strategically reasonable.

Counsel's shift of focus away from expert testimony about mental health diagnoses and toward lay testimony about the adverse experiences that affected Garza and his positive character traits was a reasonable decision arrived at after extensive investigation into mental health issues. In arguing otherwise, Garza cites *Correll v. Ryan*, where the court noted that an "uninformed strategy is not a reasoned strategy." 539 F.3d 938, 949 (9th Cir. 2008). In *Correll*, counsel's mitigation strategy, which was to seek good character evidence but ultimately to present no mitigation case at all and to rely entirely on information in a presentence report, was uninformed because counsel failed "almost complete[ly]" to investigate an "abundance of classic mitigation evidence," which included Correll's drug use, head injuries, psychiatric history, and family dysfunction. *Id.* at 944–46. In Garza's case, counsel's decision to use lay testimony to show the adversity Garza had faced and his many good qualities was arrived at only after counsel had fulfilled their duty of "inquir[ing] into [Garza's] social background, including investigation of any family abuse, mental impairment, physical health history, and substance abuse history." *Id.* at 943 (citing *Summerlin v. Schriro*, 427 F.3d 623, 630 (9th Cir. 2005)).

Garza also cites *Daniels v. Woodford*, 428 F.3d 1181, 1204 (9th Cir. 2005), but that case too is distinguishable because of the omissions in counsel's mitigation investigation. Counsel there not only failed to follow up on a preliminary psychological examination suggesting Daniels suffered from schizophrenia and paranoia, but also failed to review

1    Daniels's family and social history or prison hospital records indicating that Daniels was

2    mentally ill and at risk of experiencing a psychotic episode. *Id.* at 1204. Garza's counsel,

3    by contrast, relied on testing by more than one mental health expert and fully investigated

4    Garza's family and social history.

5         The performance of Cleary and Dupont was similar to that of the defense in *Raley*

6    *v. Ylst*, 470 F.3d 792, 801–03 (9th Cir. 2006), where counsel retained three separate mental

7    health experts to interview the defendant, provide a report, and possibly testify at trial. The

8    reports were not helpful to the defendant's case, however, and counsel decided not to

9    present their testimony, relying instead on the "lay testimony of Petitioner's father and

10   sister as the means of informing the jury of Petitioner's history of abuse." *Id.* at 802. On

11   habeas review, the Ninth Circuit concluded that this was a reasonable strategic decision

12   made after a "reasonable investigation" and did not constitute ineffective assistance of

13   counsel. *Id.*

14        Garza further argues that '[b]inding precedent . . . instructs that counsel cannot

15   reasonably ignore the explicit recommendations of mental-health experts." (Doc. 44 at 91.)

16   He cites *Bean v. Calderon*, where the court faulted counsel for their delay in pursuing the

17   testing recommended by their experts and their failure to provide the experts with "other

18   necessary information." 163 F.3d 1073, 1078 (9th Cir. 1998). The result of these

19   deficiencies was a "woefully ineffective" if not "deleterious" mitigation case. *Id.* at 1079.

20        *Bean* is inapposite. Counsel's performance there bears no similarity to the

21   performance of Garza's counsel. One of Bean's attorneys, appointed just a month and a

22   half before sentencing began, "engaged in no preparation for the penalty phase and

23   conducted no investigation of penalty-phase issues" while the other "virtually abdicated

24   responsibility for the penalty phase" in the mistaken belief that he was prohibited from

25   participation. *Id.* at 1078. Garza's counsel, by contrast, investigated and presented a

26   substantial case in mitigation based in part on the factors identified by their expert, Dr.

27   Reidy.

28

More importantly, neither *Bean* nor any other case holds that counsel have a duty to follow the recommendations of experts if counsel decide, after reasonable investigation, not to pursue a mental health strategy. *See Strickland*, 466 U.S. at 691 ("[A] particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."). "While a lawyer is under a duty to make reasonable investigations, a lawyer may make a reasonable determination that particular investigations are unnecessary." *Leavitt v. Arave*, 646 F.3d 605, 609 (9th Cir. 2011) (quoting *Babbitt*, 151 F.3d at 1173, and citing *Cullen v. Pinholster*, 563 U.S. 170, 194–96 (2011)). The Supreme Court has "emphasize[d] that *Strickland* does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing. Nor does *Strickland* require defense counsel to present mitigating evidence at sentencing in every case." *Wiggins*, 539 U.S. at 533. It follows that there is no obligation under *Strickland* to offer expert mental health evidence in mitigation.

In *Pinholster*, the Supreme Court found that the state court reasonably denied an ineffective assistance of counsel claim where counsel presented only one mitigation witness, the defendant's mother "who gave a detailed account of Pinholster's troubled childhood and adolescence," and chose to present neither the testimony of their expert, a psychiatrist who had diagnosed the defendant with antisocial personality disorder, nor other evidence of the defendant's abusive and deprived childhood. 563 U.S. at 190, 199. The Court found that the Ninth Circuit, in ruling otherwise, had failed to apply *Strickland*'s "strong presumption of competence." *Id.* at 196.

The *Pinholster* Court explained that assessing the reasonableness of counsel's decision to present a single lay witness at sentencing required the reviewing court "to affirmatively entertain the range of possible" reasons counsel proceeded as they did. *Id.* at 196. In contrast to *Pinholster*, some of the grounds for Garza's counsel proceeding as they did are present in the record. For example, counsel did not want Garza evaluated by a State expert when their own expert, Dr. Reidy, had not examined Garza, and they were concerned

1  that the prosecution would make inappropriate use of information gained in an examination
2  by such an expert. (*See* RT 7/1/04 at 142–43.) This strategic decision is presumed
3  reasonable. *See, e.g.*, *Lewis v. Dretke*, 355 F.3d 364, 366 (5th Cir. 2003) ("[D]efense
4  counsel made a strategic, informed decision to forego a psychiatric evaluation of Lewis to
5  avoid the testimony of the State's expert psychiatric witness on the special issue of future
6  dangerousness.") Another possible basis for the decision not to pursue further psychiatric
7  evaluations is counsel's reasonable wariness of a personality disorder diagnosis. Such a
8  diagnosis is not necessarily mitigating, nor was it necessary to the themes advanced in
9  Garza's mitigation case. *See, e.g.*, *Leavitt*, 646 F.3d at 611–12. Finally, the record shows
10 that counsel believed the topics developed by Dr. Reidy could be adequately presented
11 through lay testimony. (Doc. 38-5, PCR Pet., Ex. 53, ¶ 11; Ex. 52, ¶ 7.)

12      Garza has not rebutted the "strong presumption" that counsel's decisions
13 represented "sound trial strategy." *Strickland*, 466 U.S. at 689; *see Lang v. Bobby*, 889 F.3d
14 803, 815 (6th Cir. 2018) (finding petitioner "did not rebut the presumption that counsel
15 acted strategically" in relying on mitigating testimony from mother and sister and not
16 calling psychologist). As demonstrated by the mitigation evidence counsel did present,
17 consisting of twenty-seven witnesses over five days of testimony, this is not a case where
18 counsel "abandoned their investigation of [Garza's] background after having acquired only
19 rudimentary knowledge of his history from a narrow set of sources." *Wiggins,* 539 U.S. at
20 524; *see Sears v. Upton*, 561 U.S. 945, 952 (2010) (agreeing with state court that the "the
21 cursory nature of counsel's investigation into mitigation evidence—'limited to one day or
22 less, talking to witnesses selected by [defendant's] mother'—was 'on its face . . .
23 constitutionally inadequate'").

24      Again, Garza argues that counsel's investigation was incomplete and therefore
25 unreasonable because they did not follow through with the recommended psychiatric
26 evaluations. However, the decision not to pursue a psychiatric evaluation was arrived at
27 only after Garza had been evaluated by a psychiatrist, a psychologist, two
28 neuropsychologists, and by another psychologist who reviewed Garza's background and

1   the previous evaluations. The decision reflected counsel's strategic choice to pursue a case

2   that did not depend on expert testimony about Garza's mental health. *See Raley v. Ylst*, 470

3   F.3d at 801–02 (holding that decision not to present mental health experts was "an informed

4   tactical decision" made after "reasonable investigation," including reviewing findings of

5   three previous experts); *see also Leavitt*, 646 F.3d at 612.

6        Dupont and Cleary reached a point in their investigation of Garza's mental health

7   where they could "reasonably decide that another strategy [was] in order," thus making a

8   psychiatric evaluation unnecessary. *Pinholster*, 563 U.S. at 197. That strategic choice is

9   "accorded a high level of deference," *Fairbank v. Ayers*, 650 F.3d 1243, 1252 (9th Cir.

10  2011), to the point of being "virtually unchallengeable." *Strickland*, 466 U.S. at 690; *see*

11  *Cox*, 613 F.3d at 899. Garza has not shown that counsel's performance was deficient under

12  *Strickland*.

13       Garza's failure to establish deficient performance renders this claim meritless.

14  However, the Court has also considered the prejudice prong and found that it too remains

15  unsatisfied.

16       First, counsel did present, through the testimony of the lay witnesses, the adverse

17  developmental factors and the positive character traits that were detailed in Dr. Reidy's

18  report and that supported the mitigation theme that Garza was immature, naïve, easily

19  manipulated, and taken advantage of by Larry Franco who was the moving force behind

20  the murders.

21       Second, assuming that counsel had followed through on the recommended

22  psychiatric evaluation, with results reflecting the findings of Dr. Morenz, the omission of

23  testimony about such diagnoses did not prejudice Garza. Dr. Morenz opined that Garza

24  suffered from depressive disorder NOS and personality disorder NOS. With respect to the

25  latter condition, Dr. Morenz explained that it was manifested in Garza's "desperate efforts

26  to have others approve of him," "recurrent suicidal thoughts and some attempts," and

27  "alcohol abuse and excessive spending." (Doc. 38-5, PCR Pet., Ex. 49 at 21–22.) Again,

28

evidence of each of these phenomena was presented through the testimony of the lay witnesses.

Karen Thompson, Sally Garza, and Amanda Garza testified about Garza's suicide attempts and depression. (RT 9/8/04 at 147–48; RT 9/9/04 at 172–74; RT 9/13/04 at 135; RT 9/14/04 at 103.) Marina Hernandez and Michelle Alvarez also testified that Garza was down and depressed. (RT 9/9/04 at 32, 89.)

Several witnesses, including Laura Withey, Marina Hernandez, Michelle Alvarez, Cassie Hayes, Ruben Garza Sr., and Angela and Amanda Garza, testified about Garza's generosity, his attempts to win friends by giving away rides or money, and the fact that others took advantage of him. (*See* RT 9/8/04 at 123–24; RT 9/9/04 at 27–28, 90; RT 9/13/04 at 88; RT 9/14/04 at 12, 55, 57, 73, 104–05.)

Finally, several witnesses testified about Garza's alcohol abuse. Marina Hernandez testified that Garza drank a lot and she believed he was an alcoholic. (RT 9/9/04 at 26–27, 29.) He came to her apartment "really, really drunk." (*Id.* at 29.) Once he was "real sick" and started coughing up blood. (*Id.*) He drank tequila alone in his apartment. (*Id.* at 30.) Michelle Alvarez testified that Garza had problems with alcohol. He was very emotional and used alcohol to ease his problems. (*Id.* at 89.) Angela Garza testified that Garza told her he drank alone, and Amanda testified that Garza drank before school, was so drunk once that he could barely walk and had to be helped to bed, and passed out at home. (RT 9/14/04 at 59–60, 102–03.) Jessica Garza testified that she saw empty beer and tequila bottles in Garza's bedroom. (*Id.* at 127.)

Garza argues that the omitted testimony of Dr. Reidy and the absence of the diagnoses of an expert like Dr. Morenz prejudiced him because such evidence was necessary to "humanize" Garza and "for the jury to better understand [him]." (Doc. 27 at 183, 187.) The Court disagrees. Such evidence was not necessary to establish the adverse factors Garza faced growing up or his many good qualities, nor was expert testimony necessary to advance the mitigation theme that was Garza was immature, gullible, and easily manipulated by Larry Franco. *See Raley*, 470 F.3d at 802–03.

In *Raley*, the petitioner offered in mitigation a "mental defect defense" based on the abuse he suffered as a child. *Id.* at 802. His father and sister testified about the abuse. (*Id.*) He argued, however, that he was prejudiced by the "absence of an expert to explain the link between abusive treatment and Petitioner's subsequent mental state." *Id.* In finding that the petitioner was not prejudiced, the Ninth Circuit explained that expert testimony was not necessary because "the link between suffering abuse as a child and later committing abusive acts is not so esoteric as to be beyond the understanding of a lay jury." *Id.* at 803.

In Garza's case, neither depression nor alcohol abuse are beyond a lay juror's understanding, nor is a diagnosis of "borderline personality NOS" necessary for a jury to comprehend the causes and consequences of Garza's gullibility, eagerness to please, and susceptibility to manipulation by someone like Larry Franco. The humanizing effect of this evidence exists apart from any diagnosis, and the diagnoses themselves add little of explanatory value to the lay testimony about Garza's character and conduct. *See Strickland*, 466 U.S. at 676 (finding no prejudice from counsel's failure to call a psychiatric expert to testify that defendant was "chronically frustrated and depressed" due to his inability to support his family); *Henley v. Bell*, 487 F.3d 379, 388 (6th Cir. 2007) (finding no prejudice resulting from counsel's failure to call a psychiatric expert to testify that defendant had learning disabilities, had dropped out of school, and at the time of the offense was depressed and acting out of character).

There was not a reasonable probability of a different outcome at sentencing if counsel had presented Dr. Reidy as an expert witness or offered other mental health diagnoses such as those contained in Dr. Morenz's report.

The PCR court's denial of these claims was not contrary to or an unreasonable application of *Strickland* under § 2254(d)(1).

Garza also contends that the PCR court's decision was based on an unreasonable factual determination under 28 U.S.C. § 2254(d)(2). The court found that "counsel were hampered in further developing . . . mental health evidence, by Defendant's . . . refusal to

1   submit to an examination by the State's expert." (PCR Ruling, ME 7/29/13, at 8.) Garza

2   argues that the PCR court "unreasonably found that Garza refused to submit to the State's

3   mental health examination." (Doc. 27 at 157.) According to Garza, the decision was made

4   by counsel, not by Garza "of his own accord." (*Id.*)

5          A state court decision may rest on an unreasonable factual determination under §

6   2254(d)(2) where the court "plainly misapprehend[ed] or misstate[d] the record in making

7   [its] findings, and the misapprehension goes to a material factual issue that is central to the

8   petitioner's claim." *Taylor*, 366 F.3d at 1000. A factual determination is presumed correct,

9   however, and a petitioner bears the burden of overcoming that presumption with clear and

10  convincing evidence. *Miller-El I*, 537 U.S. at 340; 28 U.S.C. § 2254(e)(1).

11         The PCR court's statement is ambiguous. To the extent it can be read as finding that

12  Garza himself decided, "of his own accord," not to submit to an exam, the finding is not

13  supported in the record, which clearly shows that counsel were involved in the decision.

14  That is a strained reading of the PCR court's ruling, however, as there is no reason the court

15  would consider whether Garza made such a decision on his own, without the input of

16  counsel. In a more plausible interpretation, the PCR court found that Garza decided, on the

17  advice of counsel, not to submit to an evaluation by the State, and that decision limited the

18  mental health evidence counsel could develop and present in mitigation. With respect to

19  *that* finding, which is amply supported by the record, Garza has not overcome the

20  presumption of correctness with clear and convincing evidence. *See, e.g.*, *Lambert v.*

21  *Blodgett*, 393 F.3d 943, 980–84 (9th Cir. 2004) (finding district court failed to properly

22  apply presumption of correctness to state court's denial of ineffective assistance claims).

23         Applying the doubly deferential standard required by AEDPA and *Strickland*, the

24  Court finds that Garza is not entitled to relief on this claim. *See Richter*, 562 U.S. at 105;

25  *Mirzayance*, 556 U.S. at 123. Claims 7(A)(4)(d) and (e) are therefore denied.

26              d.     Alcoholism and substance abuse

27         In Claim 7(A)(4)(f), Garza alleges that counsel provided ineffective assistance by

28  failing to present expert testimony about his alcoholism and substance abuse. (Doc. 27 at

187.) Citing the findings of substance abuse counselor Nelson (Doc. 38-5, Ex. 50), Garza argues that an addiction expert could "have presented an infinitely clearer picture to the jury" about Garza's alcohol and substance abuse, which was the subject of inconsistent testimony at the mitigation hearing. (*Id.* at 188.) An expert could have accurately depicted addiction as a disease and "explained in clinical terms some of the key features of Garza's dependencies," including his use of alcohol to cope with life stressors and to function at school and socially. (*Id.* at 192.) Finally, expert testimony "would have conveyed to the jury how Garza's alcohol abuse, which was causing physical and moral deterioration, exacerbated his poor judgment and contributed to Garza going to the Rush residence on the night of the crimes." (*Id.*)

As just discussed, a number of mitigation witnesses testified about Garza's alcohol abuse. Marina Hernandez believed Garza was an alcoholic—he drank a lot, got sick on occasion, and drank alone. (RT 9/9/04 at 26–27, 29.) Michelle Alvarez testified that Garza had problems with alcohol and drank to ease his emotional problems. (*Id.* at 89.) Angela Garza testified that Garza told her he drank alone. (RT 9/14/04 at 59–60.) Amanda Garza testified that Garza drank before school and drank so much he passed out. (*Id.* at 102–03.) Jessica Garza testified that she saw empty alcohol bottles in Garza's bedroom. (*Id.* at 127.)

Other witnesses, however, including Garza's parents, were either unaware of his alcohol use or did not know the extent of his problem. (*See* RT 9/8/04 at 65, 135; RT 9/9/04 at 126, 146–47; RT 9/13/04 at 67, 113–14; RT 9/14/04 at 20–21, 126.)

In his closing argument at the mitigation-phase of trial, Dupont discussed Garza's alcohol abuse. He told the jury that Garza "made some poor choices with respect to drinking, and he wasn't handling his alcohol properly, and his judgment was poor with the way he treated himself as well." (RT 9/16/04 at 18.) He argued that Garza reached the point where he was suffering from "[f]ullblown alcoholism," citing testimony from Michelle Alvarez, Marina Hernandez, and Amanda Garza that Garza drank during the school day, drank alone to the point of intoxication, attempted suicide while drinking, and drank so

much he was unable to walk. (*Id.* at 22.) He noted that empty bottles were found in Garza's room. (*Id.*)

Dupont argued that alcoholics "hide their drug and alcohol usage from the people they are close to, the way Garza did by drinking alone." (*Id.* at 22–23.) He also pointed to evidence that Garza used drugs but argued that Garza "wasn't a druggy." (*Id.* at 24–25.) He suggested, however, that Garza may have been on methamphetamine at the time of the crimes, and that the drug had been supplied by Franco. (*Id.* at 30–31.) Finally, Dupont argued that Franco used Garza's susceptibility to alcohol as a way to manipulate him. (*Id.* at 40.)

In declarations prepared during the PCR proceedings, counsel discussed the issue of Garza's alcohol and drug use. Cleary stated that he and Dupont "were aware of Ruben's alcohol abuse and use of methamphetamine" and felt that the fact that Garza had meth in his pocket when he was arrested was "important information for mitigation purposes." (Doc. 38-5, PCR Pet., Ex. 52, ¶ 11.) Counsel "looked for additional evidence of Ruben's substance abuse problems to develop a theory either of addiction or present intoxication at the time of the homicides" but "did not come up with much additional evidence to support these theories." (*Id.*) Cleary also stated that he and Dupont "discussed the issue of whether to hire an addiction expert" but the discussions were limited because they had "difficulty getting factual support for Ruben's alcoholism as an initial matter." (*Id.*, ¶ 12.)

Dupont stated that the defense investigated Garza drug and alcohol use, spoke with Garza's family and friends about "any possible substance abuse problems," and "eventually confronted Ruben with evidence of his having sold marijuana and having been arrested with methamphetamine on his person." (*Id.*, Ex. 53, ¶ 26.) Garza "denied and minimized his drug use." (*Id.*) Dupont felt that Garza "could not admit his drug use to his family, in particular his father, because there was such a stigma associated with drug use." (*Id.*) Dupont noted that Garza "was willing to admit to his alcohol abuse readily, which was accepted by his father, but not to his drug abuse, which had been stigmatized by his father." (*Id.*)

Because of Garza's "reluctance to admit his drug use," counsel could not "establish a clear connection between Larry Franco and Ruben's drug use" and were unable to pursue their theory that Franco "had manipulated Ruben with drugs." (*Id.*, ¶ 27.) Dupont believed that evidence of Garza's intoxication on the night of the murders was an "important issue," but did not "recall the specifics of how we attempted to present that evidence at trial." (*Id.*, ¶ 29.)

Dupont recalled that "some witnesses testified that they were not aware that Ruben was an alcoholic." (*Id.*, ¶ 30.) Counsel considered not using Garza's alcoholism as mitigating evidence "because of the uncertainty and ambivalence of some of these witnesses" and because "much of the evidence of Ruben's alcoholism was self-reported," though Dupont did recall that Garza's mother found empty alcohol bottles under his bed. (*Id.*, ¶ 30.) Dupont added that "[w]ith respect to having Ruben testify to his alcohol use," counsel were "concerned that his testimony alone would not be sufficient." (*Id.*)

Dupont remembered asking Dr. Reidy to look into Garza's "possible drug addiction and/or alcoholism" and having "discussions about possible addiction and alcoholism experts." (*Id.*, ¶ 31.)

In her 2012 declaration, mitigation specialist Dawn Whitt stated that she and Dupont believed that methamphetamine addiction might have been an issue, but she "was not able to substantiate the pattern of use and symptoms of addiction that would have been necessary to argue methamphetamine addiction as a mitigating factor." (Doc. 38-5, PCR Pet., EX. 60, ¶ 49.) She also stated that it was "quite clear to all of us that Ruben abused alcohol." (*Id.*, ¶ 52.) However, while "[t]here was a great deal of substantiation from Ruben himself," Whitt "had a more difficult time finding evidence of this from lay witnesses. For example, one person would say he never drank, but another would say he drank all the time." (*Id.*) Whitt did not recall any discussions about hiring an addiction expert. (*Id.*, ¶ 52.)

Dr. Reidy, in his 2004 report to counsel, noted that Garza faced "risk factors" for substance abuse, including a genetic predisposition, with multiple members on both sides

of his family being alcoholics, and the "modeling of substance abuse and dependence" by older peers. (ROA 382, Ex. B at 4.) Garza began drinking at age 12 with his maternal grandfather and drank at family gatherings with his cousins and his uncle Larry Franco. (*Id.*) In junior high school, Garza drank to get drunk and thereafter engaged in "heavy daily drinking." (*Id.*) His tolerance increased and he experienced blackouts. (*Id.*) He tried to hide his alcohol abuse by drinking alone. (*Id.*) He carried a bottle of tequila in his car. (*Id.*) He began abusing methamphetamine in 11th grade, using it once every couple of months. (*Id.*) In his 2012 declaration, Dr. Reidy stated that he "considered drug and alcohol abuse from an early age to be a highly significant mitigating factor." (Doc. 38-5, PCR Pet., Ex. 67, ¶ 5.) Reidy "had collateral sources regarding Ruben's drug and alcohol use from Dawn Whitt and others." (*Id.*)

In denying this claim, the PCR court noted that a "number of witnesses testified about [Garza's] heavy drinking and drug use." (PCR Ruling, ME 7/29/13, at 8.) This is partly correct, as a number of witnesses did testify about Garza's alcohol abuse, but testimony about drug use was limited and vague. The court also found that counsel were "hampered" in developing further evidence of alcoholism and substance abuse by Garza's "reluctance to acknowledge his heavy drinking and drug use." (*Id.*) This too is only partly correct. According to the declarations of trial counsel, Garza was reluctant to admit to drug use but was willing to discuss his alcohol abuse. (*See* Doc. 38-5, PCR Pet., Ex. 53, ¶¶ 26–27; *see id.*, Ex. 60, ¶ 51.)

Given these mischaracterizations of the record, the Court will assume that the PCR court's ruling was based on an unreasonable determination of the facts under 28 U.S.C. §2254(d)(2). Review of this claim will therefore be de novo. Even under that standard, of course, *Strickland* places the burden on Garza to prove both deficient performance and prejudice.

To establish that counsel's performance was deficient, Garza must rebut the "strong presumption" that counsel's decisions represented "sound trial strategy." *Strickland*, 466 U.S. at 689. "The selection of an expert witness is a paradigmatic example of the type of

1    'strategic choic[e]' that, when made 'after thorough investigation of [the] law and facts,'

2    is 'virtually unchallengeable.'" *Hinton v. Alabama*, 571 U.S. 263, 275 (2014) (quoting

3    *Strickland*, 466 U.S. at 690); *see Floyd*, 949 F.3d at 1141.

4          Counsel considered retaining an addiction expert but ultimately decided against it.

5    (Doc. 38-5, Ex. 52, ¶ 12; *id.*, Ex. 53, ¶ 31.) The basis for that decision, according to Cleary,

6    was counsel's "difficulty getting factual support for Ruben's alcoholism as an initial

7    matter" and a lack of evidence that Garza was intoxicated at the time of the crimes. (*Id.*,

8    Ex. 52, ¶ 12; *see id.*, ¶ 11.) The defense team's inability to substantiate Garza's drug use

9    also appears to have been a factor. (*Id.*, ¶ 11; *see id.*, Ex. 60, ¶ 49.) Dr. Reidy had prepared

10   a report detailing Garza's substance abuse, but as discussed above, his testimony was

11   precluded as a result of the defense's decision not to allow Garza to be examined by a

12   mental health expert for the State.

13         The record shows that counsel thoroughly investigated Garza's drinking and drug

14   use, including through Dr. Reidy's report on the issue, but decided not to retain an addiction

15   expert to testify at the mitigation hearing. This strategic decision is "virtually

16   unchallengeable." *Strickland*, 466 U.S. at 690; *Hinton*, 571 U.S. at 275. Moreover, in

17   reviewing this aspect of counsel's performance, the Court must "affirmatively entertain the

18   range of possible" reasons for counsel's decision not to retain an addiction expert.

19   *Pinholster*, 563 U.S. at 196. In addition to the reasons suggested by counsel, it is not

20   apparent that testimony from an addiction expert would have escaped the trial court's order

21   precluding testimony by a mental health expert.

22         Garza has not met his burden of establishing that counsel's performance was

23   deficient. He also fails to establish prejudice.

24         Counsel presented abundant evidence of Garza's alcohol abuse. Garza cites the

25   information contained in Nelson's 2012 report as the kind of evidence the jury was

26   deprived of through counsel's failure to retain an addiction expert. In fact, counsel

27   presented testimony supporting the factors listed by Nelson in his explication of Garza's

28   alcoholism. For example, the witnesses testified about the stressors Garza faced, including

his severe asthma, the physical and emotional abuse committed by his father, emotional abuse from his peers, and his severe acne. (Doc. 38-5, PCR Pet., Ex. 50 at 6; *see, e.g.*, RT 9/8/04 at 60; RT 9/9/04 at 27–28, 79, 88, 156–57, 165, 170–71; RT 9/14/04 at 8, 73–74, 79–80, 104–05.) The witnesses also testified about what Nelson called the "pathological pattern" of Garza's alcohol use, including increasing tolerance, drinking in the morning, drinking alone, and drinking to cope with life stressors. (*Id.*; *see, e.g.*, RT 9/9/04 at 26–27, 29, 88–89; RT 9/14/04 at 59–60, 102–03.) Garza highlights as corroborating evidence of his alcoholism a statement from his mother reportedly made to Dupont about empty bottles she found under Garza's bed. (Doc. 27 at 189) (citing Doc. 38-5, PCR Pet., Ex. 53, ¶ 30). Such testimony was not omitted, however, as Garza's sister Jessica testified about finding empty bottles in Garza's room. (RT 9/14/04 at 127.) Finally, in addition to the testimony addressing the factors later cited in Nelson's report, counsel's opening statement and closing argument put Garza's alcoholism into context as a mitigating circumstance that both humanized Garza and helped account for his participation in the crimes.

Given the mitigating evidence that was presented, Garza cannot show that he was prejudiced by the absence of expert testimony on the same subject matter. *See Leavitt*, 646 F.3d at 615 (explaining that "cumulative evidence is given less weight because it is not as likely to have affected the outcome of the sentencing"); *Babbitt*, 151 F.3d at 1175 (explaining that petitioner could not show prejudice where "the evidence he now seeks to introduce is largely cumulative of the evidence actually presented during the penalty phase"). "[T]he failure to present additional mitigating evidence that is merely cumulative of that already presented does not rise to the level of a constitutional violation." *Nields v. Bradshaw,* 482 F.3d 442, 454 (6th Cir. 2007) (rejecting ineffective assistance claim based on counsel's failure to retain an expert to testify explicitly about the causal relationship between the defendant's alcoholism and his behavior on the night of the murder) (additional quotations omitted). There was not a reasonable probability of a different sentence if counsel had presented expert testimony in addition to lay testimony about Garza's alcoholism.

1
2
3

Garza has not met his burden of showing that counsel's failure to obtain an expert on addiction constituted deficient performance or resulted in prejudice. Claim 7(A)(4)(f) is therefore denied.

4

e.      Gullibility

5
6
7
8
9
10

In Claim 7(A)(4)(g), Garza alleges that trial counsel performed ineffectively by failing to develop and present evidence of his gullibility. (Doc. 27 at 193.) The PCR court denied this claim on the merits, finding that counsel presented such evidence during the mitigation hearing. (PCR Ruling, ME 7/29/13, at 8.) This decision was not contrary to or an unreasonable application of *Strickland*, nor was it based on an unreasonable determination of the facts.

11
12
13
14
15
16
17
18
19

Garza's gullibility was a major theme in counsel's mitigation presentation. As already noted, two dozen witnesses, including Garza's parents and all of his siblings along with numerous friends and adult acquaintances, testified about Garza's generosity, helpfulness, eagerness to please, attempts to gain acceptance by giving away rides or money, and incidents where others took advantage of him. (*See* RT 9/8/04 at 123–24; RT 9/9/04 at 27–28, 90; RT 9/13/04 at 88; RT 9/14/04 at 12, 55, 57, 73, 104–05.) Counsel told the jury in both his opening statement and closing argument that Garza was generous to a fault and easily manipulated and taken advantage of, particularly by Larry Franco, whom Garza idolized. (RT 9/7/04 at 43–47; RT 9/16/04 at 32–33.)

20
21
22
23
24
25
26
27

Garza cites additional evidence counsel could have presented that would have "nicely bolstered the themes counsel sought to emphasize, including the characteristics that made Garza easy for an individual such as Larry Franco to manipulate." (Doc. 27 at 193.) This testimony, however, would have been cumulative to the testimony that was presented, and therefore its omission was not prejudicial. *See Belmontes*, 558 U.S. at 22 ("Some of the evidence was merely cumulative of the humanizing evidence [counsel] actually presented; adding it to what was already there would have made little difference."); *Van Hook*, 558 U.S. at 11 ("[T]here comes a point at which evidence from more distant relatives

28

can reasonably be expected to be only cumulative, and the search for it distractive from more important duties."); *Babbitt*, 151 F.3d at 1175.

The PCR court's denial of this claim satisfied neither § 2254(d)(1) or (2). *See Richter*, 562 U.S. at 105; *Mirzayance*, 556 U.S. at 123. Claim 7(A)(4)(g) is denied.

### f.     Cumulative prejudice

In Claim 7(A)(4)(o), Garza alleges that the "cumulative effect of trial counsel's many instances of deficient performance—especially counsel's unreasonably limited investigation—was an unreliable sentencing proceeding." (Doc. 27 at 201.) The Court need not address the parties' disagreement about the procedural status of this claim, as it is plainly meritless. 28 U.S.C. § 2254(b)(2); *Lambrix*, 520 U.S. at 524–25.

Because the Supreme Court has not recognized the doctrine of cumulative error, and because this Court has determined that no prejudice resulted from the instances of ineffective assistance alleged by Garza, this claim of cumulative prejudice is meritless. Claim 7(A)(4)(o) is denied.

### Conclusion: Claim 7(A)

Counsel did not perform deficiently in their investigation, development, and presentation of mitigating evidence. Their investigation of mitigating issues was reasonable. *See Cox*, 613 F.3d at 896 (finding "counsel's thorough mitigation investigation was more than reasonable. Counsel interviewed most of Petitioner's close relatives, CYA counselors, school teachers, and other people familiar with Petitioner's background"); *Van Hook*, 558 U.S. at 11 (finding reasonable performance where counsel spoke with defendant's mother, father, aunt, and a family friend; met with two expert witnesses; reviewed military and medical records; considered retaining a mitigation specialist; and presented evidence of defendant's traumatic childhood experiences and his impairment from drugs and alcohol on the day of the crime).

Counsel's presentation of mitigating evidence was not deficient. Twenty-seven witnesses testified on Garza's behalf, including his parents and all of his siblings, other relatives, employers and teachers, and friend and peers. Their testimony supported the

mitigation themes that Garza was "young, immature, easily influenced, and naïve," that he was "manipulated and controlled by Larry Franco," and that he "had to endure some difficult family issues and struggled with substance abuse, but . . . was still well-respected by his friends." (Doc. 38-5, PCR Pet., Ex. 52, ¶ 15.) Because counsel's investigation of potential mitigating circumstances, including mental health issues, was thorough, the strategic choices arising from that investigation are "virtually unchallengeable." *Strickland*, 466 U.S. at 690. "As long as a reasonable investigation was conducted, we must defer to counsel's strategic choices." *Cox*, 613 F.3d at 899 (finding counsel performed reasonably in pursuing four mitigations theories, including an argument that petitioner was not the shooter and the presentation of humanizing evidence); *see also Williams*, 384 F.3d at 616 ("Counsel made a reasonable strategic choice not to present mitigating evidence based upon the investigation he conducted. Consequently, what he might have uncovered had he investigated further is irrelevant."). Garza has not met his "heavy burden" of showing that counsel's performance was unreasonable. *Murtishaw*, 255 F.3d at 939.

Garza has also failed to meet the "highly demanding and heavy" burden of showing that he was actually prejudiced by counsel's performance. *Allen*, 395 F.3d at 1000. The difference between the mitigating evidence that could have been presented and the evidence that was presented was not sufficient to "undermine confidence in the outcome" of Garza's sentencing proceeding. *Strickland*, 466 U.S. at 694; *see Cox*, 613 F.3d at 899 (finding no prejudice where additional evidence was cumulative to evidence presented at the penalty phase).

Finally, with respect to Claims 7A(4)(b), (c), (d), (e), and (g), which the PCR court rejected on the merits, Garza has not met the "doubly deferential" standard that applies to ineffective assistance claims under AEDPA. *See Richter*, 562 U.S. at 105; *Mirzayance*, 556 U.S. at 123

For all of these reasons, Claim 7(A) is denied.

B.   Polygraph evidence

1      In Claim 7(B), Garza alleges that counsel performed ineffectively by failing to make

2 an offer of proof to the trial court about the results of the excluded polygraph evidence.

3 (Doc. 27 at 205.) He contends that an offer of proof would have "facilitate[d] appellate

4 review." (*Id.* at 207.) The PCR court denied the claim, explaining that the polygraph

5 evidence was inadmissible under Arizona Supreme Court precedent and that "[f]ailure to

6 make an offer of proof regarding clearly inadmissible evidence does not constitute deficient

7 performance." (PCR Ruling, ME 7/29/13, at 9.) This decision was not contrary to or an

8 unreasonable application of clearly established federal law.

9      As discussed above, polygraph evidence, because it is unreliable, is "generally

10 inadmissible" in Arizona courts. *Ikirt*, 160 Ariz. at 115, 770 P.2d at 1161; *Rodriguez*, 186

11 Ariz. at 250, 921 P.2d at 653. The PCR court reasonably determined that counsel did not

12 perform ineffectively by failing to make an offer of proof as to evidence the reviewing

13 court would not consider. *See Rupe*, 93 F.3d at 1445 ("[F]ailure to take a futile action can

14 never be deficient performance.").

15      In *Rupe*, the habeas petitioner argued that trial counsel performed ineffectively by

16 failing to present expert testimony on the reliability of the polygraph results and by not

17 attempting to have the results admitted at his penalty phase retrial. *Id.* The Ninth Circuit

18 disagreed. Because the state supreme court had found the results "clearly unreliable" and

19 the trial court indicated it would follow that ruling, counsel's decision "not to pursue the

20 issue was not deficient performance." *Id.*

21      In Garza's case, the trial court determined that the polygraph results were

22 inadmissible. (RT 9/2/04 at 20.) That decision was in accord with Arizona Supreme Court

23 precedent. Pursuing the issue further would have been fruitless. In addition, as Garza

24 acknowledges, counsel did submit the polygraph results to the trial court. (Doc. 27 at 207

25 n.53; *see* ROA 332, Ex. A.) Under these circumstances it is unclear what an offer of proof

26 would have done to facilitate appellate review.

27

28

1    Applying the doubly deferential standard required by the AEDPA and *Strickland*,

2  the Court finds that Garza is not entitled to relief on this claim. *See Richter*, 562 U.S. at

3  105; *Mirzayance*, 556 U.S. at 123. Claim 7(B) is denied.

4         C.    Closing argument

5    In Claim 7(C), Garza alleges that counsel performed ineffectively in making his

6  mitigation-phase closing argument. (Doc. 27 at 208.) According to Garza, counsel failed

7  to "sharpen the issues," undercut his own mitigating arguments, and failed to rebut the

8  State's closing argument. (*Id.* at 209–10.) The PCR court denied the claim on the merits,

9  finding that "counsel highlighted the mitigation for the jury and his performance was not

10  deficient." (PCR Ruling, ME 7/29/13, at 8.) This decision was not contrary to or an

11  unreasonable application of clearly established federal law.

12    In his closing argument, defense counsel Dupont first asked the jury to be guided

13  by "fairness and mercy" and to consider all the evidence. (RT 9/16/04 at 14.) He then

14  summarized the mitigating evidence, which included Garza's young age and immaturity,

15  his lack of a criminal record, his peaceful character, sensitivity, kindness, and generosity,

16  his mental state at the time of the crime, the role drugs may have played in the offense,

17  Garza's loving relationships with his family and friends, his susceptibility to manipulation,

18  personal misfortunes prior to the crimes, low self-esteem, alcoholism, suicide attempts, and

19  severe asthma. (*Id.* at 15–27.) Dupont also summarized the positive testimony about

20  Garza's character as offered by the mitigation-phase witnesses. (*Id.* at 36–39.)

21    Dupont devoted the remainder of his closing argument to Larry Franco, describing

22  the role he played in Garza's life; citing evidence suggesting that Franco, not Garza, was

23  responsible for the murders; and arguing that the disparity in punishments, with Franco

24  "walking the streets" and Garza sentenced to death, was a mitigating circumstance. (*Id.* at

25  27–36.) Dupont argued that Franco was an "expert manipulator" to whose influence Garza,

26  who idolized his uncle and godfather, was particularly vulnerable. (*Id.* at 32–33.) Counsel

27  characterized Franco as a "violent, drug-addicted wife-beater" and suggested he would

28  have found a way to kill Ellen without Garza's participation. (*Id.* at 34.)

1  Dupont closed by emphasizing each juror's individual right to consider and weigh

2  the mitigating evidence and to reach a sentencing decision according to his or her own

3  conscience. (*Id.* at 42–45.)

4  Garza's selective quotes from the closing argument (Doc. 27 at 209–10) do not

5  accurately depict the overall consistency with which Dupont presented the mitigating

6  circumstances and ignore Dupont's other mitigating theme, that Larry Franco bore primary

7  responsibility for the murders. Garza similarly mischaracterizes Dupont's performance in

8  his rebuttal closing argument when he criticizes counsel for failing to "affirmatively ask

9  the jury to spare Garza's life." (Doc. 27 at 210.)

10  The State in its closing argument attacked the defense's "Sunday school image" of

11  Garza. (RT 9/16/04 at 56, 57.) To that end the prosecutor detailed Garza's conduct in

12  carrying out the crime and argued that Garza had in fact been provided with many

13  advantages in his life, including a loving family. (*Id.* at 51–58, 75–76.)

14  In his rebuttal argument, Dupont told the jury "it is not the Sunday school person .

15  . . that committed the crime" but explained that under the law the jury had to "sentence

16  both the person that committed the crime and the Sunday school person." (*Id.* at 94.)

17  Dupont then argued that having advantages in life does not protect a person from "the

18  influence of alcohol and drugs" and "human frailties" and that "nothing is going to protect

19  you from a person like Larry Franco when he is your godfather." (*Id.* at 97.) Dupont

20  reminded the jurors that any "doubt must be resolved in favor of a life." (*Id.* at 100.) He

21  concluded by urging that "the most powerful mitigator in this case is that Ruben Garza is

22  a person who is well-loved, and he loves other people in return," and asking, rhetorically,

23  "Is love enough?"(*Id.*)

24  In challenging the PCR court's denial of this claim, Garza cites *Gentry*, 540 U.S. at

25  5–6, and *Spisak*, 558 U.S. at 155. (Doc. 27 at 9, 10.) In neither case, however, did the Court

26  find that counsel's closing argument merited habeas relief.

27  "The right to effective assistance extends to closing arguments." *Gentry*, 540 U.S.

28  at 5. Nonetheless, "counsel has wide latitude in deciding how best to represent a client, and

- 168 -

deference to counsel's tactical decisions in his closing presentation is particularly important because of the broad range of legitimate defense strategy at that stage." *Id.* at 5–6. "Closing arguments should 'sharpen and clarify the issues for resolution by the trier of fact,' but which issues to sharpen and how best to clarify them are questions with many reasonable answers." *Id.* at 6 (quoting *Herring v. New York*, 422 U.S. 853, 865 (1975)). "Judicial review of a defense attorney's summation is therefore highly deferential—and doubly deferential when it is conducted through the lens of federal habeas." *Id.*

In *Gentry*, the Supreme Court, reversing the Ninth Circuit, found that the state court reasonably determined that counsel's closing argument did not constitute deficient performance. 540 U.S. at 8. In *Spisak*, the Court reversed the Sixth Circuit and found that counsel's closing argument, even under de novo review, did not prejudice the petitioner. 558 U.S. at 155–56.

The Court in *Gentry* held that counsel's failure to include several potentially exculpatory facts in her closing argument did not render her approach incompetent, explaining that "[f]ocusing on a small number of key points may be more persuasive than a shotgun approach." 540 U.S. at 8. The Court also rejected the argument that counsel performed deficiently by failing to directly ask the jury for an acquittal and failing to explicitly argue that the prosecution had not proved its case beyond a reasonable doubt. *Id.* at 10. The Court explained that "a low-key strategy that stresses the jury's autonomy is not unreasonable" and noted that counsel's "entire presentation made [the] point" that the State had not proved its case. *Id.*

Dupont's mitigation-phase closing argument focused on the various mitigating circumstances in the context of a plea for "fairness and mercy." Garza does not identify any mitigating circumstances counsel omitted from his argument. *See Spisak*, 558 U.S. at 155 ("Nor does Spisak tell us what other mitigating factors counsel might have mentioned."). While he criticizes Dupont for failing to affirmatively ask to jury to spare Garza's life, Dupont's "entire presentation made that point" while also stressing the jurors' independence and autonomy in rendering a sentencing decision. *Gentry*, 540 U.S. at 10;

1   *see Spisak*, 558 U.S. at 155 ("[I]n light of counsel's several appeals to the jurors' sense of

2   humanity . . . we cannot find that a more explicit or more elaborate appeal for mercy could

3   have changed the result.").

4       Under the reasoning of *Gentry* and *Spisak*, counsel did not perform ineffectively in

5   his mitigation-phase closing argument. The PCR court reasonably applied clearly

6   established federal law in denying this claim. Under AEDPA's doubly deferential standard,

7   Garza is not entitled to relief. *See Richter*, 562 U.S. at 105; *Mirzayance*, 556 U.S. at 123.

8   Claim 7(C) is denied.

9       D.    Allocution

10      Garza alleges that counsel performed ineffectively by advising Garza not to allocute

11  and failing to make a record of his proposed allocution. (Doc. 27 at 211.) The PCR court

12  denied the claim, finding it was Garza's choice not to allocute, noting that the Arizona

13  Supreme Court held that Garza's right to allocute was not violated, and concluding that

14  Garza "has not shown that he would have added anything in allocution that would have

15  constituted additional mitigation sufficient to result in leniency." (PCR Ruling, ME

16  7/29/13, at 9.) This decision was neither contrary to nor an unreasonable application of

17  *Strickland*, nor was it based on an unreasonable determination of the facts.

18      Garza cannot show that counsel's performance was deficient. In its ruling, the PCR

19  court cited Cleary's declaration. (PCR Ruling, ME 7/29/13, at 9.) Cleary stated that he and

20  Dupont "advised [Garza] on the positives and negatives of allocution," "advised him that

21  if he discussed the details of the crime during allocution, he would be subject to cross-

22  examination by the State," and suggested that if he did allocute he should speak about his

23  "remorse, what Ellen Franco meant to him, or how the entire proceeding affected his life."

24  (Doc. 38-5, PCR Pet., Ex. 52, ¶ 13.) This information contradicts Garza's argument that

25  counsel advised him not to allocute and supports the PCR court's conclusion that the

26  decision was Garza's.

27      Garza also bears the burden under *Strickland* of showing there was a reasonable

28  probability of a different sentence if he had allocuted. He fails entirely to meet that burden

as the record is still free of any information about what Garza would have said had he addressed the jury.

Garza is not entitled to relief on this claim under the doubly deferential standard required by AEDPA and *Strickland*. *See Richter*, 562 U.S. at 105; *Mirzayance*, 556 U.S. at 123. Claim 7(D) is denied.

### E.   Instruction on unanimity

Garza alleges that counsel performed ineffectively by failing to seek an instruction that the jury did not have to agree unanimously as to the existence of a mitigating circumstance. (Doc. 27 at 214.) The PCR court denied the claim, correctly finding that "the trial court instructed the jury that it need not be unanimous is determining what circumstances are mitigating" and noting that the Arizona Supreme Court had rejected Garza's challenge to the instructions. (PCR Ruling, ME 7/29/13, at 6.)

The PCR court reasonably applied *Strickland*. Counsel cannot be ineffective for failing to challenge an instruction the Arizona Supreme Court found was correct. *See Simpson*, 912 F.3d at 600 (finding no deficient performance arising from failure to object to correct jury instruction); *Johnson*, 113 F.Appx. at 250; *Juan H.*, 408 F.3d at 1273 (explaining that counsel cannot be ineffective for failing to raise a meritless objection). As the Court noted above, Garza's jury was specifically instructed that "[a] finding that a particular mitigating circumstance exists need not be unanimous, that is you all need not agree on what particular mitigation exists." [45] (RT 9/16/04 at 105.)

Garza is not entitled to relief on this claim. *See Richter*, 562 U.S. at 105; *Mirzayance*, 556 U.S. at 123. Claim 7(E) is denied.

### F.   Prosecutorial misconduct

Garza alleges that counsel performed ineffectively by failing to object to prosecutorial misconduct during the State's closing argument. (Doc. 28 at 216.) He did not raise this claim in state court. (*Id.*) He argues that its default is excused by the ineffective

_____

[45] In Claim 8(E)(3), this Court determined that the instructions did not violate *Mills*, 486 U.S. at 384.

1  assistance of PCR counsel. (*Id.*) The Court need not address the claim's procedural status

2  as it is clearly meritless. *See* 28 U.S.C. § 2254(b)(2); *Lambrix*, 520 U.S. at 524–25.

3      The Ninth Circuit has "repeatedly held that, 'absent egregious misstatements,'

4  failing to object to error during closing argument falls within the 'wide range' of reasonable

5  assistance." *Demirdjian v. Gipson*, 832 F.3d 1060, 1073 (9th Cir. 2016) (quoting

6  *Cunningham v. Wong*, 704 F.3d 1143, 1159 (9th Cir. 2013)) (additional quotes omitted).

7  Here, the Court has already determined that the instances of alleged misconduct did not

8  violate Garza's due process rights or result in prejudice.[46] The Arizona Supreme Court

9  likewise denied relief on two of Garza's claims of prosecutorial misconduct. *Garza*, 216

10  Ariz. at 68–69, 163 P.3d at 1018–19. Objection, therefore, would have been futile. *See*

11  *Demirdjian*, 832 F.3d at 1073 (explaining that where none of the prosecutor's statements

12  "was error—let alone egregious error," counsel could have seen objecting as "meritless")

13  (citing *Juan H.*, 408 F.3d at 1273).

14      Garza cites *Zapata v. Vasquez*, 788 F.3d 1106, (9th Cir. 2015), where the court

15  found that defense counsel performed ineffectively by failing to object to the prosecutor's

16  "egregious misconduct," which included "inflammatory, fabricated and ethnically charged

17  epithets" and speaking to the jury in the victim's voice *Id.* at 1116, 1123.

18      Garza's reliance on *Zapata* is misplaced. There, in contrast to the findings of the

19  Arizona Supreme Court in Garza's case, the state court had determined that "the prosecutor

20  committed serious misconduct." *Zapata*, 788 F.3d at 1122; *see Rowland v. Chappell*, 876

21  F.3d 1174, 1191 n.3 (9th Cir. 2017) (finding state court decision rejecting ineffective

22  assistance claim was reasonable and noting, in contrast to *Zapata*, that the state court found

23  prosecutor's comments were "'sound' and did not mislead the jury"). In Garza's case, there

24  was no misconduct for counsel to object to, let alone the kind of egregious misconduct that

25  occurred in *Zapata*.

26      Garza has not shown that counsel's performance here was either deficient or

27  prejudicial. Claim 7(F) is denied.

28

---

[46] *See* Claim 9.

**Claim 12:**

Garza alleges that trial counsel performed ineffectively by failing to move for a new trial based on juror quid pro quo bargaining. (Doc. 27 at 265.) The PCR court rejected this claim on the merits, finding counsel were not ineffective because there was no juror misconduct. (PCR Ruling, ME 7/29/13, at 8.) As explained above and in the Court's order denying evidentiary development (Doc. 73 at 19), the PCR court was correct in determining there was no misconduct. Trial counsel therefore did not perform ineffectively under *Strickland* by failing to move for a new trial based on improper juror bargaining because such a claim was meritless. *See Juan H.*, 408 F.3d at 1273. Claim 12 is therefore denied.

**Claim 14:**

Garza alleges that appellate counsel performed ineffectively. (Doc. 27 at 271.) All told, this claim consists of eight separate allegations of ineffective assistance. The claims are meritless.

Claims of ineffective assistance of appellate counsel are evaluated under the *Strickland* standard. *See Moormann*, 628 F.3d at 1106 (citing *Smith v. Robbins*, 528 U.S. 259, 285 (2000)). First, the petitioner must show that counsel's performance was objectively unreasonable, which in the appellate context requires the petitioner to demonstrate that counsel acted unreasonably in failing to discover and brief a merit-worthy issue. *Id.* Second, the petitioner must show prejudice, which in this context means he must demonstrate a reasonable probability that, but for appellate counsel's failure to raise the issue, he would have prevailed in his appeal. *Id.*; *see Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986) (holding that to prove prejudice a petitioner must show that there is a reasonable probability the state appellate court would have reversed the trial court's decision).

A.    Failure to argue that mitigating circumstances warranted life sentence

In Claim 14(C), Garza alleges that appellate counsel performed ineffectively by failing (or refusing) to argue, in his opening brief, during oral argument before the Arizona Supreme Court, or in his supplemental brief, that the mitigating circumstances in Garza's

case were sufficiently substantial to warrant leniency.[47] (Doc. 27 at 273–87.) The PCR court denied this claim on the merits:

> The record shows that the Supreme Court requested further briefing on this issue and sought counsel's input at oral argument. Counsel chose not to respond to either request based, as shown by his affidavit, on his tactical decision that the argument would not be persuasive.
>
> Appellate counsel has an affirmative obligation to advocate for leniency at every opportunity, and most especially when a Court requests assistance. Assuming that counsel's performance was deficient for failing to avail himself of these opportunities because his tactical decision was unreasonable, the Court nonetheless finds Defendant was not prejudiced because the Supreme Court did independently review the record.

(PCR Ruling, ME 7/29/13, at 4) (citation omitted).

Garza argues that this decision was contrary to and an unreasonable application of clearly established federal law and based on an unreasonable determination of the facts. (Doc. 27 at 286.) He also argues that because the PCR court did not rule on the deficiency prong of *Strickland*, he is entitled to de novo review. (*Id.*)

The Court disagrees with the latter argument. The deficient performance and prejudice prongs of *Strickland* do not constitute two separate claims. In fact, as previously noted, *Strickland* instructs that a court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the

---

[47] The Arizona Supreme Court addressed this aspect of appellate counsel's performance before conducting its independent review of Garza's death sentence:

> Garza did not argue, either in his appellate briefing or at oral argument, that there were "mitigating circumstances sufficiently substantial to call for leniency," and that the jury therefore should not have imposed the death penalty for the murder of Rush once it found an aggravating circumstance. Although we should have been aided by argument of counsel on this point, A.R.S. § 13-703.04 nevertheless mandates that we review the evidence of aggravating and mitigating circumstances and independently determine whether death is the appropriate penalty.

*Garza*, 216 Ariz. at 71, 163 P.3d at 1021 (citations and footnotes removed).

alleged deficiencies." 466 U.S. at 697. That is the course taken by the PCR court, and it is the course this Court will take as well. Applying AEDPA deference, the Court finds that the PCR court's conclusion that Garza failed to show prejudice from appellate counsel's performance satisfies neither § 2254(d)(1) nor (2).

At the time of Garza's trial, the Arizona Supreme Court independently reviewed aggravating and mitigating circumstances to determine whether the death penalty was the appropriate sentence. *See Garza*, 216 Ariz. at 71, 163 P.3d at 1021. In carrying out such review, the court "consider[ed] the quality and the strength, not simply the number, of aggravating and mitigating factors." *State v. Greene*, 192 Ariz. 431, 443, 967 P.2d 106, 118 (1998). The PCR court reasonably determined that this review eliminated any prejudice from appellate counsel's reluctance to argue in support of Garza's mitigation case.

Garza, noting that the "record on appeal is over 12,000 pages," argues that the PCR court's ruling "ignores the influence counsel have in providing guidance to the court on what portions of the record are important." (Doc. 27 at 287.) Whatever the volume of the record as a whole, however, the mitigation phase of trial took place over seven days, and Garza's counsel in his closing argument summarized the relevant mitigating evidence. (RT 9/16/04 at 15–40.)

Appellate counsel's failure to point to this part of the record would not have prevented the Arizona Supreme Court from carrying out its mandated review of the "quality and strength" of the mitigating evidence. Indeed, as Respondents note, it is clear from the justices' questioning of appellate counsel at oral argument that the Arizona Supreme Court was familiar with the record as it pertained to mitigating evidence. (Doc. 38-3, PCR Pet., Ex. 32 at 13–14, 17, 20, 22–25.) Moreover, appellate counsel did, when prodded, cite several mitigating circumstances, including Garza's age, lack of a criminal record, and family support, as well as the influence of Larry Franco and Franco's role in the shootings. (*Id.* at 16–17.) Therefore, if the Arizona Supreme Court's opinion was silent on "Franco's involvement in the crime, Garza's gullibility, or Franco's manipulative

nature" (Doc. 27 at 285), it was not because the court lacked guidance from appellate counsel.

Because the Arizona Supreme Court independently reviewed the mitigating circumstances, there was not a reasonable probability of a different outcome on appeal if counsel had argued more vigorously for leniency.

Applying AEDPA's doubly deferential standard to this ineffective assistance claim, the Court finds that Garza is not entitled to relief. *See Richter*, 562 U.S. at 105; *Mirzayance*, 556 U.S. at 123. Claim 14(C) is denied.

## B. Failure to include statement of facts in the brief

In Claim 14(D), Garza alleges that appellate counsel performed ineffectively by failing to include a statement of facts in his opening brief, as required by the Arizona Rules of Criminal Procedure.[48] (Doc. 27 at 288.) The PCR court denied the claim. (PCR Ruling, ME 7/29/113, at 4) While recognizing that a statements of facts is required by the rules, the court again found that Garza was not prejudiced because the Arizona Supreme Court undertook an independent review of the trial record. (*Id.*) This ruling was not contrary to or an unreasonable application of clearly established federal law, nor was it based on an unreasonable determination of the facts.

Garza again criticizes the PCR court for ignoring counsel's influence in guiding the reviewing court by pointing out the significant portions of the record. (Doc. 27 at 289.) In support of this argument, Garza relies on *Lambright v. Schriro*, 490 F.3d 1103, 1125 (9th Cir. 2007), where the Ninth Circuit found that defense counsel's failure to identify and explain mitigating circumstances to the sentencer "may, in some instances, be prejudicial." *Lambright*, which addresses a claim of ineffective assistance of trial counsel, offers little

---

[48] The Rule requires appellate briefs to include a statement of facts, defined as follows:

> A statement of facts relevant to the issues presented for review, with appropriate references to the record. The statement shall not contain evidentiary matter unless material to a proper consideration of the issues presented, in which instance a reference shall be made to the record or page of the transcript where such evidence appears.

Ariz. R. Crim. P 31.13(c)(1)(iv).

1  support for Garza's argument that he was prejudiced by appellate counsel's failure to offer

2  an appellate court a "statement of facts relevant to the issues presented for review." Ariz.

3  R. Crim. P. 31.13(c)(1)(iv).

4      Garza contends he was prejudiced because the Arizona Supreme Court "was never

5  provided a narrative of events from Garza's perspective." (Doc. 27 at 288.) Such a

6  narrative, according to Garza, would have included references to testimony about Larry

7  Franco's motivation for killing Ellen, his manipulative and violent character, and his

8  behavior on the night of the murders. (Doc. 44 at 161–62.) This argument is not persuasive

9  for two reasons. First, the facts presented in the statement of facts must be "relevant to the

10  issues presented," Ariz. R. Crim. P 31.13(c)(1)(iv), and record-based, not just helpful to

11  Garza or reflective of his "perspective." Garza does not explain how in this format he could

12  have presented an alternative "narrative" of the facts. Second, appellate counsel did include

13  information in his opening brief, as relevant to Garza's *Brady* claim, about Larry Franco's

14  violent and jealous nature and his motive for killing Ellen. (Opening Brief at 80–96.) Garza

15  was not prejudiced by counsel's failure to include similar information in a statement of

16  facts.

17      This PCR court reasonably determined that Garza was not prejudiced by appellate

18  counsel's performance. Under AEDPA's doubly deferential standard, Garza is not entitled

19  to relief on this claim. *See Richter*, 562 U.S. at 105; *Mirzayance*, 556 U.S. at 123. Claim

20  14(D) is denied.

21      C.    "Other meritorious issues"

22      In Claim 14(E), Garza alleges that appellate counsel performed ineffectively by

23  failing to raise several "nonfrivolous" claims. (Doc. 27 at 289.) These include (1) a

24  Confrontation Clause claim challenging the testimony of the medical examiner; (2) a

25  challenge to the trial court's exclusion of mental health evidence; (3) jury misconduct

26  issues; (4) a *Miranda* claim regarding Garza's statements to the detectives; and (5) a

27  challenge to the exclusion of the polygraph evidence.

28

1    Garza raised claims (1) through (4) in his PCR petition. (PCR Pet. at 19–23.) The
2    court denied relief, finding that the underlying claims were meritless and would not have
3    prevailed on appeal. (PCR Ruling, ME 7/29/13, at 5.) Garza acknowledges that he did not
4    raise claim (5) in state court, but argues that its default is excused under *Martinez* by PCR
5    counsel's ineffective performance. (Doc. 27 at 272.) As noted above, however, *Martinez*
6    applies only to claims of ineffective assistance of trial counsel, not to claims of ineffective
7    assistance of appellate counsel. *Davila*, 137 S. Ct. at 2065. Therefore, Claim 14(E)(5)
8    remains procedurally defaulted and barred from federal review.

9    The PCR court's denial of claims (1) through (4) was not contrary to or an
10   unreasonable application of clearly established federal law, nor was it based on an
11   unreasonable determination of the facts. As set forth elsewhere in the order, the Court has
12   determined that each of the underlying allegations is meritless.[49] Appellate counsel's
13   failure to raise the claims, therefore, does not constitute deficient performance, nor did it
14   result in prejudice to Garza. *Turner v. Calderon*, 281 F.3d 851, 872 (9th Cir. 2002) ("A
15   failure to raise untenable issues on appeal does not fall below the *Strickland* standard.");
16   *see Moormann*, 628 F.3d at 1106. There was not a reasonable probability of a different
17   result on appeal if the claims had been raised. *See Wildman*, 261 F.3d at 840 ("[A]ppellate
18   counsel's failure to raise issues on direct appeal does not constitute ineffective assistance
19   when appeal would not have provided grounds for reversal."); *Kimmelman*, 477 U.S. at
20   375.

21   Under AEDPA's doubly deferential standard, Garza is not entitled to relief on these
22   claims. *See Richter*, 562 U.S. at 105; *Mirzayance*, 556 U.S. at 123. Claim 14(E) is denied.

23   **D.    Motion for reconsideration**

24   In Claim 14(F), Garza alleges that appellate counsel performed ineffectively by
25   filing an "untimely and insufficient" motion for reconsideration. (Doc. 27 at 296.) This
26   claim is without merit.

27

28

---

[49] *See* Claims 3(A), 3(C), 8(A), 8(B), and 11.

When appellate counsel indicated he would not be filing a motion for reconsideration, Garza's mitigation specialist Dawn Whitt took it upon herself to draft such a motion. (*See* Doc. 38-5, PCR Pet., Ex. 60, ¶ 55; *id.*, Ex. 52, ¶ 21.) The motion was largely a summary of the mitigating evidence. Appellate counsel later added an introductory paragraph, which cited the appropriate rule and argued that "there are sufficient facts extant in the record for this Court to conclude that the mitigating circumstances are sufficiently substantial to call for leniency," along with a paragraph on aggravating circumstances, but cited no case law. (*Id.*) Appellate counsel signed the motion and filed it nine days after the fifteen-day filing deadline. (Doc. 38-4, PCR Pet., Ex. 38.) The Arizona Supreme Court accepted the late filing and issued a one-word denial. (*Id.*, Ex. 37.)

The PCR court denied Garza's claim of ineffective assistance of appellate counsel, explaining that "although the motion was filed late, the Supreme Court accepted it and ruled on its merits." (PCR Ruling, ME 7/29/13, at 4.)

Garza argues that the motion for reconsideration was insufficient because it failed to challenge the Arizona Supreme Court's independent review of his death sentence. (Doc. 27 at 298.) He contends that counsel's failure to preserve that claim was deficient performance and he was prejudiced because if the claim had been raised there was a reasonable probability of a different result on appeal. (*Id.*)

The Court has determined that Garza's challenges to the Arizona Supreme Court's independent review are meritless.[50] Therefore, appellate counsel's failure to raise the claims was neither deficient nor prejudicial. *Turner*, 281 F.3d at 872. There was not a reasonable probability of a different result on appeal if the claims had been raised. *Wildman*, 261 F.3d at 840; *Kimmelman*, 477 U.S. at 375.

Under AEDPA's doubly deferential standard, Garza is not entitled to relief on this claim. *See Richter*, 562 U.S. at 105; *Mirzayance*, 556 U.S. at 123. Claim 14(F) is denied.

Garza is not entitled to relief on his individual claims of ineffective assistance of appellate counsel. In addition, because Supreme Court precedent does not recognize the

---

[50] *See* Claim 15.

doctrine of cumulative error, and because this Court has determined that no prejudice resulted from the individual errors alleged by Garza, his allegation of cumulative prejudice is also meritless.

Garza is not entitled to relief on his allegations of ineffective assistance of appellate counsel. Claim 14 is denied.

<u>Conclusion: ineffective assistance of counsel claims</u>

"Surmounting *Strickland*'s high bar is never an easy task," *Padilla*, 559 U.S. at 371, and "[e]stablishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult," *Richter*, 562 U.S. at 105; *see Kayer*, 141 S. Ct. at 526.

For the reasons discussed above, Garza has not shown that his counsel, at trial or on appeal, made errors so serious that they were "not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. It cannot be said that Garza's conviction or death sentence "resulted from a breakdown in the adversary process that renders the result unreliable." *Id.* Finally, with respect to claims decided on the merits, the PCR court's rulings were "not so obviously wrong as to be 'beyond any possibility for fairminded disagreement.'" *Kayer*, 141 S. Ct. at 526 (quoting *Richter*, 562 U.S. at 103).

Garza is not entitled to relief on Claims 2, 5, 7, 12, or 14.

## V. Death Penalty and Arizona's Death Penalty Scheme

The Court disposed of several of these claims in its order denying evidentiary development, denying Claims 18, 19, 25, 27, and 35 on the merits and Claim 37 as non-cognizable. (*Id.* at 34.) The Court also determined that Claims 23 and Claim 24 were procedurally defaulted and barred from federal review. (*Id.* at 32–34.) As set forth below, the Court finds that Claims 23 and 24 also fail on the merits. The Court addresses the remaining claims as follows.

**Claim 16:**

Garza alleges that he was provided insufficient notice of the aggravating factors because they were not included in the indictment and that his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments were violated because there was not a finding of

probable cause with respect to any of the factors. (Doc. 27 at 320.) The Arizona Supreme Court denied the claim, citing its decision in *McKaney v. Foreman*, 209 Ariz. 268, 100 P.3d 18 (2004). *Garza*, 216 Ariz. at 67, 163 P.3d at 1017. The claim is without merit.

The Supreme Court has held that facts constituting the elements of an offense must be charged in a federal indictment. *See Jones v. United States*, 526 U.S. 227, 251–52 (1999). However, the Fifth Amendment Due Process Clause does not incorporate the same requirements into state criminal prosecutions. *See Branzburg v. Hayes*, 408 U.S. 665, 688 n.25 (1972) (citing *Hurtado v. California*, 110 U.S. 516, 538 (1884)); *see also Gautt v. Lewis*, 489 F.3d 993, 1003 n.10 (9th Cir. 2007). Because states are not required by the Constitution to empanel grand juries for purposes of indictment, they are not required to specify aggravating factors in an indictment.

Garza contends that *Ring* and *Apprendi* support his position (Doc. 27 at 320–21), but in neither case did the Supreme Court address the issue, let alone hold that aggravating factors must be included in an indictment and subjected to a probable cause determination. *See Ring*, 536 U.S. at 597 n.4. In *McKaney* the Arizona Supreme Court expressly rejected the argument that *Ring* requires aggravating factors to be alleged in an indictment and supported by probable cause. 209 Ariz. at 270, 100 P.3d at 20.

The Arizona Supreme Court's denial of this claim was neither contrary to nor an unreasonable application of clearly established federal law. Claim 16 is denied.

**Claim 20:**

Garza alleges that AEDPA is unconstitutional. (Doc. 27 at 331.) His arguments are meritless. *See Crater v. Galaza*, 491 F.3d 1119, 1125–26 (9th Cir. 2007) (holding that the AEDPA violates neither the Suspension Clause nor the separation of powers doctrine); *Evans v. Thompson*, 518 F.3d 1, 3 (1st Cir. 2008) ("Similar constitutional challenges to the AEDPA amendments have been rejected by majority opinions in the Fourth, Seventh, and Ninth Circuits, at times over spirited dissents."); *Cobb v. Thaler*, 682 F.3d 364, 374 (5th Cir. 2012). Claim 20 is denied.

**Claim 21:**

Garza alleges that capital punishment is categorically cruel and unusual, in violation of the Eighth Amendment. (Doc. 27 at 344.) The Arizona Supreme Court's denial of the claim, *Garza*, 216 Ariz. at 73, 163 P.3d at 1023, was neither contrary to nor an unreasonable application of clearly established federal law.

Supreme Court precedent holds that the death penalty does not constitute cruel and unusual punishment. *See Gregg v. Georgia*, 428 U.S. 153, 169 (1976); *see also Glossip v. Gross*, 576 U.S. 863, 881 (2015) ("[W]e have time and again reaffirmed that capital punishment is not per se unconstitutional."); *Roper v. Simmons*, 543 U.S. 551, 568–69 (2005) (noting that the death penalty is constitutional when applied to a narrow category of crimes and offenders). Claim 21 is denied.

**Claim 22:**

Garza alleges that imposing capital punishment on individuals diagnosed with FASD violates the Eighth and Fourteenth Amendments. (Doc. 27 at 347.) He acknowledges that he failed to raise this claim in state court, but contends that its default is excused by the ineffective assistance of trial and PCR counsel. (*Id.*) He is incorrect.

First, as previously discussed, before ineffective assistance of trial counsel may be used as cause to excuse a procedural default, the particular ineffective assistance allegation must be exhausted before the state courts as an independent claim. *Carpenter*, 529 U.S. at 453; *Carrier*, 477 U.S. at 489–90; *see Tacho v. Martinez*, 862 F.2d 1376, 1381 (9th Cir. 1988). During the PCR proceedings, Garza did not allege ineffective assistance of trial counsel based on the failure to raise this claim. Therefore, ineffective assistance of trial counsel cannot constitute cause for its default.

Next, the alleged ineffectiveness of PCR counsel does not excuse the default of Claim 22 under *Martinez*, which, as described above, applies only to defaulted claims of ineffective assistance of trial counsel. *Martinez (Ernesto)*, 926 F.3d at 1225; *Pizzuto*, 783 F.3d at 1177; *Hunton*, 732 F.3d at 1126–27. Therefore, the claims remain procedurally defaulted and barred from federal review. The claim is also meritless.

Garza argues that "the impairments associated with FASD mirror in critical ways those suffered by intellectually disabled offenders." (*Id.* at 349.) There is no authority holding that individuals with FASD are exempt from capital punishment. *Cf.*, *In re Soliz*, 938 F.3d 200, 203 (5th Cir. 2019) (finding inmate failed to show that FASD "is now medically equated to intellectual disability as defined in *Atkins*"); *United States v. Fell*, No. 5:01-CR-12-01, 2016 WL 11550800, at *7 (D. Vt. Nov. 7, 2016) (noting "lack of any national consensus as to whether the death penalty is a disproportionate punishment for individuals with FASD" and explaining that "Fell has not shown that all persons with FASD . . . have cognitive and behavioral impairments that result in the same (or 'equivalent') diminishment in moral culpability, ability to be deterred, and capacity to assist in their defense as individuals with [Intellectual Disability]"). In addition, Garza has not shown that he is an intellectually disabled offender.

Claim 22 is denied.

**Claims 23 and 24:**

In procedurally defaulted Claim 23, Garza alleges that the Eighth Amendment prohibits his execution due to his age and lack of brain development at the time of the crimes. (Doc. 27 at 352.) He asserts that when he committed the murders he was functioning "in neurodevelopmental terms . . . as a juvenile" as a result of his cognitive impairment and FASD. (*Id.* at 353.) In support of this claim Garza relies on *Roper v. Simmons*, 543 U.S. 551, which placed a categorical ban on the execution of persons under the age of 18.

"*Roper* is clear in its holding," however, and Garza's argument that it should be expanded beyond an offender's chronological age "runs into a hard wall of precedent," including subsequent Supreme Court rulings which "support the principle that age eighteen is a valid dividing line between juveniles and adults in an Eighth Amendment context." *United States v. Johnson*, No. CR 17-201, 2020 WL 8881711, at *3 (E.D. La. July 13, 2020) (citing *Miller v. Alabama*, 567 U.S. 460 (2012), and *Graham v. Florida*, 560 U.S. 48 (2011)). "The Court drew this line well aware of the 'objections always raised against

categorical rules.'" *United States v. Mitchell*, 502 F.3d 931, 981 (9th Cir. 2007) (citing *Roper*, 543 U.S. at 574).

Accordingly, "[a]lthough policy arguments may support an extension of the law to prohibit a death sentence for an offender who is developmentally juvenile," this Court's analysis "is confined to a consideration of constitutional law as it presently stands." *In re Garner*, 612 F.3d 533, 536 (6th Circ. 2010); *see United States v. Bernard*, 762 F.3d 467, 482 (5th Cir. 2014) (finding "no legal support for [the defendant]'s argument" that he was ineligible for the death penalty because he was nineteen years old at the time of the offense but "operating at a much lower mental age"); *Mitchell*, 502 F.3d at 981 (rejecting argument "that it would violate the Eighth Amendment to sentence him to death because of his age and maturity level").

Claim 23 is meritless.

In defaulted claim 24, Garza argues that he suffers from serious mental illness and that the execution of the seriously mentally ill violates the Eighth Amendment. (Doc. 27 at 358.)

In *Ford*, 477 U.S. at 409–10, the Supreme Court held that it is a violation of the Eighth Amendment to execute someone who cannot comprehend that his execution is based on a conviction for murder. Garza, however, does not contend that he is incompetent to be executed under *Ford*, only that he has serious mental illness. *See ShisInday v. Quarterman*, 511 F.3d 514, 521 (5th Cir. 2007) (finding petitioner's execution not prohibited where he contended only that he was mentally ill, not insane).

Garza argues that the holdings in *Atkins* and *Simmons* should be extended to prohibit the execution of the mentally ill, but he offers no support for such an extension. *See, e.g.*, *Cornwell v. Warden, San Quentin State Prison*, No. 206CV00705TLNKJN, 2018 WL 934542, at *129 (E.D. Cal. Feb. 15, 2018), *report and recommendation adopted*, No. 206CV00705TLNKJN, 2019 WL 12117105 (E.D. Cal. Mar. 19, 2019) ("[N]either the Supreme Court nor this circuit has extended the *Atkins/Roper* protections to the mentally ill whose illness does not reach that of incompetency or insanity."); *see Doerr v. Ryan*, No.

CV-02-582-PHX-PGR, 2010 WL 582198, at *3 (D. Ariz. Feb. 11, 2010) ("[T]he authorities that have considered the scope of *Atkins* have all rejected the proposition that the Eighth Amendment prohibits execution of the mentally ill.") (collecting cases). "Although petitioner's references to international law, public opinion data, and various other reports and studies are instructive, this Court must follow Supreme Court authority." *Cornwell*, 2018 WL 934542, at *129; *see Carroll v. Sec'y, DOC*, 574 F.3d 1354, 1370 (11th Cir. 2009) ("[S]ans a decision from the Supreme Court barring the execution of mentally ill prisoners, we reject Carroll's claim that he is exempt from execution because he is mentally ill.").

In any event, a determination of incompetence cannot be made until an execution warrant is issued making the petitioner's execution imminent. *See Martinez-Villareal v. Stewart*, 118 F.3d 628, 630 (9th Cir. 1997) (citing *Herrera v. Collins*, 506 U.S. 390, 406 (1993)).

Claim 24 is meritless.

**Claim 25:**

Garza alleges that his execution, after an extended period on death row, violates the Eighth and Fourteenth Amendments. (Doc. 27 at 370.) This claim is also without merit.

"The Supreme Court has never held that execution after a long tenure on death row is cruel and unusual punishment." *Allen v. Ornoski*, 435 F.3d 946, 958 (9th Cir. 2006); *see Lackey v. Texas*, 514 U.S. 1045 (1995) (mem.) (Stevens, J. & Breyer, J., discussing denial of certiorari and noting the claim has not been addressed); *Thompson v. McNeil*, 556 U.S. 1114 (2009) (mem.) (Stevens, J. & Breyer, J., dissenting from denial of certiorari; Thomas, J., concurring, discussing *Lackey* issue); *see also Knight v. Florida*, 528 U.S. 990 (1999) (Thomas, J., concurring in denial of certiorari) ("I am unaware of any support in the American constitutional tradition or in this Court's precedent for the proposition that a defendant can avail himself of the panoply of appellate and collateral procedures and then complain when his execution is delayed.").

1  Circuit courts, including the Ninth Circuit, have consistently held that prolonged

2  incarceration under a sentence of death does not violate the Eighth Amendment. *See*

3  *McKenzie v. Day*, 57 F.3d 1493, 1493–94 (9th Cir. 1995) (en banc); *White v. Johnson*, 79

4  F.3d 432, 438 (5th Cir. 1996); *Stafford v. Ward*, 59 F.3d 1025, 1028 (10th Cir. 1995). Claim

5  25 is denied.

6  **Claim 26:**

7  Garza alleges that Arizona's death-qualification process for jurors violates the Sixth

8  and Fourteenth Amendments. (Doc. 27 at 372.) He concedes he did not present this claim

9  in state court. (*Id.*) He argues that its default is excused by the ineffective assistance of trial

10  and PCR counsel. (*Id.*) Ineffective assistance of trial counsel cannot serve as cause because

11  Garza did not independently exhaust a claim of ineffective assistance of trial counsel based

12  on the failure to raise this claim. *Carpenter*, 529 U.S. at 453; *Carrier*, 477 U.S. at 489–90.

13  Ineffective assistance of PCR counsel can only excuse claims of ineffective assistance of

14  trial counsel. *Martinez (Ernesto)*, 926 F.3d at 1225; *Pizzuto*, 783 F.3d at 1177; *Hunton*, 732

15  F.3d at 1126–27. The claim remains defaulted barred from federal review. It is also

16  meritless. "[D]eath qualification does not deny the capital defendant a fair guilt phase trial."

17  *Furman v. Wood*, 190 F.3d 1002, 1004–05 (9th Cir. 1999) (citing *Lockhart v. McCree*, 476

18  U.S. 162, 168–73, 174–77 (1986)); *see also Witherspoon v. Illinois,* 391 U.S. 510, 518–19

19  (1968). Claim 26 is denied.

20  **Claim 28:**

21  Garza alleges that Arizona's capital-sentencing scheme violates the Eighth and

22  Fourteenth Amendments because it creates a presumption of a sentence of death and

23  requires a defendant to affirmatively prove that his life should be spared. (Doc. 27 at 377.)

24  The Arizona Supreme Court's denial of the claim, *Garza*, 216 Ariz. at 71, 163 P.3d at 1021,

25  was neither contrary to nor an unreasonable application of clearly established federal law.

26  The Supreme Court has rejected the argument that "Arizona's allocation of the burdens of

27  proof in a capital sentencing proceeding violates the Constitution." *Walton*, 497 U.S. at

28  651. Claim 28 is denied.

**Claim 29:**

Garza alleges that Arizona's capital sentencing scheme violates the Eighth and Fourteenth Amendments because it requires a death sentence whenever one aggravating circumstance and no mitigating circumstances are found. (Doc. 27 at 378.) The Arizona Supreme Court's denial of the claim, *Garza*, 216 Ariz. at 74, 163 P.3d at 1024, was neither contrary to nor an unreasonable application of clearly established federal law.

Arizona's death penalty scheme allows certain, statutorily-defined aggravating factors to be considered in determining eligibility for the death penalty. For death to be an appropriate sentence, at least one aggravating factor must be found and the sentencer must determine that the mitigating circumstances do not warrant a lesser sentence. This scheme has been found constitutionally sufficient. *See Jeffers*, 497 U.S. at 774–77; *Walton*, 497 U.S. at 649–56; *Woratzeck v. Stewart*, 97 F.3d 329, 334–35 (9th Cir. 1996); *see also Smith v. Stewart*, 140 F.3d 1263, 1272 (9th Cir. 1998). Claim 29 is denied.

**Claim 30:**

Garza alleges that Arizona's capital sentencing scheme violates the Eighth and Fourteenth Amendments because it does not set forth objective standards to guide the sentencer in weighing aggravating factors against mitigating circumstances. (Doc. 27 at 379.) The Arizona Supreme Court's denial of the claim, *Garza*, 216 Ariz. at 74, 163 P.3d at 1024, was neither contrary to nor an unreasonable application of clearly established federal law.

The Supreme Court has held that in a capital case "the sentencer may be given 'unbridled discretion in determining whether the death penalty should be imposed after it has found that the defendant is a member of the class made eligible for that penalty.'" *Tuilaepa v. California*, 512 U.S. 967, 979–80 (1994) (quoting *Zant v. Stephens*, 462 U.S. 862, 875 (1983)); *see Franklin*, 487 U.S. at 179 ("[W]e have never held that a specific method for balancing mitigating and aggravating factors in a capital sentencing proceeding is constitutionally required."). Claim 30 is denied.

**Claim 31:**

Garza alleges that the trial court's failure to require special verdict forms for the jury to indicate its specific findings on mitigating circumstances violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments. (Doc. 27 at 380.) The Arizona Supreme Court's denial of the claim, *Garza*, 216 Ariz. at 74, 163 P.3d at 1024, was neither contrary to nor an unreasonable application of clearly established federal law.

As previously discussed, the Constitution does not require a capital sentencer to document its analysis of mitigating circumstances, as long as the sentencer considers all of the evidence. *See Jeffries v. Blodgett*, 5 F.3d 1180, 1197 (9th Cir. 1993) ("[D]ue process does not require that the sentencer exhaustively document its analysis of each mitigating factor as long as a reviewing federal court can discern from the record that the state court did indeed consider all mitigating evidence offered by the defendant") (citing *Parker*, 498 U.S. at 314–19); *see also Jeffers*, 38 F.3d at 418 (explaining that a defendant is not "entitled to a specific listing and discussion of each piece of mitigating evidence under federal constitutional law").

In addition, at the time of Garza's direct appeal, the Arizona Supreme Court independently reviewed each death sentence to determine the presence or absence of aggravating and mitigating factors and the weight to which the factors were entitled. *See State v. Gretzler*, 135 Ariz. 42, 54, 659 P.2d 1, 13 (1983). The court undertook such a review in Garza's case. *Garza*, 216 Ariz. at 171–72, 163 P.3d at 1021–22. Therefore, any error by the trial court in failing to document its consideration of mitigating evidence was cured by the Arizona Supreme Court's review of Garza's sentence.

Claim 31 is denied.

**Claim 32:**

Garza alleges that Arizona's capital sentencing scheme impermissibly limits the jury's full consideration of mitigation evidence by requiring mitigating circumstances to be proved by a preponderance of the evidence. (Doc. 27 at 381.) The Arizona Supreme Court's denial of the claim, *Garza*, 216 Ariz. at 74, 163 P.3d at 1024, was neither contrary to nor an unreasonable application of clearly established federal law.

The United States Supreme Court has upheld the constitutionality of Arizona's death penalty sentencing scheme, including its requirement that the defendant bear the burden of proving mitigating circumstances sufficiently substantial to call for leniency. *See Walton*, 497 U.S. at 650; *Kansas v. Marsh*, 548 U.S. 163, 173 (2006). Claim 32 is denied.

**Claim 33:**

Garza alleges  that Arizona's capital-sentencing scheme violates the Sixth, Eighth, and Fourteenth Amendments because it does not require the State to prove that the aggravating circumstances outweigh the mitigating circumstances. The Arizona Supreme Court's denial of the claim, *Garza*, 216 Ariz. at 74, 163 P.3d at 1024, was neither contrary to nor an unreasonable application of clearly established federal law. The Supreme Court has held that a state may assign the defendant the burden of proving that the mitigating circumstances outweigh the aggravating factors. *Marsh*, 548 U.S. at 173. Claim 33 is denied.

**Claim 34:**

Garza alleges that Arizona's capital-sentencing scheme violates the Fifth, Eighth, and Fourteenth Amendments because it denies defendants the benefit of proportionality review of their sentences. (Doc. 27 at 385.) The Arizona Supreme Court's denial of the claim, *Garza*, 216 Ariz. at 74, 163 P.3d at 1024, was neither contrary to nor an unreasonable application of clearly established federal law.

Proportionality review of death sentences is not constitutionally required. *See McCleskey v. Kemp*, 481 U.S. 279, 306 (1987) (citing *Pulley v. Harris*, 465 U.S. 37, 43 (1984)); *Allen*, 395 F.3d at 1018. Moreover, while "meaningful appellate review" is necessary to ensure that the death penalty is not imposed in an arbitrary or irrational fashion, *Pulley*, 465 U.S. at 54 (Stevens, J., concurring); *Parker*, 498 U.S. at 321, the Supreme Court has never held that "independent" or "de novo" review of death sentences is constitutionally mandated. *See Walton*, 497 U.S. at 655–56. The Constitution requires only that an appellate court "consider whether the evidence is such that the sentencer could have arrived at the death sentence that was imposed," not whether the appellate court itself

1    would have imposed a death sentence. *Clemons*, 494 U.S. at 749 (1990). Claim 34 is

2    denied.

3    **Claim 36:**

4         Garza alleges that Arizona's capital-sentencing scheme discriminates against

5    indigent male defendants with white victims, in violation of the Fourteenth Amendment.

6    (Doc. 36 at 387.) The Arizona Supreme Court's denial of the claim, *Garza*, 216 Ariz. at

7    74, 163 P.3d at 1024, was neither contrary to nor an unreasonable application of clearly

8    established federal law.

9         Clearly established federal law holds that "a defendant who alleges an equal

10   protection violation has the burden of proving 'the existence of purposeful discrimination'"

11   and must demonstrate that such discrimination "had a discriminatory effect" on him.

12   *McCleskey*, 481 U.S. at 292 (quoting *Whitus v. Georgia*, 385 U.S. 545, 550 (1967)).

13   Therefore, to prevail on this claim, Garza "must prove that the decisionmakers in his case

14   acted with discriminatory purpose." *Id.* He does not attempt to meet this burden. He offers

15   no evidence specific to his case that would support an inference that his sex, race, economic

16   status, or the race of his victims played a part in his sentence. *See Richmond v. Lewis*, 948

17   F.2d 1473, 1490–91 (1990), *vacated on other grounds*, 986 F.2d 1583 (9th Cir. 1993)

18   (holding that statistical evidence that Arizona's death penalty is discriminatorily imposed

19   based on race, sex, and socioeconomic background is insufficient to prove that

20   decisionmakers in petitioner's case acted with discriminatory purpose). Claim 36 is denied.

21                    **CERTIFICATE OF APPEALABILITY**

22        Pursuant to Rule 22(b) of the Federal Rules of Appellate Procedure, a petitioner

23   cannot take an appeal unless a certificate of appealability has been issued by an appropriate

24   judicial officer. Rule 11(a) of the Rules Governing Section 2254 Cases provides that the

25   district judge must either issue or deny a certificate of appealability when it enters a final

26   order adverse to the applicant. If a certificate is issued, the court must state the specific

27   issue or issues that satisfy 28 U.S.C. § 2253(c)(2).

28

Under § 2253(c)(2), a certificate of appealability may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." This showing can be established by demonstrating that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner" or that the issues were "adequate to deserve encouragement to proceed further." *Slack*, 529 U.S. at 484 (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). For procedural rulings, a certificate of appealability will issue only if reasonable jurists could debate whether the petition states a valid claim of the denial of a constitutional right and whether the court's procedural ruling was correct. *Id.*

The Court finds that reasonable jurists could debate its resolution of Claim 1, alleging that Garza is intellectually disabled, and Claim 7(A), alleging ineffective assistance of counsel for failure to present mitigating evidence.

## CONCLUSION

The Court has considered Garza's claims and determined that none establish entitlement to habeas relief.

Based on the foregoing,

**IT IS HEREBY ORDERED** that Garza's Petition for Writ of Habeas Corpus (Doc. 27) is **DENIED**. The Clerk of Court shall enter judgment accordingly.

**IT IS FURTHER ORDERED** granting a certificate of appealability with respect to Claims 1 and 7(A).

. . .

. . .

. . .

. . .

. . .

. . .

. . .

1     **IT IS FURTHER ORDERED** that the Clerk of Court forward a courtesy copy of

2   this Order to the Clerk of the Arizona Supreme Court, 1501 W. Washington, Phoenix, AZ

3   85007-3329.

4

5     Dated this 9th day of December, 2021.

6

7

8

9   _____

    Susan R. Bolton
10   United States District Judge

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28